UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

             Plaintiff,

                                      Case No. 13-cr-20772

vs.                                 HON. GERSHWIN A. DRAIN

RASMIEH ODEH,

             Defendant.

_____/

**ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE EVIDENCE PRODUCED BY THE ISRAEL MILITARY OCCUPATION LEGAL SYSTEM [#59], DENYING DEFENDANT'S MOTION TO EXCLUDE THE SPECIFIC CHARGES AND CONVICTION EMANATING FROM DEFENDANT'S ARREST AND PROSECUTION [#60], GRANTING DEFENDANT'S MOTION TO EXCLUDE ANY REFERENCE TO TERRORIST OR TERRORIST ACTIVITY [#61], GRANTING THE GOVERNMENT'S MOTION TO EXCLUDE EVIDENCE RELATING TO CLAIMS OF INNOCENCE AND ALLEGATIONS OF TORTURE [#66], GRANTING THE GOVERNMENT'S MOTION TO RULE ADMISSIBLE EVIDENCE PRODUCED PURSUANT TO MUTUAL LEGAL ASSISTANCE TREATY [#67] AND GRANTING THE GOVERNMENT'S MOTION TO EXCLUDE ANY ARGUMENT IN SUPPORT OF ALLEGED SELECTIVE PROSECUTION [#73]**

**I.     INTRODUCTION**

On October 22, 2013, Defendant RasmiehYousef Odeh was charged with unlawful procurement of naturalization in violation of 18 U.S.C. § 1425(a). Trial is scheduled to commence on November 4, 2014. Presently before the Court are various pretrial motions.

Specifically, the following motions are presently before the Court: (1) Defendant's Motion *in Limine* to Exclude all Evidence Created and Produced by the Israeli Military Occupation Legal System [#59]; (2) Defendant's Motion *in Limine* to Exclude all Mention of the Specific Charges and

Conviction Emanating from Defendant's Arrest and Prosecution [#60]; (3) Defendant's Motion *in Limine* to Exclude from Trial any Reference to Defendant as a Terrorist or that she was a Member of a Terrorist Group or Involved in Terrorist Activities [#61]; (4) the Government's Motion *in Limine* to Exclude Evidence Relating to Claims of Innocence of Underlying Foreign Convictions and Allegations of Torture [#66]; (5) the Government's Motion *in Limine* to Rule Admissible for Trial Foreign Evidence Produced Pursuant to Mutual Legal Assistance Treaty [#67]; and (6) the Government's Motion *in Limine* to Exclude at Trial any Claim, Questioning or Argument in Support of Alleged Selective Prosecution [#73]. The motions are fully briefed and a hearing was held October 21, 2014.[1]

## II.     FACTUAL BACKGROUND

In December of 1994, Defendant, a citizen of Jordan, filed an Application for an Immigrant Visa in order to immigrate to the United States. The Application required that Defendant list all of the places she had lived for six months or longer since the age of sixteen. Defendant stated that she had lived in Amman, Jordan from 1948 onward. The Application also asked whether Defendant had ever been convicted of committing two or more offenses for which the aggregate sentences were five years or more. Defendant answered "no" to this question. Further, question thirty-four asked the following: "Have you ever been arrested, convicted, or ever been in a prison or almshouse, have you ever been the beneficiary of a pardon or an amnesty[?]" Defendant also answered "no" to question thirty-four on the Application. Defendant received a visa on April 18, 1995, and immigrated to the United States.

---

[1] The Government filed a supplemental brief on October 22, 2014 to address legal issues raised by the Court at the October 21, 2014 hearing. *See* Dkt. No. 112.

On June 4, 2004, Defendant filed an Application for Naturalization with the United States Citizenship and Immigration Service ("USCIS"). An Application for Naturalization asks various questions related to the applicant's criminal history. Specifically, Defendant was asked to answer the following questions:

> Have you **EVER** been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason?
> Have you **EVER** been charged with committing any crime or offense?
> Have you **EVER** been convicted of a crime or offense?
> Have you **EVER** been in jail or prison?

Ind., ¶¶ 23-26 (emphasis in original). Defendant answered "no" to all of the above questions. She was further asked whether she had "EVER given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent . . . exclusion[.]" *Id.* at ¶ 28. Defendant also answered "no" to this question.

Defendant was interviewed by an immigration officer on November 3, 2004, in Detroit, Michigan. During the interview, the immigration officer reviewed Defendant's Application for Naturalization with her. Defendant made seventeen corrections to her application. None of the corrections related to her answers concerning her criminal history.

The charge giving rise to the instant action concerns Defendant's purported failure to honestly answer questions related to her criminal history on both her Application for Immigrant Visa and Application for Naturalization. Specifically, on May 5, 1969, Defendant was charged, along with four other individuals, with various crimes relating to membership in an unlawful organization, specifically the National Front for the Liberation of Palestine ("PFLP"), which orchestrated bombings of a grocery store resulting in the death of two civilians, as well as a building housing the British Consulate, damaging the building.

-3-

After a trial by the Israeli military court, Defendant was convicted of the following charges:

## FIRST COUNT

(Against Defendants No. 1[2], No. 2, No. 3 and No. 5)

**Nature of Offense** – Membership in an unlawful organization in accordance with Regulation 85(1)(A) of the 1945 (Emergency) Defense Regulations.

**Particulars of Offense** – On or about February 21, 1969, in Jerusalem, above defendants were members of an organization known as the "National Front for the Liberation of Palestine," which is an unlawful organization as described in Regulation No. 84(1)(A) of the 1945 (Emergency) Defense Regulations.

## SECOND COUNT

(Against Defendants No. 1, No. 2, No.3)

**Nature of Offense** – Placing a bomb as described in Regulation 58(B) and 66 as of the 1945 (Emergency) Defense Regulations.

**Particulars of Offense** – The above defendants: Defendant No. 2–the major offender, and Defendants 1 and 3 as accomplices [end of line cut off] placed explosives in the hall of the SuperSol in Jerusalem, with the intention of causing death or injury to any [end of line cut off] and/or cause damage to property. One of the bombs exploded and caused the death of Leon Kannar and Edward Jaffe, May Their Memory Be a Blessing, as well as injuries to a multitude of people.

## FOURTH COUNT

(Against Defendant No. 1)

**Nature of the Offense** – Placing a bomb as described in Regulation 58(d) of the 1945 (Emergency) Defense Regulations.

**Particulars of Offense** – On or about February 21, 1969, in Jerusalem, the above defendant placed a bomb in the building housing the British Consulate. The purpose of placing it was to cause death or injury to any person and/or cause damage to the property. The bomb was discovered without causing damage.

## PART SEVEN (AGAINST DEFENDANTS NO.1 [F] AND NO. 4)

---

[2] Defendant was "Defendant No. 1" in the 1969 Indictment.

> **Nature of Offense** –placing a bomb according to Regulation (58) Bet [B] and –66 of Defense Regulations (Emergency) 1945.
>
> **Details of Offense** – The aforementioned defendants –defendant No. 1 as the main perpetrator and defendant no. 4 as an accomplice.  On the date of 25.2.69 or proximate to that day, in Jerusalem in the building of the British Consulate, they placed a bomb for the purpose of causing death or terror to people or damage to property.  The bomb exploded and the building was damaged.

*See* Dkt. No. 79 at 2-4.

Defendant asserts that she was continuously and brutally beaten and raped during the first forty-five days of her detention.  She further claims that she was prevented access to a lawyer until she signed a confession prepared by her interrogators.  Her purported confession was written in Hebrew, a language she does not read nor understand.  Defendant maintains that her confession was the product of the torture she suffered at the hands of the Israeli military.

Defendant immediately recanted her confession when she was finally brought before the military court, which chose to disbelieve her claims of torture. Defendant was convicted and sentenced to ten years imprisonment on count one and to life imprisonment on counts on counts four and seven.[3]  After Defendant served ten years of her sentence, the Israeli government commuted her sentence and she was released as part of a prisoner exchange with the PFLP.

## III.    LAW & ANALYSIS

### A.    Evidence Produced Pursuant to Mutual Legal Assistance Treaty [#59, #67]

The parties have filed competing motions with respect to evidence produced pursuant to the Treaty with Israel on Mutual Legal Assistance in Criminal Matters.  In 1998, the United States entered into a Treaty with Israel entitled "Treaty Between the Government of the United States of

---

[3]  It is unknown what sentence was imposed on count two.  Ind., ¶ 6.

America and the Government of the State of Israel on Mutual Assistance in Criminal Matters."
Article 9 of the Treaty states in relevant part:

> Official records produced pursuant to this Article may be authenticated . . . by the official in charge of maintaining them in the manner specified by the Requesting State, which may include the use of Form B appended to this Treaty, if so requested. *No further authentication or certification shall be necessary in order for such records to be admissible in evidence in proceedings of the Requesting State*.

Dkt. No. 67, Ex. A, Article 9, ¶2 (emphasis supplied).

The Government issued a formal request pursuant to the Treaty in 2011. Israel responded by producing hundreds of pages of documents in Hebrew, which include trial transcripts, police reports, identity documents, fingerprint cards, and other law enforcement documents. When translated, the documents are approximately 1,400 pages in length.

Defendant asserts that the Government should be precluded from introducing evidence created and produced by the Treaty because it is the product of an unfair system without due process of law. Defendant argues that after the 1967 Six-Day War, Israel set up a "belligerent" occupation in the West Bank. A temporary military system of government was created, wherein the Israeli military commander, with full judicial authority over the territories in the West Bank, established military courts to try all offenses connected with security. Defendant points the Court to a now declassified cable with the subject heading "Torture of Arab Prisoners in Jerusalem and the West Bank." The cable was prepared in 1978 by Alexandra Johnson, Vice Consul, Post Visa Officer in Jerusalem, and sent to the Secretary of State. The cable contains Johnson's conclusions concerning the military courts and prisons in the West Bank. Specifically, Johnson concluded that:

> The evidence suggests that the use of brutality in the interrogation of Arab prisoners arrested in security cases may be widespread, and possibly even common practice. It is difficult to see how this could be so unless the practice were "officially ignored" and perhaps tacitly condoned. In view of the accused's confession in securing

-6-

> convictions in this type of case, one may well question the significance the military
> courts seeming to follow some of the outward forms of due process.  It may well be
> concluded that this is less a pursuit of justice than an exercise with certain political
> aims in view.

*See* Dkt. No. 59, Ex. 2.  A 1979 Amnesty International Report confirmed Johnson's conclusions.

The 1987 Landau Commission Report, headed by a retired Israeli Supreme Court Justice,

determined that the Israeli military charged with interrogation of detainees suspected of security

offenses were systematically lying in the military courts about their use of physical force in

obtaining confessions.

Additional evidence of the lack of due process comes from the fact that the judges of the

military courts were either military officers or reserve officers.  Moreover, pursuant to Military

Order No. 78, a person arrested for suspected security offenses could be held for up to eighteen days

without access to a judge or lawyer.  The eighteen day period could be extended for a period of up

to six months  in order to continue the interrogation and obtain a signed confession.  Defendant

maintains that she was arrested without a warrant, denied access to a lawyer and sadistically tortured

and raped in order to secure her confession.  She asserts that this Court cannot allow the admission

of evidence that is the product of the Israeli military court system, which has documented proof that

it failed to comport with this country's concepts of fairness and due process.

The Court of course agrees that confessions obtained through the use of torture and rape are

antithetical to the concepts of fairness, due process and basic human rights.  Moreover, the Court

accepts as credible Defendant's claims of torture and is not unaffected by the inhumane

circumstances of her detention in the West Bank.  However, the issue here is whether Defendant

provided false answers on her Visa and Naturalization Applications.  The validity of Defendant's

conviction is not an issue for the jury's determination.  As the Court noted during the hearing in this

-7-

matter, it will not be retrying Defendant's convictions for membership in an unlawful organization and her activities related to the bombings of the Supersol grocery store or the British Consulate in Jerusalem in the early part of 1969.

In support of her argument, Defendant primarily relies on *Small v. United States*, 544 U.S. 385 (2005), where the Supreme Court stated in dicta that "foreign convictions differ from domestic convictions" when the conviction stems from "a legal system that is inconsistent with [the] American understanding of fairness." *Id.* at 389 (citing U.S. Dept. of State, Country Reports on Human Rights Practices for 2003, Submitted to the House Committee on International Relations and the Senate Committee on Foreign Relations, 108th Cong., 2d Sess., 702-705, 1853, 2023 (Joint Comm. Print 2004)). However, *Small* is distinguishable from the instant matter because it has nothing to do with the admission of evidence pursuant to a Mutual Legal Assistance Treaty.

The issue in *Small* concerned the statutory interpretation of 18 U.S.C. § 922(g)(1), which makes it "unlawful for any person . . . who has been *convicted in any court* of, a crime punishable by imprisonment for a term exceeding one year . . . to possess . . . any firearm." *Id.* at 387 (emphasis in original). The specific question before the *Small* court was whether "the words 'convicted in any court' . . . apply only to convictions entered in [] domestic courts" or whether foreign convictions could also serve as the predicate offense for a violation under the statute. *Id.* As such, *Small* did not concern the admissibility of foreign evidence produced pursuant to a United States Treaty, rather *Small* analyzed whether the defendant's criminal conviction in Japan constituted an element of the offense, not whether the government could admit evidence from a foreign judgment of conviction to establish the elements of the offense. The *Small* court resolved the issue before it on the basis of statutory construction and found that "the phrase 'convicted in any court' applies domestically, not

-8-

extraterritorially." *Id*. at 390-91.  In so concluding, the *Small* court further noted that the statute did not involve a "special subject matter" such as "immigration or terrorism, where one could argue that foreign convictions would seem especially relevant."  *Id*. at 391.

The Government maintains that the documents at issue were produced in accordance with the Treaty, do not require further authentication and are admissible.  The Court agrees.  "[A]ll treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl.2.  Courts are to follow and apply treaties in good faith. *Tucker v. Alexandroff*, 183 U.S. 424, 437 (1902) ("Treaties of every kind are to receive a fair and liberal interpretation according to the intention of the contracting parties, and are to be kept with the most scrupulous good faith.").

The evidence produced has been properly authenticated according to the Treaty.  The entire production contains a certification from the State of Israel, Directorate of Courts to the United States Department of Justice, Office of International Affairs, dated May 31, 2011, certifying the response to the Government's request.  Additionally, there are individual attestations which cover portions of the production, and together cover all of the documents produced.

Defendant's remaining challenges have no merit.  As an initial matter, Defendant fails to provide any authority, controlling or otherwise, wherein a Court excluded evidence produced in accordance with a Mutual Legal Assistance Treaty's requirements because the evidence failed to comply with the Federal Rules of Evidence.  Defendant's challenges to the admission of the subject evidence pursuant to Federal Rules of Evidence 901 and 902 are misplaced because authentication here is pursuant to the Treaty with Israel on Mutual Legal Assistance in Criminal Matters.

-9-

Defendant also relies on the United States Court of Appeals for the Ninth Circuit's decision in *United States v. Perlmuter*, 693 F.2d 1290 (9th Cir. 1982), wherein the defendant, charged with the same offense as Defendant herein, argued that the district court erred by admitting his criminal records from Israel. *Id.* at 1292. However, the evidence at issue in *Perlmuter* was not obtained by a Mutual Legal Assistance Treaty. Rather, the evidence at issue had been obtained by an immigration investigator, serving as liaison to Interpol, who requested a certified copy of the defendant's criminal records held by the Israeli National Police. *Id.* As such, *Perlmuter* is distinguishable from the circumstances herein.

Lastly, Defendant's arguments concerning Federal Rule of Evidence 604 are similarly misplaced. "Federal Rule of Evidence 604 applies only to interpreters who translate the testimony of witnesses on the stand and does not apply to language experts." *United States v. Armijo*, 5 F.3d 1229, 1235 (9th Cir. 1993); *see also* Wright and Gold, Federal Practice and Procedure, Evidence 2d § 6053 ("Rule 604 also does not apply to witnesses who take the stand and testify concerning the meaning in English of documents or other out of court statements. These are conventional expert witnesses who are subject to cross-examination, Rule 702, and the requirements of Rule 603."). As such, Defendant's challenges may be raised during cross-examination of the Government's language translation experts. Her arguments go to the weight to be accorded to the translators' expert testimony rather than its admissibility.

Based on the foregoing, the documents produced pursuant to the Mutual Legal Assistance Treaty are admissible. At the hearing in this matter, the Government indicated that it has narrowed the group of documents it seeks to introduce at trial from the 1,400 translated documents to roughly 100 documents. However, the Government is hereby on notice that in order to prevent undue delay

-10-

by the presentation of cumulative evidence, the Court will exercise its right to exclude any evidence it deems inadmissible under Rule 403 as cumulative.

Accordingly, the Government's Motion *in Limine* to Rule Admissible for Trial Foreign Evidence Produced Pursuant to Mutual Legal Assistance Treaty is granted. Defendant's Motion *in Limine* to Exclude All Evidence Created and Produced by the Israel Military Occupation Legal System is denied.

### B.   Defendant's Motion *in Limine* to Exclude Mention of the Specific Charges and Conviction Emanating from Defendant's Arrest and Prosecution [#60]

In the instant motion, Defendant moves for an Order excluding any mention of the specific charges and the specific conviction that was the subject of her arrest and conviction by the Israeli military system. Defendant argues that to allow the Government to introduce her arrest and conviction for bombings would distract the jury from the narrow questions presented by the Indictment and will deny the Defendant any possibility of a fair trial. Defendant maintains this evidence is irrelevant. Alternatively, Defendant maintains that if the Court deems this evidence relevant to the issues herein, it should nonetheless be excluded because its prejudicial effect far outweighs any relevance.

Rule 401of the Federal Rules of Evidence permits the admission of only relevant evidence. Evidence that is irrelevant is inadmissible. Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence. Fed. R. Evid. 401. Rule 403 permits the exclusion of relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence. *See* Fed. R. Evid. 403. "'Unfair prejudice' as used in Rule 403 does not mean the damage

-11-

to a [party's] case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Schrock*, 855 F.2d 327, 335 (6th Cir. 1988) (citations omitted).

The Government asserts that evidence of the specific charges that Defendant was arrested, convicted and imprisoned for in Israel are relevant to the Indictment herein. The nature of the crimes is directly related to two of the elements the Government will be required to prove to secure Defendant's conviction for violation of 18 U.S.C. § 1425(a): materiality and procurement. Specifically, the Government must show that Defendant made "material" false statements on her Naturalization Application. The United States Supreme Court in *Kungys v. United States*, 485 U.S. 759 (1988), held that misrepresentations are "material" when "they ha[ve] a natural tendency to influence the decision" of USCIS. *Id.* at 770. The procurement element is demonstrated when a citizen obtains United States citizenship as a result of the material false statement because "it is 'fair to infer that the citizen was actually ineligible[]'" for naturalization. *United States v. Mensah*, 737 F.3d 789, 808 (1st Cir. 2013) (quoting *United States v. Latchin*, 554 F.3d 709, 713-14 (7th Cir. 2009)).

In order to be eligible for citizenship, Defendant was required to establish: (1) she has been lawfully admitted for permanent residence, (2) satisfies the residency requirements, and (3) has been a person of good moral character. 8 U.S.C. §§ 1427 and 1429. In order to establish materiality, the Government will introduce the testimony of Douglas Pierce, Section Chief for the USCIS. Mr. Pierce will testify that a conviction for participating in a bombing that resulted in the death of two civilians would be material because it would be relevant to Defendant's good moral character. An arrest for minor offenses such as jay-walking or loitering would not satisfy the materiality

requirement because such crimes do not show lack of moral character.  Mr. Pierce will also testify

that such a conviction would call into question whether Defendant obtained her permanent resident

status lawfully because anyone who has engaged in the type of activity for which she was convicted

is not admissible to the United States as a permanent resident.  *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I).[4]


As such, contrary to Defendant's arguments, the specific crimes for which she was convicted

in 1969 are directly relevant to the materiality element of unlawful procurement of naturalization.

At the hearing, Defendant offered to stipulate that she was convicted of a "serious" crime.  However,

[t]he government is not required to accept the defendant's stipulation, and the defendant has no right

to selectively stipulate to particular elements of the offense."  *United States v. Boyd*, 640 F.3d 657,

668 (6th Cir. 2011).  Moreover, Defendant's contention that if the Government is permitted to

introduce the specifics of her 1969 conviction, then the door will be opened allowing her to attack

the legitimacy of her conviction is erroneous.  Again, the validity of Defendant's conviction by the

Israeli military court is not an issue the jury has to decide in order to determine whether she lied on

her Visa and Naturalization Applications.

Similarly, in order to prove unlawful procurement, the Government must produce evidence

sufficient to raise a fair inference that Defendant was ineligible for naturalization.  *Kungys*, 485 U.S.

---

[4]  While the Court agrees that the Government must be allowed to introduce the charges
and conviction from 1969, as will be discussed in the next section, the Court finds that the terms
"terrorist" and "terrorist activities" are unfairly prejudicial within the meaning of Rule 403 of the
Federal Rules of Evidence.  Therefore, these terms shall not be introduced at trial and Mr. Pierce
may not use these terms during his testimony.  Rather, he may testify that Defendant's
conviction for bombing the Supersol grocery store and the building housing the British consulate
are crimes that render her ineligible to immigrate under the Immigration and Nationality Act.  He
may not inform the jury that such crimes are defined as "terrorist activities" under the Act.

at 783-84.  A minor offense would not raise a fair inference that Defendant was ineligible for naturalization because it would not necessarily impugn her good moral character, nor would it demonstrate her ineligibility for admission as a lawful permanent resident.  The Immigration and Nationality Act lists specific crimes which render an alien inadmissible for entry into the United States, including crimes related to any activity involving the use of any "explosive . . . or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." 8 U.S.C. § 1182(a)(3)(B)(i)(I).  Defendant was charged and convicted in 1969 for activities including, but not limited to, "plac[ing] explosives in the hall of the Supersol in Jerusalem, with the intention of causing death or injury . . . ." Dkt. No. 79 at 2.

Lastly, Defendant's contention that the unfair prejudice resulting from the admission of the specifics of her conviction outweighs the relevance of her convictions is without merit.  Her conviction for participating in the bombing of the SuperSol grocery store and the building housing the British Consulate are directly related to the elements of materiality and procurement.  The probative value of this evidence is overwhelming. Without this evidence, the Government will be unable to establish two elements of the crime of unlawful procurement of naturalization.  Based on the foregoing considerations, Defendant's Motion is denied.

**C.**   **Defendant's Motion** *in Limine* **to Exclude Any Reference to the Defendant as a "Terrorist" or That She Was a Member of a Terrorist Group or Involved in "Terrorist Activities" [#61]**

Here, Defendant argues that the words "terrorist" and "terrorism" are highly prejudicial and completely irrelevant to the charges before the Court.  As such, the Government should be precluded from using those words to describe Defendant or the nature of her conviction.  Defendant contends that the Government can establish all of the elements of the Indictment without resorting to the use

-14-

of these highly prejudicial words.

The Government counters that the terms "terrorist" and "terrorism" are directly related to the elements of materiality and procurement.  Specifically, the Government points to the fact that Defendant was convicted of membership in an unlawful organization, specifically the PFLP.  By failing to disclose this conviction, the USCIS was unaware that she was a former member of the PFLP, which was designated as a terrorist organization in 1997 (after she sought lawful permanent resident status, but prior to her application for citizenship).  The Government argues that "[i]t is precisely because the United States considered the PFLP a terrorist organization that defendant's conviction for membership in that organization was material to USCIS."  Dkt. No. 71 at 3.

However, at the time Defendant was a member of the PFLP in 1969, it was not considered a 'terrorist organization' by the United States.  The 1969 Indictment does not label the PFLP a "terrorist organization," rather it charged Defendant with being a member of an "unlawful organization" under the 1945 (Emergency) Defense Regulations.  To rely on the 1997 designation of the PFLP as a "terrorist" organization when there is no evidence in the record to suggest that Defendant was a member of that organization when she applied for her immigrant visa is highly prejudicial and will have an undue tendency to improperly influence the jury's verdict by appealing to its fears of terrorists and terrorist activities.  It goes without saying that the American public is particularly emotional when it comes to terrorism and the threat of terrorism, not only due to the attacks on the World Trade Center in 2001, but also due to the public's present awareness and fears stemming from the activities of a certain group, which in recent months has inflicted brutal violence upon Americans and others overseas. While the Court agrees that past membership in an organization presently designated a terrorist organization would have been material to USCIS, the

probative value of this evidence is substantially outweighed by the danger of unfair prejudice to the Defendant.  Fed. R. Evid. 403; *Schrock*, 855 F.2d at 335.

The Government further argues that Defendant's failure to disclose her conviction is relevant to showing that she was ineligible for naturalization.  Specifically, the Government seeks to introduce Mr. Pierce's testimony that Defendant obtained her permanent resident status unlawfully because an individual who has "engaged in terrorist activity" is statutorily barred from becoming a lawful permanent resident.  *See* 8 U.S.C. § 1429 ("[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this Chapter.")   As such, Defendant's criminal history would have supported a decision by USCIS to deny her naturalization because she had fraudulently immigrated to the United States by failing to disclose her conviction.  The Immigration and Nationality Act's definition of "terrorist activity" encompasses the same activities for which Defendant was convicted in 1969:

> As used in this Act, the term 'terrorist activity' means any activity . . .which involves any of the following:
>
>     \*                     \*                     \*
> (V) the use of any–
>
>     \*                     \*                     \*
> (b) explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b).  While the Government is entitled to introduce evidence of a sensitive or gruesome nature to prove the elements of an offense, "[s]uch evidence, of course, remains subject to FRE 403 and may be excluded if its probative value is substantially outweighed

-16-

by the danger of unfair prejudice." *Boyd*, 640 F.3d at 669 n.2.

Here, the Government may still establish that Defendant unlawfully obtained her permanent resident status by explaining that her criminal conviction is one that rendered her ineligible for permanent resident status and, consequently naturalization because she was convicted of engaging in activities involving the use of "explosive[s] . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." 8 U.S.C. § 1182(a)(3)(B)(i)(I).

The Government's suggestion that the terms "terrorist" and "terrorism" will not improperly influence the jury because those terms are used by Congress in the Immigration and Nationality Act is without merit. These terms are highly prejudicial and create a danger of improperly influencing the jury's verdict. The Government will still be able to establish the elements of materiality and procurement without using these terms. As previously discussed, Mr. Pierce is free to testify that Defendant's conviction for bombings render her ineligible to immigrate under the Immigration and Nationality Act. As such, if she had disclosed her 1969 conviction, she could not establish her eligibility for citizenship because she was not lawfully admitted as a permanent resident. Based on the foregoing considerations, Rule 403 of the Federal Rules of Evidence preclude the admission of the terms "terrorist," terrorist group" and "terrorist activity" and Defendant's Motion is granted.

   D.    **Government's Motion** *in Limine* **to Exclude Evidence Relating to Claims of Innocence of Underlying Foreign Convictions and Allegations of Torture [#66]**

Here, the Government argues that evidence of Defendant's factual guilt or innocence for the bombings and membership in the PFLP is irrelevant to the issue before this Court–whether Defendant knowingly made a false statement on her naturalization application in order to procure

naturalization unlawfully. The level of due process afforded to Defendant in Israel is not in issue herein and should be precluded from admission at trial. Alternatively, the Government argues that even if this evidence is relevant, it should nonetheless be excluded because any probative value would be significantly outweighed by the risk of misleading the jury. The jury may render a verdict based on whether it believes Defendant was tortured during her detention, instead of based on whether she in fact lied on her Naturalization Application.

The Court has already concluded that Defendant's factual guilt or innocence for the crimes for which she was convicted in Israel is irrelevant to whether or not she truthfully answered questions on her Naturalization Application. The questions ask about all convictions, and not only convictions that are obtained consistent with due process of law. The mere fact of a conviction is relevant here, and not whether the applicant is innocent or was convicted based on a coerced confession.

Additionally, because the Court has decided to reconsider its earlier decision regarding the intent element of the charge at issue herein, it must similarly exclude all evidence of the torture suffered by Defendant during her detention in 1969. Upon reconsideration, the Court has concluded § 1425(a) is a general intent crime, therefore Defendant's post-traumatic stress disorder defense is inadmissible to negate *mens rea*. The Court's conclusions with respect to this issue are set forth in a separate opinion. As previously noted, the Court finds Defendant's claims of torture to be credible and does not intend with the instant decision to suggest a callous disregard for the inhumane and deplorable physical and emotional abuse that Defendant may have endured during her detention. Yet, the law in this circuit is clear that this type of defense is unavailable to negate the *mens rea* of a general intent crime. *United States v. Kimes*, 246 F.3d 800, 806 (6th Cir. 2001); *United States v.*

-18-

*Gonyea,* 140 F.3d 649, 651 (6th Cir. 1998). Therefore, Defendant's post-traumatic stress disorder defense is irrelevant and inadmissible.  As such, the Government's motion to exclude evidence of innocence and torture is granted.

> **E.    Government's Motion *in Limine* to Exclude at Trial Any Claim, Questioning or Argument in Support of Alleged Selective Prosecution [#73]**

In the instant motion, the Government seeks to preclude any claim, questioning or argument relating to the Government's purported selective prosecution.  Defendant has not filed a Response to the instant motion.  In any event, this motion is due to be granted based on this Court's Order denying Defendant's Motion to Dismiss the Indictment based on Selective Prosecution.  *See* Dkt. No. 98 at 3-7, 16.  Accordingly, Defendant is precluded from introducing any argument concerning selective prosecution.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion *in Limine* to Exclude all Evidence Created and Produced by the Israeli Military Occupation Legal System [#59] is DENIED.

Defendant's Motion *in Limine* to Exclude all Mention of the Specific Charges and Conviction Emanating from Defendant's Arrest and Prosecution [#60] is DENIED.

Defendant's Motion *in Limine* to Exclude from Trial any Reference to Defendant as a Terrorist or that she was a Member of a Terrorist Group or Involved in Terrorist Activities [#61] is GRANTED.

The Government's Motion *in Limine* to Exclude Evidence Relating to Claims of Innocence of Underlying Foreign Convictions and Allegations of Torture [#66] is GRANTED IN PART.

The Government's Motion *in Limine* to Rule Admissible for Trial Foreign Evidence Produced Pursuant to Mutual Legal Assistance Treaty [#67] is GRANTED.

The Government's Motion *in Limine* to Exclude at Trial any Claim, Questioning or Argument in Support of Alleged Selective Prosecution [#73] is GRANTED.

SO ORDERED.

Dated: October 27, 2014

S/Gershwin A. Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 27, 2014.

s/Felicia M. Moses for Tanya Bankston

TANYA BANKSTON
Case Manager

-20-