UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,  CRIMINAL NO. 2:13-cr-20772

Plaintiff,  HONORABLE GERSHWIN A. DRAIN

vs.

D-1 RASMIEH YOUSEF ODEH,

Defendant.
_____/

## SENTENCING MEMORANDUM OF THE UNITED STATES

### INTRODUCTION

Following a jury trial in November, 2014, Defendant Rasmieh Odeh was found guilty of having unlawfully procured her United States citizenship, in violation of 18 U.S.C. § 1425(a).  The guideline range for defendant's offense is either 12-18 months or, if the Court determines that she should be assessed two points for obstruction, 15-21 months.  The argument for obstruction is discussed below, and is based on defendant Odeh's materially false trial testimony as well as her continued efforts throughout that testimony to obstruct these proceedings, by violating the Court's rulings restricting that testimony.  For the reasons stated below, the Court either should upward depart from the guideline range and select a range which reflects the fact that Defendant's offense is not in the "heartland" of

§ 1425 cases.  *See* U.S.S.G. Ch. 1, Pt. A, p.s. 4(b).  In the alternative, applying the sentencing factors of 18 U.S.C. § 3553(a), if the Court declines to upward depart to a higher sentencing guideline range, it should nevertheless vary upward from the advisory guideline range, and instead impose a sentence in the range of 5-7 years (60-84 months), commensurate with what other courts have imposed in similar cases and in proportion to the harm such offenses wreak on the United States immigration system.

ENHANCEMENT FOR OBSTRUCTION

In the Presentence Report, the Probation Department declined to adjust the offense level for obstruction pursuant to U.S.S.G. § 3C1.1, noting that "The Court is in the best position to determine whether the defendant engaged in obstructive conduct in the trial, warranting an adjustment for obstruction of justice." Presentence Report, ¶ 11.  The government seeks the enhancement on two bases: first, the defendant provided materially false trial testimony.  *See United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993).  Moreover, as a separate and independent basis, defendant obstructed the proceedings by repeatedly and intentionally disregarding and violating this Court's rulings and admonitions that her claims of torture in Israel were not admissible and were not to be related to the jury.

At trial, the government proved that Defendant's application for an immigrant visa contained a false material statement, specifically the question of each place she had lived since age 16. *See* question 21 of Government Exhibit 2A, immigrant visa application. This question was important because a truthful answer would have shown to immigration authorities that defendant spent ten years in prison in Israel, which then would have led to discovery of her conviction in Israel, after which she never would have been granted an immigrant visa. The false answer on the immigrant visa was incorporated into her naturalization application. Question 23 of the Naturalization Application, Government Exhibit 1, asked whether defendant had "**EVER** given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" Question 24 asked whether defendant had "**EVER** lied to any U.S. government official to gain entry or admission into the United States?" Those questions were alleged to be part of the conduct which constituted the charged crime. *See* Indictment, ¶¶ 12, 28-29. Thus, at trial, a critical issue was whether defendant had given those answers, knowing they were false.

In order to dispute that she knew the answers were false, defendant testified that her brother wrote out for her what to fill in on the application for an immigrant visa. Defendant testified that her brother did this because he had lived in the

United States since age 17, receiving a college degree and a Ph.D. and thus was a fluent English speaker, while she spoke no English.  Defendant's testimony at trial was internally inconsistent.  She first testified that her brother wrote the entire set of answers, and that she then copied them into a new form.  She could give no explanation for why she would have recopied a fully filled-out form; why her brother had provided false information about her whereabouts during her three years in Lebanon and regarding her having been convicted of an offense; or why he had not listed himself as someone assisting in the filling out of the form in the place required in such a case.  However, she later testified that she had personally filled in the biographical information, but not the other answers.  Yet the writing for the biographical information matches both the writing on her application for naturalization (Exhibit 1A), which she admits she filled out personally, as well as the answer to question 21 asking where she had lived.  It also would have required defendant to have received a form from her brother with the answers, recopy *some of them* into a new form, then send that form to him to fill in the other answers *for a second time*.  Defendant never testified that her brother filled in a form twice. Based on that and the writing, it is thus obvious that defendant herself filled in all of the answers and then lied about it during her trial testimony.

Even more significantly, in handwriting which matches the answer to question 21 and which asked why defendant would not become a public charge,

- 4 -

the answer is "I am ready to work, I could fine a job."  Exhibit 2A, question 35.  It is simply not possible that defendant's brother, who came to the United States at age 17 and as of 1995 when the form was filled out had been in the United States for approximately forty years, and who had received college and graduate degrees here, would make such a grammatical error.   The answers obviously were defendant's, and at trial she falsely denied those facts because to admit otherwise would have been to admit her guilt.  Defendant should receive two points for her obstructive and perjurious testimony.

Moreover, as a completely independent basis for finding obstruction, the Court should enhance defendant's sentence under U.S.S.G. § 3C1.1 based on defendant's repeated, intentional violations of the Court's rulings and orders regarding the permissible scope of her testimony.  Prior to her testimony, the Court directly addressed defendant, reminding her of its rulings that claims of torture were not admissible, that claims regarding the Israeli legal system were not admissible, and advising her of the areas she was not allowed to discuss. Notwithstanding that, defendant repeatedly referred to claims of torture, referred to her time in prison in Israel as "a political prisoner," and stated that she was not guilty of the crimes charged in Israel.  Each of those statements directly violated the Court's previous rulings, and thus should be scored as obstructive behavior. *See* U.S.S.G. § 3C1.1. (comment. n.4(I)) (any conduct prohibited by obstruction of

justice statutes qualifies for enhancement).  Indeed, the Court already has noted that "the Government has made compelling arguments concerning Defendant's seeming proclivity for dishonesty, as well as her apparent disdain for this Court's Orders," and remarked on "her substantial disdain for this Court's Orders."  *See* Docket Entry 148 at 3, Page ID 1521.  Thus, defendant should properly be assessed two points for obstruction.  Her adjusted offense level would therefore be 14 with a criminal history category of I, and an advisory guideline range of 15-21 months imprisonment.

<u>SENTENCING FACTORS</u>

As is now well-known, in *Booker v. United States*, 543 U.S. 220 (2005) the Supreme Court severed and rendered inapplicable 18 U.S.C. §§ 3553(b)(1) and 3742(e), which had made adherence to the Guidelines mandatory. Nonetheless, the *Booker* Court also explained that sentencing courts should continue to consider the recommended Guidelines sentence, and in *Gall v. United States*, 552 U.S. 38, 49 (2007) the Court noted that "The Guidelines should be the starting point and the initial benchmark" for determining a substantively reasonable sentence.  However, a district court "may not presume that the Guidelines range is reasonable," but must rather "make an individualized assessment based on the facts presented."  *Id.* at 50.  In other words, the remainder of § 3553(a), setting forth the factors to be considered by a sentencing court, is still valid.  *See Booker*, 543 U.S. at 259-260.

- 6 -

Section 3553(a) lists a number of factors that sentencing courts "shall consider." Those factors are addressed below.

## UPWARD DEPARTURE AND VARIANCE

As noted, the starting point for a Section 3553(a) analysis is the guideline range, which is 15-21 months when the obstruction enhancement is included. Nevertheless, the government is seeking either an upward departure from the guidelines or an upward variance from the guideline range, to a sentence of between 5 and 7 years, based on a number of factors. Regarding an upward departure, defendant's case is not in the heartland of § 1425 cases, making the base offense level insufficient for her circumstances. This is based on the simple fact that few immigration fraud cases are based on a defendant having failed to disclose criminal history involving acts of terrorism.

Regarding an upward variance from the guideline range as found by the Probation Department, with or without the enhancement for obstruction, the guideline range provides for a sentence which is insufficient under many of the § 3553(a) factors which the Court is required to consider. Both the departure analysis and the variance analysis have much in common and there is significant overlap between them. A sentence of 21 months or less would not sufficiently take account of defendant's character and background, or the unusually severe effects of defendant's conduct on the immigration system; would fail to provide adequate

- 7 -

deterrence; would fail to reflect the seriousness of the offense; would fail to promote respect for the law; would fail to provide just punishment for the offense; and would fail to avoid unwanted sentencing disparity.

<u>FRAMEWORK FOR DEPARTURE/VARIANCE</u>

The framework for an upward departure in a case involving a conviction under 18 U.S.C. § 1425(a) was set by the court in *United States v. Beatrice Munyenyezi*, 10-cr-85-01-SM (D. NH 2013).[1]  In that case, as in the present case, the defendant was convicted of procuring naturalization unlawfully.  The defendant had participated in the Rwandan genocide by working at a roadblock at which she participated in stopping people and selecting some for execution and allowing others to pass.  The New Hampshire court sentenced her to the statutory maximum ten years in prison.   The rationale for the Court's decision was not that the defendant was being punished for having committed genocide, but rather because the nature of the lies on her immigration application and the resulting fraud perpetrated on the naturalization system were extraordinary in light of her history and background.  The Court noted:

> The maximum sentence prescribed by Congress, I stress, is not imposed as a surrogate punishment for genocidal conduct, for murder or for aiding and abetting kidnap or rape, or for the persecution of innocents, but it is imposed for committing the

---

[1]The case was argued in the United States Court of Appeals for the First Circuit on February 4, 2015.  See case number 13-1950 in that Court.

most serious of violations of Section 1425 that one can describe. Lying about participation in genocide when specifically asked, knowing that such conduct is automatically disqualifying with respect to immigration and citizenship seriously undermines the integrity of this country's immigration standards in the most offensive way possible and obviously puts this country at risk; particularly, we cannot abide this country being a haven for genocidaires. If any lies in the immigration and naturalization process warrant imposition of the statutory maximum punishment contemplated by Congress, it's surely this one. The nature of the defendant's underlying conduct and her lies about that conduct take this case, in my judgment, well out of the heartland of Section 1425 prosecutions. Obviously this is hardly a run-of-the-mill immigration or citizenship fraud case.

Docket Entry 274 (sentencing transcript) in 10-cr-85-01-SM (D. NH 2013), at 40-41. As in *Munyenyezi*, the government does not seek an above-guideline sentence as surrogate punishment for the bombings. Rather, the violent nature of defendant's underlying crimes takes them out of the heartland of facts involved in most immigration fraud offenses, and thus are inadequately provided for under the guidelines. And as in *Munyenyezi*, the nature of the defendant's Odeh's crimes would have automatically disqualified her for United States citizenship as she had "engaged in terrorist activities." *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I). That fact too takes her case out of the heartland of immigration fraud cases, justifying an above-guidelines sentence.

- 9 -

The *Munyenyezi* court also found that the good which the defendant had done in the United States, including her community work, simply could not outweigh the harm her fraudulent naturalization had brought about. "I have considered the fact that this defendant has lived a different life here in the United States, but she's lived that life under false pretenses all the while." *Id*. at 39. The same is obviously true of Odeh. Moreover, because she committed fraud in her immigrant visa application, every single day in which defendant Odeh was in the United States was illegal and fraudulently obtained. The court ought not to give any weight to whatever good she claims to have done in the United States, given that under the law she never should have been admitted in the first place.

Similarly, in *United States v. Jordan*, 2011 WL 2581518 (11th Cir. 2011), the Court upheld an upward departure to the ten year statutory maximum for a conviction under § 1425. In that case, the defendant, in order to obtain United States citizenship, had concealed his overseas "membership in the military and his participation in a massacre" in his home country.

Defendant Odeh's acts of denying on her immigration forms the crimes for which she had been arrested, charged, convicted and imprisoned in Israel were the only facts relevant at trial. Concealment of those facts alone, given the harm to the U.S. immigration system, warrants a not-insignificant sentence. However, the *Munyenyezi* framework, which also considers the acts which the defendant

committed prior to naturalization and the effects and significance that denying such acts had on the U.S. immigration system, makes the nature of Odeh's life prior to her immigration highly relevant to the sentencing determination.   Moreover, completely separate and apart from the *Munyenyezi* framework for a departure, § 3553(a)(1) requires the court to consider "the nature and circumstances of the offense *and the history and characteristics of the defendant*."   (Emphasis added.) Such an analysis must include defendant's guilt or innocence as to the bombings in Israel.   Thus, a significant portion of this memorandum addresses the overwhelming evidence of defendant's guilt in the bombings and her membership in the Popular Front for the Liberation of Palestine (PFLP).

## DEFENDANT ODEH'S GUILT IN THE BOMBINGS; DEFENDANT ODEH'S MEMBERSHIP OF AND PARTICIPATION IN THE PFLP

The present recitation of facts regarding defendant's guilt in the bombings in Israel relies *not at all* on defendant's confessions to Israeli authorities.  This is not because of any question the government has as to the legitimacy of the confessions; defendant confessed first after one day in custody and then in more detail days later (in marked contradiction of her claims of confession only after weeks of torture), and the confessions are corroborated in many respects.

Rather, this analysis relies only on the numerous voluntary statements made through the years by defendant, her conspirators, and other PFLP members in what can only be described in many instances as videotaped terrorist reunions, of which

defendant was an integral and active participant. By relying only on such materials, which are beyond challenge, there can be no question as to the role Odeh played in the events at issue.

At trial, the government played an excerpt from *Women in Struggle*, a 2004 video in which both defendant Odeh and her codefendant in the Israeli proceedings, Aisha Odeh, appear. Aisha Odeh freely admits that she placed the bomb at the Supersol. In addition, she stated that her role was implementing rather than planning, and she thus was less involved than others. Aisha Odeh stated that Rasmieh Odeh and a third individual, Rasheda Obideh, had gone and studied the location in advance. *See* https://www.youtube.com /watch?v=v0Va7-cNxf8 at 10:10 *et seq*.; *see also* http://palwatch.org/main.aspx?fi=458&fld_id=458&doc_id= 9862.

Rasheda Obideh, the third individual, was not in *Women in Struggle* and was never arrested for her role in the offense. However, she appeared in another video, made in 1993, *Tell Your Tale Little Bird*. Rasheda Obideh discussed what she terms "the operation on the Supersol." *See* https://www.youtube.com/watch?v= wdkoxBjKM1Q at 24:28 *et seq*. Obideh stated: "We were tempted to perform military attacks against occupants. That is why me and my friends Aisha and Rasmieh, the three of us participated in one operation." Rasheda Obideh then states that she regrets "the operation" not because of its nature, i.e., attacking

- 12 -

civilians, but because there was not enough preparation by the conspirators to make sure that others would carry on after them. *Id.* at 24:55-25:34.    That segment is immediately followed by Aisha Odeh discussing "supersol and also the British Consulate in Jerusalem," followed by defendant Rasmieh Odeh stating "I was captured along with Aisha Ouda." *Id*. at 25:34-25:47.  Thus, the videos evidence two of the three participants directly admitting the guilt of the three of them.

Under the circumstances of the filming of the two videos, separated by years from each other and by many years from the events at issue, the statements of all participants are obviously voluntary.  Most significantly, by her presence for and subsequent acquiescence in the statements by the other participants in the bombing, defendant Rasmieh Odeh has adopted the statements as true.

Incidentally, the video recitations of the events are precisely what defendant Rasmieh Odeh admitted in her statement to Israeli authorities:

> 10 days prior to the explosion I went with a girl called Rashidah from Jerusalem to check out the location, and we selected the spot where we were going to install the explosives in, and we bought a lot of stuff from there; like the jam jar which we bought in the afternoon as we entered the store twice; first at noon time and second time in the afternoon.  Before noon time we entered the store for a few minutes which was not long enough to check the store carefully.  At that point we had picked some items, we paid for them and we left with our receipt.

- 13 -

*See* Attachment I to Docket Entry 137, Page 5 of 18, Page ID 1422.  In addition, contemporaneous U.S. diplomatic cables confirm Defendant Odeh's guilt. Following defendant's arrest in Israel in 1969, her father Yusef Odeh, who at the time was a naturalized United States citizen, was taken into custody for a short period of time.  On March 10, 1969, he was interviewed in custody by a United States consular official named Campbell who sent a diplomatic cable at 2:33 p.m. Greenwich Mean Time, following his 12:30 meeting with Yusef Odeh.  The cable stated:

> Odeh denied any knowledge of sabotage.  Stated he had been staying Jericho and only returned to Bireh day before arrest.  But his two daughters had been living in Bireh.  Odeh cannot believe they guilty but says cannot be certain.  *Odeh was present when police found explosives in his house but claims he not formerly aware their presence or how they could have gotten there.*  States police have questioned him very little since arrest.

*Id*. at Exhibit F, Page 3 of 4, Page ID 1395 (emphasis added.)  The veracity of Mr. Campbell is certainly beyond dispute, although, remarkably enough, Odeh has disputed it.  When the government, in an earlier filing, raised the very same point about the diplomatic cables demonstrating defendant's guilt in the bombings, her response was "This assumes, unwarrantably given the larger political circumstances in play at the time, that the report from an American consulate in that fraught time was fair and accurate, and not intended to cover up Israel's

systematic use of torture."  Docket Entry 144, Exhibit F at 3, Page ID 1475. Beyond attacking the credibility of an American diplomat based on no evidence, defendant also stated "More significantly, it ignores the obvious fear a Palestinian would have, whether or not a U.S. citizen, of accusing Israelis of torture while he stood locked up in their prison."  *Id.*

Defendant's challenge to Yusef Odeh's personal observation that he saw his daughter Rasmieh's bombs and bomb-making material being removed from their home is ludicrous.  To credit defendant's theory, her father would have to have been so fearful that he affirmatively fabricated a story implicating his daughter to a U.S. diplomat, and he would have had to deliver that story so convincingly as to snooker that diplomat.  In character, when defendant had earlier asked the Court to order the government to search for and produce diplomatic cables, she stated that the cables "likely contain information which are material and exculpatory [and] would show that the U.S. government knew of the torture that the defendant and her father, who was a U.S. citizen, were subject to after their arrest by the Israeli authorities and would corroborate her claims that she was viciously tortured by the Israeli occupation authorities."  Docket Entry 89 at 2, Page ID 884.  If defendant genuinely believes that U.S. diplomats circa 1969 were sending false cables to Washington, one is left to ponder why she ever would have asked the Court to intervene and order their production to her.

In fact, the cables not only are highly *inculpatory* as to the bombing, they completely belie any claim of torture.  Mr. Campbell reported that "Odeh complains of uncomfortable, overcrowded jail conditions, but he apparently receiving no rpt [repeat] no worse than standard treatment afforded majority detainees at Jerusalem jail."  Docket Entry 144, Exhibit F at 3, Page ID 1475.  No doubt defendant will yet again supply the Court with some new theory whereby the cables, which were to be believed last August when she filed her motion seeking their production, are not deserving of credit now.

In addition, defendant has given interviews throughout the years to various other publications in which she admitted her role in the bombings.  For instance, in an article published in the Journal of Palestine Studies, she stated, "I returned to the West Bank in early 1969 and was arrested on February 28 and accused of involvement in the supermarket explosion in West Jerusalem and another in the British Consulate. We had placed a bomb there to protest Britain's decision to furnish arms to Israel. Actually we placed two bombs, the first was found before it went off so we placed another."  *See*  http://www.palestine-studies.org/sites/default/files/uploads/files/Prisoners%20for%20Palestine-%20A%20List%20of%20Women%20Political%20Prisoners.pdf, at 45.

And finally, there can be no doubt of defendant Odeh's valued membership and participation in the PFLP, a designated terrorist organization.  The PFLP,

which engaged in spectacular acts of terrorism in the late 1960s and early 1970s,
named at least two of the units involved in such terrorism the "Task Force Rasmieh
Odeh."

In 1969, a PFLP terrorist named Leila Khaled and others hijacked a TWA
plane and ordered it to Damascus, Syria. *See* http://electronicintifada.net/blogs/
patrick-strickland/palestinian-resistance-icon-leila-khaled-tour-south-africa;       *see
also* http://www.nytimes.com/movies/movie/353779/Leila-Khaled-Hijacker/
overview.  On September 6, 1970, the PFLP conducted four successful and one
unsuccessful simultaneous hijackings of aircraft, diverting three aircraft to a
remote airstrip called Dawson's Field in the Jordanian desert.  The failed hijacking
was Leila Khaled's second attempt to hijack airliners, that time an Israeli El Al
plane.   After the hijacking was foiled, the plane landed in London, and Leila
Khaled was arrested.  *See* http://www.pbs.org/wgbh/amex/hijacked/maps/map_txt_
01.html.  Upon her arrest, she reportedly stated to British authorities "I am the
leader of the hijack.  My name is Leila Khaled and a member of the PFLP and
from the unit of Rasmieh Odeh, a Palestinian woman prisoner."       *See*
https://adonis49.wordpress.com/2011/08/03/heading-to-haifa-want-to-see-my-
home-up-close-who-is-leila-khaled/.

One of the successful hijackings on September 6, 1970 was of Swiss Air
Flight 100, which was forced to land at Dawson's Field.  On the video *Tell Your*

*Tale Little Bird*, made in 1993 and referred to above, Leila Khaled appears, along with defendant Rasmieh Odeh and other conspirators in the Supersol bombing. In one segment, Leila Khaled watches a recording of news coverage of the 1970 hijacking of Swiss Air Flight 100 with her young son. In the recording of news coverage, one can clearly hear a female hijacker state in English "The Popular Front for the Liberation of Palestine informs you that its [unintelligible] Commando Unit is now in complete control of the DC-8 plane fl--, flying for Swiss Air, Flight number 100, on its way from Zurich to New York. Task Force Rasmieh Odeh who has taken over command of this plane and . . ." which is then followed by other sounds. *See* https://www.youtube.com/watch?v=wdkox BjKM1Q, at 39:50-40:41. The English language statement of the hijacker begins at 40:12.

PFLP spokesmen have made clear that the coordinated hijackings were undertaken to obtain hostages for use in bartering the release of PFLP prisoners held in Israel, such as Rasmieh Odeh. *See* https://www.youtube.com/watch?v=vH 6e1FNSUxo, at 13:10-13:25. Thus, it is not clear if the PFLP referred to the hijackers as "Task Force Rasmieh Odeh" because she was the principal target whose release was sought or if it was in honor of her role in bombing the Supersol the previous year. Either way, it is clear that she held an exalted role within the

organization, and it also is clear that the PFLP requested her release in 1979 when she was freed in a prisoner exchange.

And if any further emphasis need be placed on defendant's history, it is provided by the final scene in *Tell Your Tale Little Bird*. *See* www.youtube.com/ watch?v=wdkoxBjKM1Q at 1:28:25-1:30:08. In that scene, set to classical music, admitted terrorists Leila Khaled, Aisha Odeh, Rasheda Obideh and others sit down with defendant Rasmieh Odeh for cookies and coffee in what can only be referred to as a terrorist reunion to be filmed for posterity. Thus, defendant Odeh began having such meetings with unrepentant terrorists not later than 1993, when the film was made, two years *before* she immigrated to the United States. She continued to have such meetings at least until 2004, when *Women in Struggle* was made, after she had lived in the United States for many years and during which time she applied for and became a United States citizen.

Despite this undeniable history, defendant Odeh has never done anything other than portray herself as a victim of the legal and criminal justice system of the United States, publicly stating that the verdict against her was racist. *See* http://electronicintifada.net/blogs/charlotte-silver/defense-promises-appeal-guilty-verdict-against-rasmea-odeh ("Speaking to reporters, Odeh said, 'I felt the verdict is not justice, it was a racist verdict.'"). Her lies to U.S. immigration officials are deserving of a significant sentence.

THE NEED FOR THE SENTENCE TO REFLECT THE SERIOUSNESS OF
THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO
PROVIDE JUST PUNISHMENT FOR THE OFFENSE, AND TO
AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT

Section 3553(a)(2) requires the Court to consider the need for the sentence imposed to "promote respect for the law, and to provide just punishment for the offense."   Section 3553(a)(2)(B) requires the Court to consider whether the sentence will "afford adequate deterrence to criminal conduct."   Under the circumstances of this case, those factors overlap in large measure and thus are discussed together.

Given the clarity of defendant's violation of United States immigration law, the criminal history from Israel which she concealed, and the bombings which she undertook, as discussed in detail above, anything less than a significant sentence would grossly fail to promote respect for the law.  In addition to the facts set out above, the civilized world currently is struggling with the issue of "foreign fighters" who go to Syria, Iraq and other places for terrorist training and then fight on behalf of ISIS and other designated terrorist organizations, and who often then return home. *See, e.g*., http://www.cnn.com/2014/09/12/world/meast/isis-numbers/ (estimating that there are at present more than 20,000 fighters in ISIS, from as many as 80 different nations).

A light sentence in this case would be a signal to anyone who has fought overseas for ISIS or a similar organization that there is not much risk in coming to

the United States, hiding one's past, and seeking citizenship.  If not caught, such a person derives all the benefits of citizenship.  After perhaps 15-20 years of living in the United States, as was defendant Odeh, a person who is simply given a slap on the wrist and then deported is much better off than that person would have been by not having come to the United States in the first place.  Only a significant sentence, which shows that there is a serious price to pay for committing such fraud on the U.S. immigration system, will reflect the seriousness of the offense and provide deterrence to others who may be contemplating such a move and are weighing the possible costs and the possible gain.

<u>THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES</u>

The final sentencing factor at issue in this case is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).[2]   That factor requires courts to consider "the national scope of the disparities" in sentences. *United States v. Robinson*, No. 13-2308, ---F.3d ---, slip. Op at 9 (citation omitted) (6th Cir. Feb. 18, 2015).

---

[2] Because defendant faces removal from the United States, there is no issue of protecting the public from further crimes.  There also is no issue of educational, vocational, or medical needs of defendant, *see* 18 U.S.C. §§ 3553(a)(2)(C) and 3553(a)(2)(D), and the offense involves no financial loss and thus no restitution. 18 U.S.C. § 3553(a)(2)(7).

The case of *United States v. Beatrice Munyenyezi*, 10-cr-85-01-SM (D. NH 2013), discussed *supra*., provides the most direct comparison. *Munyenyezi* sets the bar that a defendant who conceals significant, violent criminal activity from immigration authorities and who ultimately naturalizes as a United States citizen is deserving of a sentence above or well-above the guideline range. In light of the precedent which *Munyenyezi* provides, in the present case this Court must either depart upward or vary from the sentencing guideline range, in order to maintain consistency in sentencing for § 1425 violations.

In addition, similar cases in this district have resulted in lengthier sentences than are called for by the Guidelines. In *United States v. Fadi Khalil Bazzi*, 2:13-cr-20893, Judge Edmunds imposed a sentence of 21 months on a defendant who had made false statements in his naturalization application, by concealing a past criminal conviction from Lebanon. The conviction in that case was under 18 U.S.C. § 1015(a) and so the base offense level was set under USSG § 2J1.3, but the underlying conduct – concealing and falsely denying overseas convictions when asked about them during the naturalization process – was identical to defendant Odeh's. *See* 18 U.S.C. § 3553(a)(6) (requiring avoidance of unwarranted sentence disparities among defendant's found guilty of similar *conduct* (emphasis added).

Given that the undisclosed conviction in Bazzi was for armed robbery, this case calls for a longer sentence, because defendant Odeh's underlying criminal

history which she concealed was so much more serious than Bazzi's.  To not impose a longer sentence would be to create unwarranted disparities, contrary to § 3553(a)(6).

CONDITIONS OF SUPERVISION/REMOVAL

Finally, the government asks that the Court impose, as part of supervised release, conditions relating to defendant's removal from the United States. Specifically, the government requests that defendant be required to maintain a valid Jordanian passport, which will be held in the custody of Pretrial Services until it is turned over to ICE, and that she execute, at the request of ICE, any documents needed to maintain a valid Jordanian passport.

Title 8, § 1451(e) requires that the Court revoke defendant's naturalization at sentencing, which will be followed by removal proceedings.  The Court already has noted that "Defendant stands convicted of a crime that will result in not only a certain sentence, but also certain removal from the United States upon completion of that sentence."  R. 148 at 3, Page ID 1521.  Because of the nature of § 1425 offenses and the provisions of § 1451(e), courts in such cases often impose conditions on defendants to cooperate in removal proceedings.  *See, e.g.*, *United States v. Biheiri*, 356 F.Supp.2d 589, 603 (E.D. Va. 2005) (defendant "is required to cooperate with ICE to effect his prompt removal from the United States upon his release from prison."); *see also United States v. Mohamad Mustapha Masfaka*,

- 23 -

E.D. Mi. No. 08-20458, Docket Entry 40, at 4, Page ID 335 (defendant convicted of False Oath in Matter Relating to Naturalization ordered, as a Special Condition, to "make every effort to obtain a Syrian Passport.")  Such an order by this Court would help ensure that conditions it already has taken into consideration in the case, i.e., defendant Odeh's ultimate removal from the United States, can be effectuated as expeditiously as possible.

CONCLUSION

For the foregoing reasons, the Court should impose a sentence in the range of 5-7 years, or 60-84 months.

Respectfully submitted,

BARBARA L. MCQUADE
United States Attorney

s/Jonathan Tukel                          s/Mark J. Jebson
JONATHAN TUKEL (P41642)                   MARK J. JEBSON (P53457)
Assistant United States Attorney          Special Assistant U.S. Attorney
211 West Fort Street, Suite 2001          211 W. Fort, Suite 2001
Detroit, MI 48226                         Detroit, MI 48226
(313) 226-9749                            (313) 226-9698
jonathan.tukel@usdoj.gov                  mark.jebson@dhs.gov

Dated: February 25, 2015

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2015, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF filers.

<em>s/Jonathan Tukel</em>

JONATHAN TUKEL (P41642)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9749
jonathan.tukel@usdoj.gov