UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                    CRIMINAL NO. 13-20772

       Plaintiff,                                   HONORABLE GERSHWIN A. DRAIN

v.

RASMIEH YOUSEF ODEH,

       Defendant.
_____/

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR DISCLOSURE OF GOVERNMENT EXPERT AND FOR MODIFICATIONS OF COURT ORDER

The United States, by and through its undersigned attorneys, submits this opposition to the defendant's Motion for Disclosure of Government's Expert and for Modifications of Court Order Needed to Protect the Defendant from Additional Harm. The defendant's request to modify the Court's order for a psychological examination to "protect" the defendant from alleged harm is based on a falsehood, namely that the defendant has only been able to speak of her alleged torture with the defendant's own psychologist, Dr. Fabri, and no one else. In fact, the defendant has spoken (with males) about her alleged torture in detail on a number of occasions, including in a video that is on the internet, in public testimony at the United Nations, in a published academic article, to a journalist for a newspaper article, and during her trial in Israel. The defendant's claims of alleged harm from

undergoing a psychological examination are, therefore, a gross exaggeration, at best. Even if the defendant does become emotional during the psychological examination ordered by the Court, the examiner can provide the defendant with the same accommodations that Dr. Fabri provided her during the defense examination, namely "a trip to the restroom, a glass of water, or a walk down the hallway and back."

In addition, the defendant's request to change the dates of expert disclosure, change the location of the examination, and have a "companion" at the examination should be denied. The defendant offers no compelling reason for these changes, and allowing them would compromise the integrity of the government's examination of the defendant. Lastly, the defendant's arguments about the duration of the examination and whether it should be allowed in the first instance are repetitive of arguments that she advanced in her opposition to the government's motion for a psychological examination. These arguments were rejected by the Court in its order for a psychological examination, and the defendant fails to mention, let alone meet, the standard for reconsideration; her arguments should therefore be rejected (again).

## BACKGROUND

On June 14, 2016, the Court held a status conference during which the parties and the Court agreed on several dates related to proceedings involving

expert witnesses. These dates were specifically agreed to by the defendant at the status conference. On June 21, 2016, the Court entered an order setting forth those dates. (R. 198: Order Setting Dates for Party Filings, Daubert Hearing, and Trial, PgID 2716). This order required the government to complete its psychological examination of the defendant by September 6, 2016, and that "the parties will provide each other with expert disclosures . . . by October 3, 2016. These disclosures shall include: the results or reports of any mental examination of the defendant, the identity of expert witnesses, the expert witnesses' opinions, the bases and reasons for those opinions, a written summary of any testimony that the proponent of the witness intends to use during its case-in-chief, and the witness's qualifications." (*Id.* at PgID 2716-17).

On July 8, 2016, the government filed a motion for a mental examination of the defendant. (R. 201: Gov't Motion for Mental Exam, PgID 2725). On July 21, 2016, the defendant filed an opposition that argued, in part, that an examination would "plunge" the defendant into "the depths of ghastly 'flashback' memories" of her alleged torture. (R. 203: Def. Opposition, PgID 2752).  On August 29, 2016, this Court rejected the defendant's arguments and granted the government's motion. (R. 207: Order Granting Government's Motion for Mental Exam, PgID 2774). The Court specifically ordered that the examination not exceed eighteen hours in length (which was the same amount of time that Dr. Fabri examined the

defendant), that the parties agree on the amount of days – not less than two and up to six – for the examination, and that the examination take place at the U.S. Attorney's Office in Chicago or another suitable location near the defendant's home in Chicago. *Id.* at PgID 2781. Given the time needed to resolve the defendant's objection to the government's motion, it was no longer possible for the government to examine the defendant by September 6, 2016, as originally ordered by the Court. Therefore, the Court permitted the parties to agree upon new dates for the examination. *Id.* However, no other dates were permitted to be changed. *Id.*

On August 31, 2016, the government proposed to defense counsel that the examination take place from September 19-22, 2016. The government stated that the examination would take place over four sessions of four to four-and-a-half hours each, for a total of 16 to 18 hours, and that the government would provide an interpreter for the defendant. The government was flexible in that "[i]t's up to your client whether she wants to do one session a day or two sessions in one day, with a break for lunch," and that "the time slots chosen would not have to be the same each day." The government asked defense counsel to inform the government "which dates and time slots your client prefers." Defense counsel never provided any dates to the government. Instead, defense counsel asked for the name of the government's expert, the expert's qualifications and the name of the interpreter – despite the fact that defense had already agreed that expert disclosures would not

occur until October 3, 2016. The government declined to provide this information. On September 6, 2016, the defendant filed the present motion.

ARGUMENT

I.    <u>The Defendant's Claim that a Psychological Examination Will Cause Her Harm is, at Best, a Gross Exaggeration Because She Has Discussed Her Alleged Torture Publicly on Numerous Instances Over Many Years.</u>

The defendant alleges that there is a "distinctive threat of serious further mental and emotional harm to the Defendant from the examination the Court has approved." (R. 208: Def. Motion, PgID 2783). This threat exists, according to the defendant, because it will be difficult for her to discuss her alleged torture with the government's examiner. The defendant claims that her expert, Dr. Fabri, "is the first and only one to whom Ms. Odeh has related the details of her prolonged torture including the sexual assault." *Id.* at PgID 2786. The defendant says that she was only able to discuss the details of her alleged torture with Dr. Fabri after "a substantial period of trust-building before the examination," and even then, the defendant says she had "repeated emotional reactions" and "required breaks" and even a suspension of one of the sessions with Dr. Fabri. *Id.*

The defendant's claims, however, are contradicted by the fact that she has publicly discussed the details of her alleged torture, including details about alleged sexual abuse, on numerous occasions over the years without having the types of extreme emotional reactions she now claims are inevitable. While the defendant

5

has changed the details surrounding her alleged torture over the years, one thing has remained the same: the defendant's willingness to speak about these allegations publicly – often in front of men and other people that she does not know well.

A.     The Defendant's Description of Her Alleged Torture in 1969-1970 During Her Trial in Israel

During the defendant's trial in Israel for bombing a grocery store that killed two people, which took place from late 1969 to early 1970, the defendant testified before judges, a prosecutor, and three attorneys. According to a transcript of those proceedings, the defendant testified at length about her alleged torture, claiming that she was beaten, stripped naked, exposed naked to other men, and threatened with rape. The defendant also gave graphic testimony about allegedly being sexually assaulted with a stick. The judge, prosecutor, and the three attorneys present during the trial were all male. There is also nothing in the trial transcript to indicate that the defendant became emotionally distraught, was crying, or needed to take a break from her testimony.

B.     The Defendant's Description of Her Alleged Torture in 1977 to the Jerusalem Post Magazine

In 1977, the defendant (while still serving a prison sentence in Israel after being convicted of the bombing) gave an interview to a male journalist with the Jerusalem Post Magazine. The Jerusalem Post Magazine published an article

based, in part, on the defendant's interview. According to the article, the male

journalist asked the defendant questions about her alleged torture, including

questions about the claim that guards tried to force her father to have sex with her.

[1] The defendant answered these questions. The male journalist "pressed further"

for additional details, specifically asking the defendant to explain why she had no

physical injuries if, in fact, she had been so brutally tortured as she claimed. The

article states: "Her answer makes one wonder: 'It is hard to say. I was menstruating

at the time.'" Moreover, the article does not indicate that the defendant had any

difficulty describing her alleged torture to the male journalist. In fact, just the

opposite is true. The male journalist reported that, "What struck me about Rasmiah

– and about Ghassan Hard, another victim . . . whom I visited in Ramallah – is that

they look whole, well, and in good physical shape. I had expected to see lined

faces, haunted eyes, prematurely gray hair – something resembling the broken

condition of another prisoner . . . But there was absolutely no visible physical

marks on either of them." The male journalist stated that during the interview, the

---

[1] The defendant's claim that Israeli officials tried to force her father to have sex with her is contradicted by her father himself. According to a U.S. diplomatic cable, following the arrest of the defendant's father (who was a United States citizen), a U.S. consular official met with, and interviewed, the defendant's father. According to the U.S. consular official, the defendant's father "complains of uncomfortable, overcrowded jail conditions, but he apparently receiving no rpt [repeat] no worse than standard treatment afforded majority detainees at Jerusalem jail." (R. 161: Gov't Sent. Memo., at PgID 1726).

defendant "talked intelligently, and had no complaints (other than about minor things like a shortage of novels to read, the confiscation of her poems and other writings)."

C.   The Defendant's Description of Her Alleged Torture in 1979 to the United Nations

Over the course of two days in June, 1979, the defendant gave testimony in Geneva, Switzerland, to a United Nations special committee. During this testimony, which was transcribed, the defendant described her arrest, interrogation and alleged torture in great detail, including sexual assaults. Her description of the events included the claim that "they placed me completely naked more than once, and once they brought in my father and tried to force him under blows to take off his clothes and have sexual relations with me." The defendant also described how her clothes were torn off and guards "threw me to the ground completely naked," and "started touching my body." At the end of her first day of testimony, the Chairman of the United Nations committee (a male) told the defendant that "at any time" she could give her testimony "in a closed meeting," but that "it is completely up to you." The defendant never accepted the Chairman's offer, and instead chose to continue providing public testimony the next day. At no point does the transcript of the defendant's testimony indicate that the defendant became emotionally distraught, was crying, or needed to take a break from her testimony. According to the transcript, three members of the committee asked the defendant questions

8

during her statement. All three of these committee members were male.

D.    The Defendant's Description of Her Alleged Torture in 1980 in an Academic Journal

The defendant was interviewed for an article in the *Journal of Palestine Studies*, which was published in 1980. The entirety of the defendant's interview appears to have been published in the article. The article is available on the internet. During the interview, the defendant described her alleged torture in great detail, including details about sexual assaults. According to the article, the defendant described how she was stripped naked in front guards: "They laughed at my nakedness and kicked me, beat me with sticks, pinched me all over, especially on the breasts; my body was covered with bruises. Then they got a wooden stick, not a smooth one, and pushed it into me to break the hymen." The defendant described other instances where she was stripped naked in front of others, an instance where they "brought in my father and told him to strip and make love to me," and instances where she was threatened with rape. She also discussed at length her time in prison following her conviction.

E.    The Defendant's Description of Alleged Torture in a 2004 Video

In 2004, the same year that the defendant lied on her naturalization application about her conviction for the bombing, the defendant was interviewed in a documentary style video entitled "Women in Struggle." This video is publicly available on the internet. In the video, the defendant gives a lengthy description of

9

her alleged torture:

> The whole interrogation was difficult, I can remember several things that were difficult but if I were to choose, the moment they brought my father into the interrogation room while I was naked and they tried to force him to sleep with me during the interrogation. This was one of the worst moments.

> Another instance was when they were interrogating a young man, there was no relationship between us by the name of Qasem Abu Aker, but they brought me in naked while they were torturing him using electric shock. He became a martyr while I was in the same room with him.

> They stripped me and displayed me in front of the young men to force them to speak, they tied me up, my legs and arms while I was completely naked, however I did not feel like some strangers are looking at me, or what is happening, I really wanted to be strong.

> But with the incident with my father, when they brought him in while I was naked. That was horrible . . . very horrible. Even though I was stripped naked and tortured in front of others, in front of my father the situation hit me at a different level. I was worried about my father, this was a very sensitive issue. I was worried he would die from this incident, as though something major inside him was destroyed.

> This increases my hatred against those who were responsible. Why? I am not the person responsible, the occupation is . . . .

During her description of this alleged torture, the defendant does not cry or become emotional in any way. In fact, she appears eager to speak and is animated during the discussion. Attached to this pleading as Exhibit A is a series of frames from this video that contains a written translation of her statements and images of the defendant, which shows her demeanor during the interview. There is nothing in the video to indicate that the defendant needed a "substantial period of trust-

building" before she could discuss these issues.

In addition to all of these public discussions of her alleged torture, it should be noted that the defendant interjected the allegation of her alleged torture into her trial in this case, despite the fact that the Court specifically instructed her not to do so.[2] The defendant also was able to listen to her attorney discuss her alleged torture during her sentencing hearing without breaking down into tears or needing to take a break from the proceedings. (R. 185: Sentencing Transcript, PgID 2565-66).

What all of these examples show is that the defendant's claim that "Dr. Fabri is the first and only one to whom Ms. Odeh has related the details of her prolonged torture including the sexual assaults" is completely false. Rather, the defendant has been able to discuss her alleged torture with a variety of individuals (including males), and in a variety of settings, over the course of many years. In addition, these examples show that the defendant was able to discuss her alleged torture without suffering any ill effects.

---

[2] At sentencing, the Court found the defendant obstructed justice by raising the issue of torture in violation of the Court's order not to do so: "THE COURT: I remember the trial in this case very well. And I spoke with Ms. Odeh before she testified and I said, don't go into certain things. Do not talk about whether or not you're 'guilty or innocent. Do not talk about torture . . . and notwithstanding that, she continuously went into those areas and I remember having to stop her and I actually remember raising my voice, because I don't normally do that. I don't usually raise my voice in court, and I had to do that to stop her, and she just decided what she was going to say and went ahead and said it." (R. 185: Sentencing Transcript, PgID 2558-59).

Even if the defendant does become emotional during her examination by the government's expert, there is no reason to believe that she cannot be accommodated in the same way that Dr. Fabri accommodated the defendant. According to Dr. Fabri's affidavit, when the defendant became emotional during Dr. Fabri's examination, Dr. Fabri responded by "taking periodic breaks to allow Ms. Odeh to compose herself," or allowing the defendant "to compose herself with a trip to the restroom, a glass of water, or a walk down the hallway and back." (R. 208-1: Affidavit of Dr. Mary Fabri, Attached to Def. Motion, PgID 2796). In one instance, Dr. Fabri ended a session prematurely so the defendant could compose herself. The government's examiner can provide the defendant with these same types of accommodations.

II.   <u>As Set Forth in the Court's Scheduling Order, and as Previously Agreed to by the Defendant, the Defendant is Not Entitled to Expert Disclosure at This Time; the Defendant and the Government Will Exchange Expert Disclosure After the Government's Examination of the Defendant.</u>

The defendant says that the Court should order the government to immediately provide the defense with the identity of its expert, the expert's qualifications, "the testing s/he intends to administer," and an "explanation for how much time is necessary" for the expert's examination. (R. 208: Def. Motion, PgID 2787). The defendant ignores the fact that the Court's scheduling order already provides for all expert disclosure in this case to take place after the government completes its examination of the defendant. The defendant expressly agreed to this

12

schedule at the status conference when the Court and parties set these dates. The defendant now seeks to change that schedule without providing any compelling reason for doing so. All the defendant says about why these disclosures are needed immediately is that there is "the real potential of harm by a prolonged examination." But the harm referred to by the defendant is, at best, a gross exaggeration given her ability to discuss her alleged torture in the media and elsewhere. And even if the potential for harm did exist, the defense fails to explain how knowing the identity of the examiner or the tests he will administer will alleviate that harm.

The government, on the other hand, has a strong interest in maintaining the integrity of its examination of the defendant by preventing outside influences from distorting the results of the examination. Disclosing the testing procedures to the defense prior to the examination would compromise that integrity because the defendant could familiarize herself with the testing prior to the examination, rehearse her answers to specific questions, or, in an extreme situation, attempt to subvert the testing.

Revealing the expert's identity prior to the examination also creates a risk that the examination would be subject to outside influences. Throughout this case, a group of individuals supporting the defendant – many of whom are from Chicago, where the examination will take place – have spoken openly about their

efforts to influence the outcome of this case by disrupting or influencing court proceedings. (R. 97: Motion of the United States to Empanel an Anonymous Jury and to Take Other Measures Necessary to Ensure an Untainted Jury, PgID 961-973 (describing in detail the defendant's supporters' self-professed desire to "sway the opinions of the jurors" by protesting at the federal courthouse). Concerns about the behavior of these individuals led the Court to issue an order prior to trial governing public conduct in the courtroom (R. 110: Order Governing Public Conduct, Courtroom Procedures and Decorum, PgID 1114-1115). After this order was issued, "leaflets prepared by Defendant's supporters were passed out to individuals entering the courthouse," necessitating the Court to issue another order governing public conduct. (R. 121: Supplemental Order Regarding Public Conduct, PgID 1262). Despite these orders, individuals supporting the defendant disrupted the trial and the sentencing.[3]

    In fact, the behavior of the defendant's supporters led this Court to order a partial sequestration of the jury, which involved the jurors being transported by the

---

[3] During the defendant's allocution at sentencing, her supporters disrupted the proceedings by speaking out, necessitating the following admonition from the Court: "THE COURT: Let me stop you. Hold on for just a minute. I heard some comments from the back of the courtroom and if I hear anymore noise from any person, I'm going to ask the Marshals or the CSOs to take you out of the courtroom. So if anyone says anything or tries to do any interpreting, I'm going to have you excused. We have an interpreter to tell us what she's saying or what she needs to do. So please be quiet." (R. 185: Sent. Hearing Transcript, PgID 2594).

U.S. Marshal Service from a "secure location to and from the courthouse . . . in a van that has its windows covered." (R. 109: Order Directing the United States Marshal Service to Partially Sequester the Jury, PgID 1112). Given this history, the government has legitimate concerns that the defendant's supporters will attempt to disrupt or influence the examination of the defendant, just as they sought to disrupt and influence the trial and sentencing.

Moreover, the defendant will suffer no prejudice because defense counsel will learn of the examiner's identity, qualifications, and testing when the parties exchange expert disclosure after the examination is complete. The defense will then have plenty of time to review this information prior to the *Daubert* hearing, which is scheduled for November 29, 2016. Nor does the defendant have any legal basis for knowing the examiner's identity or testing procedures prior to the examination. "As a general matter, a full psychiatric examination requires considerable freedom to the examiner." *United States v. Wilson*, 920 F.Supp.2d 287, 298 (E.D.NY 2012). A defendant is not permitted to decide which examiner the government uses or which tests the examiner administers. *United States v. Hardy*, 644 F.Supp.2d 749, 751 (E.D.LA 2008) (denying defendant's objections to government's examiner and the tests that examiner chose to administer because a court should "not restrict the scope of the examination," because the "Court is simply not in a position to know what lines of inquiry are appropriate from the

15

standpoint of the experts."). The proper method for challenging an expert's examination is through cross-examination of "any conclusions by the government expert that [the defense] found to be based on improper lines of inquiry." *Id.* The defendant certainly did not consult with the government prior to selecting Dr. Fabri as the defense expert; nor did the defense seek the government's input on how Dr. Fabri should go about her examination.

III.   The Examination Should Take Place at the United States Attorney's Office Because of the Government's Concerns About Maintaining the Integrity of the Examination

The defendant complains about her examination taking place at the United States Attorney's Office in Chicago, but offers no specific or identifiable harm that she will suffer if the examination is held there. In fact, Dr. Fabri's affidavit does not even discuss the location of the examination, let alone claim that it will harm the defendant. There is simply no evidence of any kind to support the conclusion that the United States Attorney's Office in Chicago is harmful to the defendant's health. Conducting the examination at the United States Attorney's Office is important because it will maintain the integrity of the examination; it provides a secure and private environment where the examination can take place without disruption or interruption by outside influences.

The defendant's proposed alternative site, namely "appropriate facilities" at the DePaul School of Law, do not afford the same level of security and privacy.

16

Last year, a group called "Students for Justice in Palestine" (SJP) held a fundraiser for the defendant at DePaul University. According to an editorial written by a member of the SJP about the event, the fundraiser involved an "overwhelming turnout" of people who were "packed" into the Student Center, the university's "largest venue."[4] The fundraiser involved speeches by the defendant, her attorney, and one of her supporters, as well as a comedy performance, dancing and selling T-shirts. The event claimed to raise over $5,000 for the defendant's "legal defense fund." However, the event had "security issues." According to the editorial, "DePaul's administration contacted SJP and required that the student organizers pay security for the event, which is a rare occurrence." The need for extra security was necessary because "concerned students reached out asking that security measures be taken." In short, the DePaul University is not a neutral site and has had issues related to security surrounding the defendant and her supporters in the past.

Given the government's legitimate concerns about maintaining the integrity of the examination, the fact that the defendant has not established that being examined at the United States Attorney's Office would be harmful to her health,

---

[4] "Op-Ed: Rasmea Odeh Fundraiser Successful Despite Opposition Threats," *Chicago Monitor*, February 9, 2015, available at http://chicagomonitor.com/2015/02/op-ed-rasmea-odeh-fundraiser-successful-despite-opposition-threats/

and the fact that the defendant's proposed site is inadequate, the government's examination of the defendant should take place at the United States Attorney's Office in Chicago.

IV.   The Defendant's Request to Have a "Companion" Present During the Examination Should Also Be Denied Because of the Need to Maintain the Integrity of the Examination.

The defendant demands that the Court allow her to have "a companion" present during the examination that will have two functions: first, the companion will serve "as a silent witness," to the examination. (R. 208: Def. Motion, PgID 2789). Second, the companion would "provide emotional support" to the defendant. *Id.* The Court should not permit the defendant's companion to be present during the examination because the presence of the companion could influence the defendant's answers to questions or disrupt the exam, thereby compromising its effectiveness.

Courts that have considered this issue have held that third parties, including both lawyers and non-lawyers, are not permitted to be present during mental examinations because "the presence of third parties during examinations can be disruptive and have adverse effects on the performance and outcome of the evaluations." *Wilson*, 920 F.Supp.2d at 305; *see also Hollis v. Smith,* 571 F.2d 685, 692 (2d Cir. 1978) ("It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the

18

presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that."); *United States v. Baird,* 414 F.2d 700, 711 (2d Cir.1969) ("[T]he presence of a third party . . . at [a mental] examination tends to destroy the effectiveness of the interview."); *Newman v. San Joaquin Delta Comm. College Dist.*, 272 F.R.D. 505, 513-14 ( E.D.CA 2011) (refusing to permit a "third party observer" despite examinee's claim "that she will probably 'freak out and have a nervous breakdown' if she does not have 'at least one support person' in the room with her during the examination because "Courts have recognized that the presence of third parties during mental examinations may be distracting and may alter the results of the testing."); *Marsch v. Rensselaer Cty.,* 218 F.R.D. 367, 371 (N.D.N.Y.2003) ("In federal court, [ ] the attendance of a subject's counsel or other observer is generally prohibited . . . ."); *Equal Emp't Opportunity Comm'n v. Grief Bros. Corp.,* 218 F.R.D. 59, 63–64 (W.D.N.Y.2003) ("[F]ederal law generally rejects requests that a party's attorney attend a [mental] examination."); *Ragge v. MCA/Universal Studios*, 165 F.R.D. 605, 609-10 (C.D.CA 1995) ("Third party observers may, regardless of their good intentions, contaminate a mental examination."); *Baba–Ali v. City of N.Y.*, 1995 WL 753904, at *2 (S.D.N.Y. 1995) ("The weight of authority is clearly against the presence of counsel at a [mental] examination.").

V.    The Defendant's Remaining Arguments Have Already Been Considered and Rejected by the Court and the Defendant Has Not Met the Standard for Reconsideration.

The defendant's motion also raises two arguments that she raised in her opposition to the government's motion for a psychological examination, namely that the government should not have up to 18 hours to complete its examination of the defendant (despite the fact that the defense examination was of the same duration), and that a mental examination of the defendant is not relevant to a *Daubert* hearing. This Court rejected both of these arguments in its order for a psychological examination of the defendant. Under Eastern District of Michigan Local Rule 7.1(h)(3), a motion for reconsideration is only permissible if the defendant can show a "palpable defect" by which the Court was misled. The Rule states that a defendant is not permitted to "present the same issues that have been already ruled on by the court, either expressly or by reasonable implication." *Id.* Here, the defendant does not allege that a palpable defect misled the Court. Rather, she simply restates her prior arguments that have been rejected by the Court. The Court should therefore deny the defendant's motion without considering these arguments.

It should also be noted that many of the defendant's arguments in her motion – including her arguments about the location of the examination, discovery, and a companion – are all arguments that could have, and should have, been raised

earlier. A defendant is not permitted to use a motion for reconsideration to raise "arguments that could have been, but were not, raised before the Court issued its ruling." *United States v. Harper*, 2016 WL 465495, *1 (E.D.MI 2016) (Cox, J.). By objecting in piecemeal fashion to the government's examination, the defendant has delayed her examination. This delay has made it impossible for the government to conduct its examination of the defendant and complete its expert reports by October 3, 2016, as set forth in the Court's scheduling order. Therefore, the government requests that the Court order that the examination take place at the United States Attorney's Office in Chicago the week of October 3-7, 2016. A certain week is necessary to prevent any further delays by the defense. Second, the government requests a short adjournment of two dates in the scheduling order. Specifically, the government requests that the date for the parties to exchange expert reports and other expert discovery (as stated in paragraph three of the Court's scheduling order) be adjourned from October 3, 2016, to October 25, 2016, and that the date for the parties to file their memorandums regarding the *Daubert* hearing and supplemental affidavits be adjourned from October 25, 2016, to November 15, 2016. The date for the *Daubert* hearing and all other dates would remain the same.

CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.

Respectfully submitted,

BARBARA L. MCQUADE
United States Attorney

s/Jonathan Tukel
JONATHAN TUKEL
Chief, National Security Unit
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

s/Cathleen M. Corken
CATHLEEN M. CORKEN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

s/Michael C. Martin
MICHAEL C. MARTIN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

Date: September 20, 2016

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2016, I electronically filed or caused to be filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF filers.

<u>s/Michael C. Martin</u>
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100