UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,　　　　CRIMINAL NO. 13-20772

　　　　Plaintiff,　　　　　　　　HONORABLE GERSHWIN A. DRAIN

v.

RASMIEH YOUSEF ODEH,

　　　　Defendant.
_____/

## GOVERNMENT'S MOTION FOR A *DAUBERT* HEARING, TO PRECLUDE THE TESTIMONY OF MARY FABRI, AND TO REENTER JUDGEMENT OF CONVICTION, AND BRIEF IN SUPPORT THEREOF

The United States, by and through its undersigned attorneys, submits this motion to hold a hearing on the admissibility of the testimony of the defendant's psychologist, Dr. Mary Fabri. Dr. Fabri's testimony should be excluded because her methodology and opinions are scientifically unreliable, her diagnosis and opinions are not focused on the relevant time period, and her testimony (or lack thereof) regarding causation is so attenuated as to render it irrelevant. Due to those infirmities, Dr. Fabri's testimony is inadmissible under Fed. R. Evid. 702. *See Daubert v. Merrell Dow* Pharmaceuticals, 509 U.S. 579 (1993). In addition, Dr. Fabri's testimony is independently subject to exclusion under Fed. R. Evid. 403. If this Court finds Dr. Fabri's testimony inadmissible, it should reenter her judgement of conviction, as the Sixth Circuit affirmed her conviction and sentence on all other

grounds.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

s/ Jonathan Tukel
Assistant U.S. Attorney
Chief, National Security Unit
211 West Fort Street, Suite 2001
Phone: (313) 226-9749
Email: Jonathan.Tukel@usdoj.gov

s/Cathleen M. Corken
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100
Cathleen.Corken@usdoj.gov

s/ Michael C. Martin
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
Phone: (313) 226-9100
Email: Michael.C.Martin@usdoj.gov

Dated: November 15, 2016

<u>TABLE OF CONTENTS</u>

BACKGROUND                                                                              5

I.      The Defendant's Indictment                                                      5

II.     The Defendant's Expert Notice                                                   5

III.    The Government's Opposition and the Court's First Hearing                       11

IV.     The Court's Skepticism that Dr. Fabri's Testimony is                            13
        Admissible and the Court's Order for an Evidentiary Hearing

V.      The Evidentiary Hearing and Dr. Fabri's Testimony                               14

VI.     The Court's Preclusion of Dr. Fabri's Testimony                                 17

VII.    Trial and Sentencing                                                           18

VIII.   The Defendant's Appeal                                                          19

IX.     The Government's Experts                                                        21

ARGUMENT                                                                                22

I.      The Court's Gatekeeping Function Under *Daubert* is                            24
        Critically Important

II.     Dr. Fabri's Opinions Are Not Scientifically Reliable                            26

        A.      Dr. Fabri's Opinion Does Not Meet the *Daubert* Factors                27

        B.      Dr. Fabri's Opinion Has All of the"Red Flags" That Caution             32
                Against Allowing Her to Testify

                1.      Dr. Fabri's Opinion is Based Entirely on Anecdotal             32
                        Information Provided by the Defendant

                2.      Dr. Fabri Did Not Consider Alternatives                        35

3.    Dr. Fabri's Opinions Are Highly Subjective    37

4.    Dr. Fabri's Opinions Are Based on Speculation    40

C.    The Fact that Dr. Fabri's Opinion Was Prepared for    41
Litigation Also Weighs Against Admissibility

III.    Dr. Fabri's Opinions Are Not Relevant to the Charges at Issue    41

IV.    Dr. Fabri Does Not Have the Right Qualifications to Conduct    45
a Forensic Examination

V.    Even if Dr. Fabri's Proposed Testimony Met the *Daubert*    48
Standard, it Nevertheless Should be Barred Under Federal
Rule of Evidence 403

A.    The Claim of PTSD Would Open the Door to the    48
Government Offering Contrary Evidence; A Trial on
Such Issues Would Likely Mislead and Confuse the Jury

B.    The Court Has Already Articulated the Reasons to    52
Exclude Dr. Fabri's Opinions Based on Rule 403

C.    The Psychological Testimony Which Defendant Wishes    54
to Introduce is Itself Unduly Confusing and Should be
Barred Under Rule 403

CONCLUSION    56

BACKGROUND

I.     The Defendant's Indictment

In 1970, the defendant was convicted in Israel of various crimes. In 1969, the defendant in concert with others caused a bomb to be placed at an Israeli supermarket that killed two Israeli civilians; she also was involved in placing another bomb at the British Consulate in Jerusalem, but the bomb was defused by Israeli officials before it detonated. The defendant was sentenced to life imprisonment, but was released in 1979 in a prisoner exchange with a Palestinian terrorist group. The defendant subsequently immigrated to the United States, and became a naturalized United States citizen.

On October 22, 2013, the defendant was indicted on one count of naturalization fraud, in violation of 18 U.S.C. § 1425(a). (R. 3: Indictment, PgID 18). This charge related to the defendant falsely answering questions on her N-400 application for naturalization, which she completed and signed on June 2, 2004. The defendant falsely answered "No," to a series of questions that asked if she "**EVER**" had been arrested, charged, convicted or imprisoned. (Emphasis in original).

II.     The Defendant's Expert Notice

Prior to trial, the defense gave notice of its intent to offer the testimony of Mary Fabri, who has a doctorate in psychology and works as a clinician at a

5

treatment center for survivors of torture. According to the defendant's notice, Dr. Fabri would testify that the defendant suffers from Post-Traumatic Stress Disorder (PTSD) due to alleged "horrific torture defendant suffered at the hands of the Israeli military and security police." (R. 42: Notice of Expert Evidence of a Mental Condition, PgID 295). The defense also stated that Dr. Fabri would testify that "as a result of her PTSD condition, the defendant did not intentionally falsely answer the questions on her naturalization application . . . ." *Id.*

A week later, the defendant filed an affidavit of Dr. Fabri setting forth Dr. Fabri's opinions regarding the defendant. (R. 45: Response to the Government's Rule 16 Request By Filing of Affidavit/Report of Expert Mary R. Fabri, PgID 318). Dr. Fabri's affidavit was considerably less definitive than the defendant's expert notice with respect to causation. While Dr. Fabri did conclude that the defendant had chronic PTSD brought on by alleged torture, she did not opine that Defendant Odeh's false answers were due to her PTSD (as the defendant's attorneys claimed she would in their expert notice). Rather, Dr. Fabri simply said that "someone with PTSD" would "cognitively process questions" to avoid recalling traumatic experiences. *Id.* at PgID 335. Dr. Fabri did not say that defendant Odeh actually did cognitively process the N-400 questions in this manner. In fact, Dr. Fabri's affidavit made no specific findings about the cause of defendant Odeh's false statements on her N-400 application.

6

Dr. Fabri's affidavit also set forth the methodology she used to arrive at her opinions. According to the affidavit, the defendant was referred to Dr. Fabri by her criminal defense attorney "for an evaluation of her mental health functioning and for psychological support." (R. 45: Affidavit of Mary Fabri, PgID 321). Dr. Fabri's examination of the defendant consisted of meeting with the defendant six times. *Id.* at PgID 326. During these sessions, the defendant completed intake forms, was interviewed by Dr. Fabri, and completed a questionnaire and a "check list." *Id.* No psychological testing was conducted, nor did Dr. Fabri review or consult any other sources of information about the defendant.

The questionnaire completed by the defendant consisted of 30 questions that asked the defendant about her PTSD symptoms. According to Dr. Fabri's affidavit, the questionnaire "alone would not be used to diagnose PTSD." *Id.* at PgID 333. The version of the questionnaire used by Dr. Fabri was called the "past month version," meaning that each of the questions asked the defendant about her symptoms "in the past month." None of the questions in the questionnaire asked the defendant about her symptoms at the time of the crime, namely in 2004 when she made false statements on her N-400 application. An example from one page of the questionnaire is reproduced below.

## Item 1: A Page From the Questionnaire Completed by the Defendant

CAPS-5  Page 9

7. (C2) Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

| | |
|---|---|
| In the past month, have you tried to <u>avoid things</u> that <u>remind you</u> of (EVENT), like certain people, places, or situations? *I cannot avoid.* | 0  Absent |
| | 1  Mild / subthreshold |
| **What kinds of things do you avoid?** *my case, my lawyer, the documents, the media everything makes me remember* | 2  Moderate / threshold |
| **How much effort do you make to avoid these reminders?** *(Do you have to make a plan or change your activities to avoid them?) I try, but I am not successful. I talk w/ people, but when I am alone...* | (3) Severe / markedly elevated |
| **[If not clear]** *(Overall, how much of a problem is this for you? How would things be different if you didn't have to avoid these reminders?)* | 4  Extreme / Incapacitating |
| <u>Circle:</u> Avoidance = Minimal   Clearly Present   Pronounced  (Extreme) | |
| **How often in the past month?**   # of times _____ *daily* | |
| *Key rating dimensions = frequency / intensity of avoidance* <br> Moderate = at least 2 X month / avoidance clearly present <br> Severe = at least 2 X week / pronounced avoidance | |

**Criterion D: Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:**

8. (D1) Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs).

| | |
|---|---|
| In the past month, have you had <u>difficulty</u> <u>remembering</u> some <u>important parts</u> of (EVENT)? *(Do you feel there are gaps in your memory of [EVENT]?)* | 0  Absent |
| | (1) Mild / subthreshold |
| **What parts have you had difficulty remembering?** *No, not the torture. Maybe the time or sequence is not always correct* | 2  Moderate / threshold |
| **Do you feel you should be able to remember these things?** *but I remember every detail* | 3  Severe / markedly elevated |
| **[If not clear]** *(Why do you think you can't? Did you have a head injury during [EVENT]? Were you knocked unconscious? Were you intoxicated from alcohol or drugs?)* [Rate 0=Absent if due to head injury or loss of consciousness or intoxication during event] | 4  Extreme / incapacitating |
| **[If still not clear]** *(Is this just normal forgetting? Or do you think you may have blocked it out because it would be too painful to remember?)* [Rate 0=Absent if due only to normal forgetting] | *Before I thought I had succeeded in forgetting, but now I know I remember everything* |
| <u>Circle:</u> Difficulty remembering = (Minimal)  Clearly Present   Pronounced   Extreme | *I had developed a good life, I did* |
| In the past month, how many of the important parts of (EVENT) have you had difficulty remembering? *(What parts do you still remember?)*   # of important aspects _____ | *not think about my torture, I was* |
| **Would you be able to recall these things if you tried?** | *busy* |
| *Key rating dimensions = amount of event not recalled / intensity of inability to recall* <br> Moderate = at least one important aspect / difficulty remembering clearly present, some recall possible with effort <br> Severe = several important aspects / pronounced difficulty remembering, little recall even with effort | |

*I thought I had left everything behind me and I had a new life. but now I don't have a normal life.*

The defendant also completed a "check list" of anxiety and depression symptoms. According to Dr. Fabri's affidavit, the "check list" is "a screening tool and would not be used to diagnose an Anxiety Disorder or Depression." (R. 45: Affidavit of Mary Fabri, PgID 321). The "check list" simply required the defendant to read a list of 25 symptoms and check a box for each symptom corresponding to severity, which ranged from "not at all" to "extremely." Significantly, the "check list" only asked the defendant whether these symptoms occurred "in the last week including today." The "check list" did not ask the defendant about her symptoms in 2004 when she completed the N-400 application. The lack of sophistication of the "check list" can be seen in the document's first page, which is produced below.

Item 2: The First Page of the "Check List" Completed by the Defendant

**HCL-25**

الاسم: _Rasmieh Odeh_      الرقم: _____

تاريخ اليوم: _____      العمر: _____

**تعليمات:**

فيما يلي بعض الأعراض التي يشكو منها الناس أحياناً. اقرأ كل واحدة منها وحدد مقدار مضايقة الأعراض لك خلال الأسبوع الماضي، بما في ذلك اليوم. رجاء وضع علامة في العمود المناسب.

**INSTRUCTIONS**

Listed below are some symptoms or problems that people sometimes have. Please read each one carefully and decide how much the symptoms bothered or distressed you in the last week, including today. Place a check in the appropriate column.

**PART I: ANXIETY SYMPTOMS**      الجزء الأول: أعراض القلق

| | PART 1<br>ANXIETY SYMPTOMS | Not at all<br>لا يوجد إطلاقاً | A little<br>قليلاً | Quite a bit<br>يوجد بدرجة متوسطة | Extremely<br>إلى أقصى حد |
|---|---|---|---|---|---|
| 1. | Suddenly scared for no reason<br>خائف فجأة بدون سبب | | | ✓ | |
| 2. | Feeling fearful<br>الشعور بالخوف | | | ✓ | |
| 3. | Faintness, dizziness, or weakness<br>الشعور بالإغماء أو الدوار أو الضعف | | | ✓ | |
| 4. | Nervousness or shakiness inside<br>العصبية أو الارتعاش الداخلي | | | ✓ | |
| 5. | Heart pounding or racing<br>قلبك يضرب بسرعة كبيرة | | | ✓ | |
| 6. | Trembling<br>الارتعاش | | ✓ | | |
| 7. | Feeling tense or keyed up<br>الشعور بالتوتر أو الضغط | | | ✓ | |
| 8. | Headaches<br>الصداع | | | ✓ | |
| 9. | Spells of terror or panic<br>نوبات من الفزع أو الرعب | ✓ | | | |
| 10. | Feeling restless, can't sit still<br>الشعور بعدم الاستقرار، لا تستطيع الجلوس في سكون | | | ✓ | |

     1     2     24     0    = 27

10

III.     The Government's Opposition and the Court's First Hearing

The government filed an opposition that argued Dr. Fabri's testimony was categorically inadmissible because the offense charged was a general intent crime. (R. 51: Response and Brief of the United States in Opposition to Defendant's Proposed Use of Expert Testimony Regarding Diminished Capacity, PgID 376). The government also argued that, even if the offense was a specific intent crime, Dr. Fabri's testimony was inadmissible because Dr. Fabri was not proposing to testify that Odeh actually lacked the intent to commit the crime charged. *Id.* at PgID 388.

The Court held a hearing on October 2, 2014, regarding Dr. Fabri's testimony. In response to the government's opposition, defense counsel argued at the hearing that Dr. Fabri would not testify about causation: "We're not putting the expert on to show she did or did not have intent." (R. 179: Motion Hearing Transcript, PgID 1919). According to defense counsel, Dr. Fabri would only testify that the defendant's false statements on the N-400 could possibly have been impacted by her alleged PTSD, not that PTSD actually did impact her answers: "The expert is going to testify that she's [Odeh] been diagnosed with PTSD and how that *could* have affected her when she read the questions and answered the questions." *Id.* (emphasis added). Defense counsel repeated this position later in the hearing: "Just to be clear, judge, the expert is not going to testify that she

11

couldn't possibly form specific intent. She's going to testify that she suffers from this condition, that she's been diagnosed, she's been interviewed extensively, and that as a result of that, that *could* have affected her understanding the questions and giving answers. She's [the expert] not going to say she [Odeh] couldn't have known." *Id.* at PgID 1926 (emphasis added).

The Court responded to defense counsel's assertions by saying the Court was "a little confused" because "I thought the expert's testimony would be to support the absence of specific intent." *Id.* at PgID 1926-27.  Defense counsel responded by acknowledging that Dr. Fabri "doesn't know what the person's intent was when she answered the questions." *Id.* at PgID 1927. Defense counsel then explained that Dr. Fabri would simply testify that "people" who have PTSD "block out their past," but Dr. Fabri would not testify that defendant Odeh actually did block out her own past when she completed her N-400: "Whether Ms. Odeh did that or not is up to the jury to decide based on what *other evidence* is presented to them." *Id.* (emphasis added).  The Court pressed defense counsel further: "what theory is it coming into evidence under if it's not to show a lack of specific intent?" *Id.* at PgID 1927-98. Defense counsel conceded that Dr. Fabri's testimony "doesn't necessarily answer the question that she did in fact have the specific intent or didn't." *Id.* at PgID 1928. The Court took the matter under advisement and indicated that it would issue a written order. *Id.* at PgID 1930.

IV.   The Court's Skepticism that Dr. Fabri's Testimony is Admissible and the Court's Order for an Evidentiary Hearing

The Court issued a written order that concluded the charged offense was not a general intent crime, and instead ruled the charged offense was a specific intent crime. (R. 98: Order Setting Evidentiary Hearing Regarding Defendant's Expert Evidence, PgID 982-87). However, the Court did not admit Dr. Fabri's testimony. Rather, the Court set a date for an evidentiary hearing so the Court could "ascertain whether Defendant's expert's anticipated testimony will support a legally acceptable theory of lack of mens rea." *Id.* at PgID 990. The Court pointed to several federal and state cases that had precluded such testimony. *Id.* at PgID 987-88. After reviewing those cases, the Court concluded that "whether expert evidence of this sort is admissible is contingent upon a defendant's *clear demonstration* that such evidence would negate intent rather than merely present a dangerously confusing theory of defense more akin to justification and excuse." *Id.* (emphasis added).

Recognizing the flaw in Dr. Fabri's affidavit with respect to causation, the Court stated that Dr. Fabri's affidavit "does not necessarily" meet this standard. The Court explained that "[b]ecause psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury from focusing on the actual presence or absence of mens rea, and (3) may easily slide into wider usage that opens up the jury to theories of defense more akin to

13

justification, district courts must examine such psychiatric evidence carefully to ascertain whether it would, if believed, support a legally acceptable theory of lack of mens rea." *Id.* at 989-90 (*quoting United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)). As a result, the district court ordered an evidentiary hearing on the subject of Dr. Fabri's testimony. *Id.* at 990.

V.     The Evidentiary Hearing and Dr. Fabri's Testimony

On October 21, 2014, the Court held an evidentiary hearing during which Dr. Fabri testified. (R. 113: Evidentiary Hearing Transcript, PgID 1161). Dr. Fabri told the Court that she was a clinical psychologist and that she worked at "a treatment center" for survivors of torture. *Id.* at PgID 1163. Dr. Fabri testified that she met with the defendant for six sessions, although the first two sessions were spent "becom[ing] familiar with each other." *Id.* During the third session, Dr. Fabri began her "clinical" assessment of the defendant, which involved having the defendant answer a "questionnaire" about PTSD and complete a two-page "check list" regarding "depression and anxiety symptoms." *Id.* at PgID 1164. Based solely on her interview with the defendant, and the defendant's answers to the questionnaire and check list, Dr. Fabri diagnosed the defendant with having one (and only one) ailment: "chronic PTSD." *Id.* at PgID 1166. Dr. Fabri did not diagnose the defendant as suffering from depression, anxiety, amnesia, or any other memory related disorder (which are considered distinct and separate

14

disorders within the field of psychology).

Defense counsel attempted to establish the causational link between Dr. Fabri's diagnosis of chronic PTSD and the defendant's false statements on the N-400 by asking the following leading question: "So, the fact that Ms. Odeh interpreted the question on her citizenship application to exclude her traumatic past, is that consistent with someone suffering from PTSD?" *Id.* at PgID 1170. Dr. Fabri responded: "Yes, *it could be*." *Id.* (emphasis added).

On cross-examination, Dr. Fabri clarified that prior to her evaluation of the defendant, a "screening interview" of the defendant was conducted by a "case manager." *Id.* at PgID 1173. The purpose of the "screening interview" was "to establish the probability that someone's a torture survivor and then they're referred for an intake." *Id.* The "screening interview" is "four or five questions" and the case manager is a person with only "a bachelor's level" education. *Id.* Only after the "screening interview" did the defendant meet with Dr. Fabri, who did the intake and assessment of the defendant. *Id.* at PgID 1174. Dr. Fabri also admitted on cross-examination that she reviewed no other material other than what the defendant told her in their sessions together. *Id.* at PgID 1175-76. Dr. Fabri did not review any background information about the defendant, any information about the case, or any of the discovery that was given to the defendant's attorneys. *Id.*

Dr. Fabri testified on cross-examination that she had testified in immigration

court in Chicago over 20 times, although Dr. Fabri said that in an unspecified number of these cases she "never actually g[a]ve testimony." *Id.* at PgID 1177. Aside from immigration court (where the federal rules of evidence do not apply), Dr. Fabri had only testified once in state court, and never in federal court. *Id.*

Dr. Fabri further admitted on cross-examination that she was only "seeing her [Odeh] at an assessment as a torture survivor." *Id.* at PgID 1198. As a result, Dr. Fabri did not look at the defendant's N-400 application, which serves as the basis for the charges in this case. *Id.* at PgID 1196. In fact, Dr. Fabri did not even know what year the defendant completed the N-400. *Id.* at PgID 1190. Dr. Fabri did not consider the defendant's background as a lawyer in order to determine the defendant's ability to read legal documents. *Id.* at PgID 1198. Dr. Fabri did say she watched a video, "Women in Struggle," in which the defendant was able to remember and speak about her alleged torture, but Dr. Fabri did not know the date of the video and she did not review the video to see if there was "evidence of symptoms of PTSD manifesting themselves from the stress of talking about her experiences." *Id.* at PgID 1201-02. Dr. Fabri did not ask the defendant any questions about the video or whether the defendant experienced symptoms after making the video. *Id.* at PgID 1204. Nor did Dr. Fabri consider information in the video that contradicted the defendant's version of events that she had previously given to Dr. Fabri. *Id.* at PgID 1206. When Dr. Fabri was pressed to explain why

16

she would not consider the video – which was produced in 2004, the same year that the defendant falsified her N-400 application – Dr. Fabri claimed that she was "a clinician" and was "following a structured interview" and was "looking to make a diagnosis." *Id.* at PgID 1205.

Dr. Fabri also repeated her equivocal view that the defendant "could potentially" have been impacted by her alleged PTSD when she completed the N-400 application, but Dr. Fabri could not say that this actually occurred because "I don't know what went on in her mind . . . ." *Id.* at PgID 1197. When pressed on cross-examination about the video, Dr. Fabri again stated that she "thinks" the defendant has PTSD, but admitted: "I don't know, you know, I don't know because I wasn't there." *Id.* at PgID 1207.

VI.     The Court's Preclusion of Dr. Fabri's Testimony

Upon the government's motion for reconsideration, the Court changed its earlier ruling that the statute at issue was a specific intent crime. The Court issued a written order concluding that the statute was a general intent crime, and holding that Dr. Fabri's testimony was categorically inadmissible as a consequence. (R. 119: Order Granting Government's Motion for Reconsideration, PgID 1257). The Court therefore had no reason to make any further findings with respect to the relevance, reliability or admissibility of Dr. Fabri's proposed testimony, and the case proceeded to trial.

17

VII.   Trial and Sentencing

During the trial, the defendant testified that she believed the question on the N-400 dealt only with convictions in the United States, despite the fact that question asked if the defendant had "**EVER** been in jail or prison." (R. 182: Trial Transcript, PgID 2367) (emphasis in original). The defendant also sought to interject claims of torture into the trial, despite repeated admonitions from the Court not to do so. (R. 183: Trial Transcript, PgID 2424). Following a six-day trial, the defendant was convicted as charged. Following the jury's verdict, the Court stated to the jury that "I think that your verdict is a fair and reasonable one based on the evidence and the testimony that came in." (R. 184: Trial Transcript, PgID 2533).

At the defendant's sentencing hearing, the Court found that the defendant committed perjury during the trial and enhanced her sentencing guidelines as a result. (R. 185: Sentencing Transcript, PgID 2558 (stating that the government "believe[s] that she committed perjury, and, actually, I do too. I hate to say it, but I think she did. Because her story about how she filled out the application and how she thought that it only applied to the United States, I think that was – well, first of all the jury didn't believe it, and neither did I. So, I think she did perjure herself and that's a reason for an enhancement.")).

The Court also enhanced the defendant's guidelines because she obstructed justice by ignoring the Court's order not to raise the issue of torture during her testimony. *Id.* at PgID 2558-59 ("And I spoke with Ms. Odeh before she testified and I said, don't go into certain things. Do not talk about whether or not you're guilty or innocent. Do not talk about torture. Do not talk about any of those things that relate to her trial in, back in Israel, and notwithstanding that, she continuously went into those areas and I remember having to stop her and I actually remember raising my voice, because I don't normally do that. I don't usually raise my voice in court, and I had to do that to stop her, and she just decided what she was going to say and went ahead and said it. So, for not following my instructions and disobeying my orders, I'm going to increase the guidelines by two points, because of the obstruction of justice under 3C1.1.")). The Court sentenced the defendant to 18 months' imprisonment. (R. 172: Judgment, PgID 1774).

VIII.   <u>The Defendant's Appeal</u>

The defendant appealed her conviction and sentence on several grounds, including the claim that the district court improperly excluded the testimony of Dr. Fabri. During oral argument, the Sixth Circuit expressed skepticism of Dr. Fabri's conclusions, noting that they were "hard to believe."[1] Nevertheless, the Sixth Circuit

---

[1] An audio recording of the oral argument is available at the Sixth Circuit's website: http://www.opn.ca6.uscourts.gov/internet/court_audio/aud2.php?link=audio/10-14-2015 - Wednesday/15-1331 USA v Rasmieh Odeh.mp3&name=15-1331 USA v Rasmieh Odeh

held that the "categorical exclusion" of Dr. Fabri's testimony was an error. *United States v. Odeh*, 815 F.3d 968, 984 (6th Cir. 2016). The Sixth Circuit remanded the case for the sole purpose that this Court determine whether there exists "other possible bases for excluding the evidence, under evidentiary standards such as those identified by the district court in its order discussing the use of PTSD testimony in federal and state courts. Nor do we prescribe whether a new trial would be required once the evidentiary determination has been made." *Id.* Other than the issue with regard to Dr. Fabri's testimony, the Sixth Circuit affirmed the defendant's conviction and sentence in all respects. *Id.*

While the Sixth Circuit thus did not determine, in the first instance, whether a ruling that Dr. Fabri's testimony was inadmissible would obviate the need for a new trial, it is apparent that that is in fact the case. To begin with, the Sixth Circuit did not reverse the conviction, but merely vacated it and remanded the case so that this Court could conduct the necessary hearing. If the trial had been impermissibly tainted by the categorical exclusion of Dr. Fabri's testimony, the Sixth Circuit would then have reversed the conviction, because nothing except a new trial could have remedied the error. Moreover, the Sixth Circuit took pains to explain that it could not, in the first instance on appeal, determine that the error it found, the categorical exclusion of Dr. Fabri's testimony, was not prejudicial. 815 F.3d at 980. However, a ruling by this Court on remand that Dr. Fabri's testimony was

20

inadmissible for non-categorical reasons by definition would be a finding that she was not prejudiced at trial, as the evidence was nevertheless properly excluded. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance that does not affect substantial rights must be disregarded.").  Thus, if upon the conclusion of the *Daubert* hearing, this Court determines that Dr. Fabri's testimony was inadmissible, the proper course is to reenter the judgment of conviction.

IX.   The Government's Experts

Following remand, the government obtained evaluations by two expert witnesses of Dr. Fabri's proposed testimony.  Each of the witnesses is an employee of the Walter Reed National Military Medical Center.  Dr. Paul Montalbano is a Ph.D. in psychology, and is Board Certified in Forensic Psychology.  He is the Director of the only post-doctoral training program in forensic psychology to receive accreditation through the American Psychological Association.  Dr. David M. Benedek, M.D., is a psychiatrist and the Director of the Center for Forensic Behavioral Sciences, also at the Walter Reed National Military Medical Center.

Both Dr. Montalbano and Dr. Benedek are expected to testify at the scheduled *Daubert* hearing on November 29, 2016, that Dr. Fabri's proposed testimony is based on a clinical approach, which is acceptable for clinical treatment.  However, Dr. Fabri's diagnosis of Defendant Odeh fails to meet forensic standards for reliability, and thus Dr. Fabri's testimony is inadmissible

21

under *Daubert*. Additionally, Drs. Montalbano and Benedek are expected to opine that there is no science to support Dr. Fabri's theory of PTSD causing a person to "filter" questions to avoid traumatic memories, and that there is no peer reviewed research or studies which support the theory. Moreover, Drs. Benedek and Montalbano are expected to testify that Dr. Fabri's theory is internally inconsistent.

The defendant was also examined by forensic psychologist, Dr. Ron Nieberding, over the course of 17 hours. Unlike Dr. Fabri, Dr. Nieberding reviewed a variety of collateral information and administered various psychological tests to the defendant. While those tests showed that the defendant was not malingering, they also showed that the defendant "endorsed an unusually high number of items indicative of somatic and cognitive difficulties that are uncommonly endorsed in medical patients," and that the defendant "may exaggerate the severity of her physical problems at times." Dr. Nieberding found that the defendant may have had some of the symptoms that are typically associated with PTSD (such as disturbing dreams or anxiety), but that the defendant did not meet the full criteria for a diagnosis of PTSD.

## ARGUMENT

When "faced with a proffer of expert scientific testimony" a district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or

methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993). In other words, a district court's task is to assess the evidence proffered to determine whether it "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. Thus, reliability and relevance are the cornerstones of admissibility of expert opinion testimony. *See infra.*

Dr. Fabri's testimony should be excluded because her proffered testimony is neither reliable nor relevant. Her testimony is not reliable because it meets none of the reliability factors set forth in *Daubert*. For example, her theories have not been tested, subjected to peer review, or generally accepted in the scientific community. In fact, Dr. Fabri's testimony has all of the "red flags" that the Sixth Circuit has warned district courts to look for when considering the admissibility of expert testimony.

Dr. Fabri's opinions also are not relevant because they do not pertain to the defendant's condition at the time of the offense in question, nor can Dr. Fabri establish a causal connection between the defendant's alleged PTSD and her false answers on the N-400 application. Without a connection to the time of the offense or the questions and answers on the N-400 application, the jury would be left to speculate about what impact (if any) the defendant's alleged PTSD had on her answers to the questions on the N-400 application. Speculation does not amount to

23

relevant testimony.

Lastly, Dr. Fabri's opinions, even if relevant, are outweighed by a danger of unfair prejudice, confusion of the issues, and misleading the jury, and should therefore be excluded under Federal Rule of Evidence 403.

## I.    The Court's Gatekeeping Function Under *Daubert* is Critically Important

Federal Rule of Evidence 702 "governs the use of expert testimony," and "reflects the Supreme Court's decisions" in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 528–29 (6th Cir.2008). Under Federal Rule of Evidence 702, "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *Id*. (quoting Fed.R.Evid. 702).[2]

The Supreme Court has emphasized "the importance of *Daubert's*

---

[2] Federal Rule of Evidence 702 states that witness "may" testify in the form of an opinion if: (1) the witness is qualified "by knowledge, skill, experience, training, or education," (2) the witness's specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue," and (3) the testimony "is based upon sufficient facts or data . . . is the product of reliable principles and methods, and . . . the witness has applied the principles and methods reliably to the facts of the case."

gatekeeping requirement," which serves to "make certain" that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The Supreme Court has described *Daubert's* requirements as "exacting standards" that expert testimony "must meet" in order to be admissible. *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). And the Sixth Circuit has stated that district courts should conduct a "close judicial analysis of expert testimony," because "expert witnesses are not necessarily always unbiased scientists." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 1349, 1352 (6th Cir. 2001).

To properly exercise its gatekeeping function, a district court cannot simply take "the expert's word for it." Fed.R.Evid. 702 advisory committee's note (2000 amends.); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). This is especially true in an area such as psychological testimony, which is often highly subjective and which jurors may give undue weight. *United States v. Deuman*, 892 F. Supp. 2d 881, 885 (W.D. Mich. 2012) (stating that district court's "role in ferreting out unreliable testimony is significant because jurors are likely to give special weight to expert testimony").

It is also significant to bear in mind that in this case, the burden of proof

25

rests with Defendant Odeh. According to the Sixth Circuit, it is the "party proffering expert testimony" (in this case, the defendant) who "must show by a preponderance of proof" that the proposed expert meets the requirements of *Daubert*. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). Moreover, the Sixth Circuit reviews a district court's decision to exclude expert testimony under an abuse of discretion standard, which "is highly deferential." *Rolen v. Hansen Beverage Co.*, 193 F. App'x 468, 472 (6th Cir. 2006), *citing Kumho Tire Co.*, 526 U.S. at 152)).

    II.    <u>Dr. Fabri's Opinions Are Not Scientifically Reliable</u>

Although there is no "definitive checklist or test" for establishing that an expert's opinions are reliable, *Daubert* sets forth a number of factors that typically "bear on the inquiry." 509 U.S. at 593. These include whether the theory or technique in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Id.* at 593–94.

"Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (affirming district court's exclusion of

26

expert testimony as unreliable because expert reached his conclusions "without questioning or verifying the data and without conducting any tests of his own"). In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion. *Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426, 434 (6th Cir.2007). In the present case, Dr. Fabri's proposed testimony cannot meet any of the *Daubert* factors and her testimony has all of the "red flags" that the Sixth Circuit has cautioned against.

A.    <u>Dr. Fabri's Opinion Does Not Meet the *Daubert* Factors</u>

Dr. Fabri's opinion has two parts, both of which must be examined in order to determine whether her testimony is scientifically reliable. The first part is that the defendant has PTSD. The second part is Dr. Fabri's theory that PTSD can cause unspecified other people to subconsciously "filter" certain questions put to them so as to avoid traumatic memories of the past. Dr. Fabri does not opine that this phenomenon causes the person to not remember the traumatic experience or that the person blocks out the memory completely. Quite the opposite. According to Dr. Fabri, a person who experiences this "filtering" phenomenon can recall the traumatic event in detail if specifically asked. However, Dr. Fabri does not say what level of specificity is needed to bypass the subconscious filter.

This part of Dr. Fabri's proposed testimony, namely the theory that PTSD can cause people to "filter" certain questions, does not meet the *Daubert* standard.

27

Dr. Fabri has not identified any academic study that has tested this theory. Nor did Dr. Fabri attempt to test this theory on the defendant.[3]  Simply put, Dr. Fabri's theory has never been tested by anyone, anywhere – which is a powerful indication that her theory is not sufficiently reliable for admission in a court of law.  The Supreme Court stated in *Daubert* that whether an expert's proposed theory has been tested is a "key question" because "scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." 509 U.S. at 593. And a lack of testing is one of the "red flags" that the Sixth Circuit says caution against permitting an expert to testify. *Newell Rubbermaid, Inc.*, 676 F.3d at 527.

Since Dr. Fabri's theory has never been tested, it is not surprising that Dr. Fabri cannot establish that this theory has been subject to peer review and publication. She has identified no study or publication linking PTSD to the phenomenon of "filtering" written questions. Nor has she identified any study that finds "filtering" occurs "subconsciously," as Dr. Fabri claims. Peer review and

---

[3] For example, Dr. Fabri could have tested her theory by seeking out evidence that Odeh has experienced this "filtering" phenomenon at other points in her life, or has experienced it with respect to answering other questions. Dr. Fabri made no such efforts. Dr. Fabri also could have developed a study that involved asking known and documented torture survivors who suffer from PTSD a series of written questions on various topics and then measuring whether their alleged "filters" prevented them from answering truthfully. Dr. Fabri could then have asked Odeh the same questions and observed whether Odeh's answers were comparable. Dr. Fabri did no such study.

publication is one indicator of "good science" because "it increases the likelihood that substantive flaws in methodology will be detected." *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 408 (6th Cir. 2006) (*quoting Daubert*, 509 U.S. at 594). The absence of any peer review is another strong indicator that Dr. Fabri's theory is not reliable. *United States v. Langan*, 263 F.3d 613, 623 (6th Cir. 2001) (excluding defendant's psychologist's opinion testimony which "lacked the requisite indicia of reliability" because there was no "empirical support for the theory," it had not been "subjected to further testing or been confirmed scientifically" and had not been "subject to peer review").

Given that Dr. Fabri's theory has not been tested, peer reviewed or published, she also cannot tell the Court the rate of error in her theory. She cannot say, for example, how many "false positives" or "false negatives" there are under her theory. She cannot say how many people with PTSD might lie on a written question because they are actually lying, instead of "filtering" the question. Nor can she say how many people with PTSD might be "filtering" a question, but still be able to answer it truthfully.

While Dr. Fabri has pointed to some academic articles, they all pertain to PTSD's impact on memory in other ways; they do not pertain to the "filtering" phenomenon theorized by Dr. Fabri. The government does not dispute that PTSD can cause people to have amnesia or block out bad memories. But this is not what

29

Dr. Fabri is claiming occurred. Therefore, Dr. Fabri's reliance on studies that deal with amnesia do not make her opinion reliable. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005) (evidence of general acceptance of "broad principles of pharmacology" insufficient to show reliability because expert offered "no testimony about the acceptance of his specific opinions.").

Lastly, there is no evidence that Dr. Fabri's theory has been generally accepted in the scientific community. The primary reference manual used by psychologists to diagnose mental disorders is the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). The DSM-5 sets forth the criteria necessary for a diagnosis of PTSD, along with the disorder's features, prevalence, development and course over time, among other information. Nowhere in the DSM-5 does it state that PTSD can cause the type of selective "filtering" phenomenon described by Dr. Fabri.

The Sixth Circuit has repeatedly held that it is proper to exclude expert opinion testimony that is not tested or supported by scientific research. For example, in *Downs v. Perstorp Components, Inc.*, 26 F. App'x 472, 476 (6th Cir. 2002), the Sixth Circuit affirmed the district court's exclusion of the opinions of a medical doctor, Dr. Kilburn, as unreliable. According to the Sixth Circuit, exclusion was warranted because "Dr. Kilburn's method does not include any reference to existing scientific knowledge or any attempt to test independently the

30

validity of his conclusion. In effect, Dr. Kilburn simply formed a hypothesis based on his observations of Downs [the plaintiff] and what he knew of Downs' medical history. He failed to take the necessary step of either supporting his hypothesis through reference to existing scientific literature or conducting his own tests to prove its reliability." *Id.* The same can be said here. Dr. Fabri simply interviewed the defendant without consulting any collateral information, and then formed a hypothesis about "filtering," without any support in the scientific literature and without conducting any of her own tests. The Sixth Circuit has not hesitated to affirm the exclusion of this type of unreliable expert opinion. *United States v. Semrau*, 693 F.3d 510, 522 (6th Cir. 2012) (affirming district court's exclusion of defendant's expert's opinion because of a "lack of real world testing" and "no formal research" was presented); *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir.2000) (affirming district court's exclusion of three experts' testimony as unreliable for "failure ... to test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts of this case."); *Dow v. Rheem Mfg. Co.*, 527 F. App'x 434, 437-38 (6th Cir. 2013) (affirming district court's exclusion of expert's opinion, in part, because expert "did not perform any tests to determine if he could duplicate" his theory).

In short, Dr. Fabri's theory of the "filtering" phenomenon does not meet any

of the *Daubert* criteria. Her theory has not been tested by herself or others. Her theory has not been subjected to peer review or publication. Nor has there been any showing of the theory's error rate or that it is generally accepted in the scientific community.

### B.   Dr. Fabri's Opinion Has All of "Red Flags" That Caution Against Allowing Her to Testify

As mentioned above, one of the "red flags" that the Sixth Circuit has cautioned against is a lack of testing. But other "red flags" include the expert's reliance on "anecdotal evidence, improper extrapolation, failure to consider other possible causes, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). All of these are present here.

### 1.   Dr. Fabri's Opinion is Based Entirely on Anecdotal Information Provided by the Defendant

Dr. Fabri's opinions are unreliable, in part, because they are based entirely on the statements of the defendant herself. Dr. Fabri interviewed the defendant and had her complete a questionnaire and check-list. Dr. Fabri did nothing to corroborate or verify any of the information that the defendant self-reported. Dr. Fabri did not review any records or documents; she did not interview the defendant's friends, family or coworkers; she did not even review the evidence associated with the trial or sentencing. As Dr. Fabri admitted on cross-examination, she did not review "anything about her [Odeh's] background,

anything about the case, [or] any of the discovery that was given to her attorneys," because "I want to meet with the client and find out from her in her own words." (R. 113: Hearing Transcript, PgID 1175).

Dr. Fabri simply took what the defendant told her, accepted it as true, and formed her opinion based on the defendant's uncorroborated self-report. Relying on Defendant Odeh as the only source of information is particularly problematic given that Odeh was found by this Court to have committed perjury during the trial on a topic (namely, her completion of the N-400 application) that is germane to Dr. Fabri's opinion.

Relying on the anecdotal self-report of an unreliable informant, without more, raises serious questions about the validity of the opinions that were formed based on that anecdotal information. The Sixth Circuit has stated that an expert's opinion is unreliable if it is based on the "wholesale adoption" of information provided by one party "without revealing or apparently even evaluating the bases" for that information. *Ask Chemicals, LP v. Computer Pkg., Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014). When this occurs, the proponent of the expert is simply trying to "cloak[] unexamined assumptions in the authority of expert analysis." *Id.* In such situations, exclusion of the testimony is proper: "Where an expert merely offers his client's opinion as his own, that opinion may be excluded." *Id.*; *see also In re Aredia & Zometa Prod. Liab. Litig.*, 483 F. App'x 182, 190 (6th Cir. 2012)

(affirming exclusion of expert testimony because opinion "relied exclusively on scientific literature provided by Plaintiff's counsel").

This view is shared by other circuit and district courts. *McClain*, 401 F.3d at 1250 ("anecdotal information offers one of the least reliable sources" of information upon which to base an opinion); *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999) ("Most courts that have considered the issue have concluded that expert testimony, based on the statements of the alleged victim, that sexual abuse in fact occurred is inadmissible under Fed.R.Evid. 702 (or similar military or state evidentiary rules) because, in such cases, the expert offering the opinion is merely vouching for the credibility of the alleged victim."); *United States v. Whitted*, 11 F.3d 782, 786 (8th Cir. 1993) (holding that doctor "could not base his diagnosis soley on [victim's] allegations of abuse"); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (affirming exclusion of doctor's opinion testimony because it "rests on Viterbo's statements that he experienced certain symptoms" and therefore the doctor's testimony "is no more than Viterbo's testimony dressed up and sanctified as the opinion of an expert"); *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.,* 815 F.Supp.2d 673, 677 (S.D.N.Y.2011) (rejecting expert testimony based on "the conclusory statements of [the party's management] and not on his independent evaluation of the facts"); *King–Indiana Forge, Inc. v. Millennium Forge, Inc.,* 2009 WL 3187685, at *2

34

(S.D.Ind. 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded.").

### 2.    Dr. Fabri Did Not Consider Alternatives

Another "red flag" is that Dr. Fabri did not consider alternative explanations for the defendant's false statements on her N-400. For example, Dr. Fabri did not even consider the possibility that the defendant's false statements on her N-400 application were made not because of a novel theory of "filtering," but because of a desire to fraudulently obtain her citizenship. Dr. Fabri's affidavit does not even address this possibility, let alone explain why she apparently rejects it.

Nor does Dr. Fabri's affidavit show that she considered other possible causes of the defendant's PTSD. Dr. Fabri simply accepted the defendant's claims of torture as true and then concluded that the alleged torture was the cause of the defendant's symptoms. Dr. Fabri never explained why other traumatic events taking place in the defendant's life at about the same time (such as witnessing warfare, seeing bodies of dead people killed in the Israeli-Palestinian conflict, and seeing her family's home destroyed) would not cause the symptoms the defendant claims to be experiencing. While these distinctions might seem less important to a clinician such as Dr. Fabri – who admitted that she was just "looking to make a diagnosis" (R. 113: Evidentiary Hearing Transcript, at PgID 1205) – they are critically important for purposes of these legal proceedings. After all, if the

35

defendant's PTSD symptoms were caused by seeing dead bodies or seeing her childhood home destroyed, then questions on the N-400 about criminal convictions or imprisonment should not have aggravated her alleged PTSD. Dr. Fabri did not even consider these issues. *Nelson*, 243 F.3d at 253 (affirming exclusion of doctor's opinion testimony as unreliable, in part, because doctor "utterly ignored" evidence that "other factors or agents . . . may have been responsible for the symptoms suffered by the flagship plaintiffs"); *Early v. Toyota Motor Corp.*, 277 F. App'x 581, 586 (6th Cir. 2008) (affirming exclusion of expert's opinion testimony as unreliable because he "failed to consider" other possible reasons for the failure of a particular auto part).

Lastly, Dr. Fabri's efforts (such as they were) to detect inaccuracies in the defendant's self-reported information were entirely inadequate. According to Dr. Fabri, the only thing she did to determine if the defendant was "truthfully relating her experiences" during their sessions was ask the defendant "the same questions in different ways" so she could "see if the responses stay the same." (R. 113: Hearing Transcript, PgID 1165). But truthfulness and accuracy are two different things. A person can be honest, but still have an inaccurate or distorted description of prior events or symptoms. Dr. Fabri administered no psychological tests to determine if the defendant's self-report was accurate, nor did she review any collateral information to see if the defendant's symptoms or memory abilities in

36

prior years were consistent with the defendant's presentation when Dr. Fabri

interviewed her.[4] Simply asking the defendant "the same question" over and over

again is insufficient to detect inaccuracies in the self-reported information provided

by a criminal defendant. Dr. Fabri has pointed to no published standards by

forensic psychologists that would support her approach (or lack thereof) to

determining whether the information provided by the defendant – which formed

the sole basis for Dr. Fabri's opinions – was even accurate. *Coffey v. Dowley Mfg.,*

*Inc.*, 89 F. App'x 927, 931 (6th Cir. 2003) (affirming exclusion of expert testimony

because opinion was based on information that amounted to a "guesstimation"

which the expert "failed to confirm . . . in any way"). These factors, combined with

the expert's "complete failure to test his predictions," meant "Garbage in. Garbage

out." *Id*.

### 3.   Dr. Fabri's Opinions Are Highly Subjective

Another "red flag" present in this case is the highly subjective nature of Dr.

Fabri's opinion. In part, this is due to the fact that psychology is itself a subjective

field of inquiry. In *Clark v. Arizona*, 548 U.S. 735, 774 (2006), the Supreme Court

ruled that states could place restrictions on a defendant's ability to present

---

[4] The defendant was able to recall (and discuss) her alleged torture during her trial in Israel in 1969 to 1970, during an interview with the Jerusalem Post Magazine in 1977, during public testimony before the United Nations in 1979, in an academic article in 1980, and during the "Women in Struggle" video in 2004. (R. 209: Government's Opposition to Defendant's Motion for Disclosure of Government Expert and for Modification of Court Order, PgID 2803-07).

psychological testimony as part of his criminal defense, either to negate an intent element or as an affirmative defense of insanity. The Court believed that such restrictions were reasonable given the "characteristics of mental-disease and capacity evidence." *Id.* Psychological testimony has three characteristics that are particularly problematic: the "controversial character of some categories of mental disease," the "potential of mental-disease evidence to mislead," and the "danger of according greater certainty" to such evidence than is justified. *Id.* at 774.

With respect to the controversial character of psychological evidence, the Court stated that psychological diagnosis "may mask vigorous debate within the profession about the very contours of the mental disease itself." *Id.* Psychologists often disagree about how a mental disease impacts a person. That is true in the present case: Dr. Fabri says PTSD can cause people to automatically "filter" questions put to them; the government's psychologists and psychiatrist say that PTSD does not do this. While the Supreme Court did not "condemn mental disease evidence wholesale," it also recognized that this type of "professional ferment" means that courts should exercise "general caution" when dealing with psychological evidence. *Id.* at 775.

The Supreme Court also recognized "the potential of mental-disease evidence to mislead jurors" because this type of evidence has the power "to suggest that a defendant suffering from a recognized mental disease lacks

38

cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all." *Id.* Even when the mental disease at issue is "broadly accepted" and the defendant's diagnosis of that disease is "uncontroversial," the diagnosis may "tell us little or nothing about the ability of the defendant to form mens rea . . ." ." *Id.* As a result, "evidence of mental disease . . . can easily mislead." *Id.* at 776.

Lastly, the Supreme Court stated that mental disease evidence "consists of judgment, and judgment fraught with multiple perils: a defendant's state of mind at the crucial moment can be elusive no matter how conscientious the enquiry." *Id.* This too is exemplified by Dr. Fabri's admission that she cannot say what impact (if any PTSD) actually had on Odeh because "I don't know what went on in her mind," and "I don't know because I wasn't there." (R. 113: Evidentiary Hearing Transcript, at PgID 1197, 1207). Incidentally, this is the exact same type of example that the Supreme Court said makes psychological testimony so problematic. *Clark*, 548 U.S. at 777 (stating that defendant's psychologist's "judgments" about defendant's state of mind was of a "potentially tenuous character" because psychologist testified "no one knows exactly what was on his [defendant's] mind at the time of the shooting").

In short, Dr. Fabri's opinions are in field that is highly subjective, which weighs in favor of excluding her testimony.

39

4.   Dr. Fabri's Opinions Are Based on Speculation

The final "red flag" is that Dr. Fabri's opinions are based on speculation. Dr. Fabri's diagnosis of the defendant does not pertain to the defendant's condition at the time of the offense in question. Dr. Fabri's opinions are based entirely on the defendant's current symptoms of PTSD. For example, the questionnaire that Dr. Fabri used asked the defendant to report symptoms that she had "in the past month," and the check-list that Dr. Fabri used asked the defendant to report symptoms that she had "in the last week, including today." Dr. Fabri did not focus on what the defendant's symptoms were like when she completed her N-400 application in 2004. As a result, any opinion by Dr. Fabri about the defendant's *mens rea* is highly speculative because it is based not on what her symptoms and mental condition were like at the time of the offense, but rather on what her symptoms and mental condition were like 10 years after the fact. This type of speculation makes Dr. Fabri's opinions inadmissible. *U.S. ex rel. Tenn. Valley Auth. V. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 750 (6th Cir. 2016) (stating that when "expert testimony amounts to mere guess or speculation, the trial court should exclude the testimony"); *McClain*, 401 F.3d at 1245 ("Subjective speculation that masquerades as scientific knowledge" does not provide good grounds for the admissibility of expert opinions."); *Rolen*, 193 F. App'x at 474 (affirming exclusion of doctor's opinion because it was based on "speculation" of

40

the cause of plaintiff's illness).

C.    The Fact that Dr. Fabri's Opinion Was Prepared for Litigation Also Weighs Against Admissibility

"A district court can also analyze more rigorously the admissibility of an expert's testimony if the expert's opinion was prepared solely for litigation." *Lawrence v. Raymond Corp.*, 501 F. App'x 515, 518 (6th Cir. 2012) (expert opinion unreliable also because of insufficient testing and expert's opinion not generally accepted). This is because "expert witnesses are not necessarily always unbiased scientists." *Mike's Train House, Inc.*, 472 F.3d at 408. In the present case, Dr. Fabri's examination of the defendant was instigated not by the defendant for treatment purposes, but by the defendant's own attorneys for purposes of this litigation. In fact, Dr. Fabri recommended to the defendant that she seek treatment for her alleged PTSD, but the defendant has never pursued any treatment (either before or after she met with Dr. Fabri). (R. 113: Evidentiary Hearing Transcript, at PgID 1179-80). Given the other deficiencies in Dr. Fabri's opinion that are discussed above, the fact that her opinion was prepared for the sole purpose of litigation weighs in favor of inadmissibility.

III.   Dr. Fabri's Opinions Are Not Relevant to the Charges at Issue

In order to be admissible under *Daubert*, Dr. Fabri's opinion must also be relevant to the issues in this particular case. *Daubert*, 509 U.S. at 592 (expert testimony only admissible if it "will assist the trier of fact to understand or

41

determine a fact in issue"). This means that Dr. Fabri's testimony must be "tied to the facts of the case" and "aid the jury in resolving a factual dispute." *Id.* Dr. Fabri's testimony is not relevant because it is not tied to the facts of this case in two important respects.

First, Dr. Fabri's evaluation and diagnosis of the defendant are not focused on the relevant time period of this case, and therefore do not have a connection to the issues the jury must decide. As explained above, Dr. Fabri's diagnosis of the defendant was focused on the defendant's mental condition at the time Dr. Fabri examined the defendant, not in 2004 when the defendant committed the offense in question. The defendant's mental health today does not necessarily tell the trier of fact anything about what the defendant's mental health was like over 10 years ago, especially if other traumatic events (such as being indicted for a federal felony and facing mandatory deportation) occurred in the intervening period. *Nelson*, 243 F.3d at 253 (doctor's testimony properly excluded because he failed "to evaluate or show a temporal relationship between exposure and symptoms").

A district court should exclude expert testimony "that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146 (affirming exclusion of expert opinion testimony based on scientific studies that "were so dissimilar to the facts presented in this litigation").

42

That is precisely the situation here. Given the temporal disconnect between Dr. Fabri's opinion and the relevant issues in the case, Dr. Fabri's testimony is simply irrelevant and should be excluded.

Second, Dr. Fabri's opinions do not establish that PTSD caused the defendant to falsify her answers on the N-400. If there is no evidence showing that PTSD caused the defendant to falsify her answers, then evidence of her PTSD does not make any fact more (or less) probable, and therefore does not help the jury. This is precisely the concern that this Court raised with the defense in a pre-trial hearing when defense counsel informed the Court that Dr. Fabri would only testify that PTSD "could" have impacted the defendant's intent and that Dr. Fabri's testimony "doesn't necessarily answer the question that she [Odeh] did in fact have the specific intent or didn't." (R. 179: Motion Hearing Transcript, PgID 1927-28). The Court responded by indicating it was "a little confused" because "I thought the expert's testimony would be to support the absence of specific intent." *Id.* at PgID 1926-27. The confusion experienced by the Court would be the same type of confusion experienced by the jury, if Dr. Fabri's opinions were admitted. Testimony that PTSD "could" or "may" have impacted the defendant's intent does not make any fact in issue more or less probable, and thus is not relevant.

Dr. Fabri's testimony is only that PTSD "could" or "could potentially" have caused the defendant to answer the N-400 questions incorrectly. (R. 113:

43

Evidentiary Hearing Transcript PgID 1170, 1197). However, "[m]ere possibility . . . cannot establish a fact to the degree of certainty necessary to justify reliance on that fact." *Mitchell v. City of Warren*, 803 F.3d 223, 230–31 (6th Cir. 2015) (affirming exclusion of expert testimony "that a product can *possibly* cause an injury" because such testimony requires "speculative leaps"). As one court in this district noted this year, "[a]n expert 'may be a distinguished doctor, and his conjecture about causation may be worthy of careful attention . . . but the courtroom is not the place for scientific guesswork, even of the inspired sort.'" *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 561–62 (E.D. MI 2016) (Borman, J.) (*quoting Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010)). Dr. Fabri's opinion that PTSD "could" cause unspecified other people to "filter" questions asked of them may be "a plausible hypothesis. It may even be right. But it is no more than a hypothesis, and it thus is not 'knowledge,' nor is it 'based upon sufficient facts or data' or the 'product of reliable principles and methods ... applied ... reliably to the facts of the case.' *Tamraz*, 620 F.3d at 670 (quoting Fed. R. Evid. 702).

In summary, Dr. Fabri's opinions are not relevant because they are not focused on the time of the offense in question. In addition, Dr. Fabri can only say that PTSD "could" have impacted her answers to the N-400 questions, not that PTSD actually did so. This type of speculative opinion does not make any fact more or less

44

probable, and therefore is not relevant. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002), "A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."); *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir. 1990, emphasis in original) (finding proper exclusion of expert opinion where "medical expert did not testify with *any* degree of certainty" because "medical expert must be able to articulate that there is  more than a mere possibility that a causal relationship exists.").

IV.   Dr. Fabri Does Not Have the Right Qualifications to Conduct a Forensic Examination

Many of the flaws in Dr. Fabri's testimony can be traced to the fact that she is not a forensic psychologist. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Dr. Fabri's experience is entirely in the area of clinical psychology, not forensic psychology. The distinction is important. A clinical psychologist treats patients for their current symptoms. A forensic psychologist does not treat patients, but instead attempts to determine a person's mental condition often in the context of litigation or criminal justice proceedings. A forensic psychologist is also trained to make an assessment not only of a person's current mental condition, but also of their mental condition at a particular point in time in the past. In addition, a clinician is more trusting of the background information and symptoms reported

45

by a patient, which makes sense when a patient comes to a clinical psychologist seeking treatment. A forensic psychologist, on the other hand, is trained to examine a defendant's self-report more closely, given that defendants are often referred to the forensic psychologist by counsel in the context of active litigation where a person has an obvious incentive to fabricate or exaggerate impairment.

While the methodologies that Dr. Fabri employed in reaching her opinion in this case may have been sufficient for purposes of conducting a limited number of treatment sessions, her methodology was seriously deficient when viewed through the standards of forensic psychology. The fact that Dr. Fabri's methods may be acceptable clinically does not mean that her opinion is necessarily admissible. According to the Supreme Court in *Daubert*, "scientific validity for one purpose is not necessarily scientific validity of other, unrelated purposes." 509 U.S. at 591; *see also Grier v. Educational Serv. Unit No. 16*, 845 F.Supp. 1342, 1353 (D. Neb. 1994) (excluding psychologist's testimony as not sufficiently reliable because "The methods used here may well have been sufficiently reliable for purposes of choosing a course of psychotherapy . . . a course which must, to some extent, rely upon . . . the subjective reports of parents and others. However, the methodologies have not been shown to be reliable enough to provide a sound basis for investigative conclusions and confident legal decision-making.").

46

The Sixth Circuit has affirmed the exclusion of expert witness testimony when the proposed expert's background (although impressive) did not fit the area of their proposed testimony. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 479 (6th Cir. 2008) (affirming exclusion of plaintiff's expert who "owns and operates two automobile sales and service facilities, performs "vehicle autopsies" for the Hamilton County District Attorney's Office, has served as an expert witness in civil litigation, and has twenty-six years of experience in repairing and diagnosing problems with automobiles," because expert was not an "accident reconstructionist" and therefore did not have experience estimating the speed of the vehicle when it hit a tree); *United States v. Langan*, 263 F.3d 613, 623 (6th Cir. 2001) (expert opinion about reliability of eye witness identification inadmissible because expert had only researched eyewitness identification by children, not adults); *In re Aredia*, 483 F. App'x at 189-90 (holding that while doctor's experience as an oral surgeon "may qualify him to diagnose," it "does not qualify him to evaluate the cause" of the illness); *Patterson v. Cent. Mills, Inc.*, 64 F. App'x 457, 462 (6th Cir. 2003) (in case involving child's T-shirt that caught fire, expert not qualified because he had experience with warning labels on mattresses and furniture, not clothing).

In short, Dr. Fabri's experience as a clinician did not prepare her to conduct the type of comprehensive psychological examination necessary to form an opinion that is sufficiently reliable for admission in federal district court.

V.    Even if Dr. Fabri's Proposed Testimony Met the *Daubert* Standard, it Nevertheless Should be Barred Under Federal Rule of Evidence 403

Even if Dr. Fabri's testimony met the *Daubert* test for admissibility of expert testimony, the Court nevertheless should rule it inadmissible under Fed. R. Evid. 403, for a number of reasons.  Under Fed. R. of Evid. 403, a court may exclude relevant evidence "'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'"  *Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 458 (6th Cir. 2016) (citations omitted).  As is the case for admissibility under Daubert, a district court's exclusion of evidence under Rule 403 is reviewed by the court of appeal for an abuse of discretion. *Id.; see also Daubert*, 509 U.S. at 595 (noting that rule 403 must be considered even if proposed testimony meets reliability and relevance standards because "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.").

A.    The Claim of PTSD Would Open the Door to the Government Offering Contrary Evidence; A Trial on Such Issues Would Likely Mislead and Confuse the Jury

In order to lay the foundation for Dr. Fabri's opinion that the defendant has PTSD as a result of torture in Israel, Odeh will necessarily have to elicit a significant

amount of other testimony as to her treatment in Israel 45 years ago, all of which the government would strongly controvert.[5]  As a result, a new trial which admitted such PTSD evidence would quickly devolve into a dispute regarding collateral issues, such as the nature of defendant's interrogation in 1969; whether she had been a member of a designated terrorist organization, the Popular Front for the Liberation of Palestine (PFLP); and whether she had in fact confessed voluntarily in Israel to the crimes with which she indisputably had been charged.  To illustrate this point, consider the following types of evidence the government would seek to introduce to rebut the defendant's claim of torture:

- **Evidence the Defendant Was a Member of the Terrorist Group, the Popular Front for the Liberation of Palestine.** If Defendant Odeh were permitted to offer evidence of torture, the door would be open to the government proving her motive to falsely claim it.  This, or course, would necessitate proof that Odeh in fact was a member of the PFLP (the group responsible for the Supersol bombing) and had participated in the bombing.

---

[5] Defendant falsely claims that the Court has found her claims of torture "credible." *See* R.213: Def. Brief, PgID 2872 n.4. However, the government respectfully suggests, without trying to put words into the Court's mouth, that the Court has done no such thing.  The complete quotation of what the Court has said is that "the Court finds Defendant's claims of torture to be credible and does not intend with the instant decision to suggest a callous disregard for the inhumane and deplorable physical and emotional abuse that Defendant may have endured during her detention." (DE 117 at 18, Page ID 1246 (emphasis added).)  Thus, the Court does not appear to have reached any sort of conclusion as to what took place during Odeh's detention, but merely that her claim was plausible.  This is particularly so given the Court's repeated statement's that it would not allow Odeh to retry the case from Israel, and that "if I let you get into it, then the government's going to put in a whole lot of evidence about the case and it will be a totally one-sided situation, and, like I said, we're not here to retry your case and to talk about torture or rape, or any of those things." (November 6, 2014 Tr. at 92-93, Page ID 2340-2341.)  In other words, the Court acknowledged that Odeh's claims of torture were subject to contradiction, but that since they were not relevant to the trial neither the claims nor the rebuttal of them would be admitted.

To do this, the government would offer several different pieces of evidence.[6]

- **Evidence of the Defendant's Motive to Falsely Claim Torture.** While at first blush it might seem unlikely that someone would falsely claim, over a period of more than forty years to have been tortured, Odeh in fact has a strong motivation to do so. Terrorist groups routinely train their operatives, in the event of capture, to claim torture. As noted, Odeh's membership in the PFLP and role in the bombing would serve to establish her motive for falsely claiming torture, because by confessing and causing the arrests of numerous confederates she undermined the mission of the PFLP. For example, according to testimony during her trial in Israel, the defendant compromised the PFLP by providing the names of more than 80 terrorists who were then arrested by Israeli officials.[7]

---

[6] This evidence would include: (1) A published article in the University of California Press which included an interview with Defendant Odeh, in which she discusses the fact that "we" were involved in the bombings; (2) The videos *Women in Struggle* and *Tell Your Tale Little Bird*, in both of which Defendant Odeh and admitted conspirators in the bombings appear and talk about the past. In those videos, conspirators describe Defendant Odeh's role in the bombing, including that fact that she scouted the location in advance and was "much more involved" than Aisha Odeh, who by her own admission planted the bomb at the Supersol; (3) The fact that during the 1972 Munich Olympic kidnaping of Israeli athletes, carried out by the PFLP, the terrorists' "communique," which demanded the release of hundreds of prisoners in Israel in exchange for the athletes, included a demand to release Defendant Odeh. The PFLP would not demand the release of anyone not affiliated with the organization, and (4) The fact that in 1970, during a series of airline hijackings in Jordan carried out by the PFLP, one of the crews of hijackers referred to themselves as "Task Force Rasmieh Odeh." The PFLP would not name a crew of hijackers after someone not affiliated with the organization.

[7] "[S]he [the defendant] provided names of others related to the network such as Ali Kassim, Aliya Khuri, the Attorney Bashir Alhiri the attorney, Abdel Hafiz Jaber, and the following day of Yakub Odeh, who is her cousin. . . During the same week of investigation the incident in the cafeteria in East Jerusalem took place. Thanks to her we've also gotten to the cafeteria, because she knew of the plans before getting arrested and she provided the names of the people who may have carried it out. She cooperated with me throughout the travels. She worked with me for 6 days of oral interrogation. Led me to places. Thanks to her we've arrested over 80 people; Shkhem, Ramallah as well as Hebron, Bet-Lehem and the whole (West) Bank[.]" *See* Israeli Trial Transcript, Bates Number 721.

- **Evidence That the Defendant's Statements Regarding Torture Were Not True.** Dr. Fabri's testimony would open the door to the government directly proving that Odeh's version of her claimed torture cannot be true. Such evidence would be critical to undermining Dr. Fabri's opinion (which is based exclusively on the defendant's self-reported claim of torture). For example, Odeh claims that in her presence, her father was beaten and told that he would be made to rape her. However, on March 10, 1969, Defendant's father, Yusef Odeh, an American citizen, was interviewed while in custody in Israel by the U.S. Consul General. *See* generally Docket Entry 161, Government's Sentencing Memorandum at 14, Page ID 1724. Defendant claims the torture had begun the night of her arrest, February 28-March 1, well before the Consul's interview of Yusef Odeh. The American Consul General sent a diplomatic cable to Washington in which he detailed his interview of Yusef Odeh. Among other things, the Consul General wrote that "Odeh states that police have questioned him very little since arrest," and that Yusef "Odeh complains of uncomfortable, overcrowded jail conditions, but he apparently receiving no rpt [repeat] no worse than standard treatment afforded majority detainees at Jerusalem jail." *Id.*

On top of this evidence would be layered competing testimony by psychologists and psychiatrists as to whether the defendant had PTSD, what its symptoms were, and whether those symptoms could have been responsible for the answers she provided during the naturalization process in 2004. All such testimony would render as a mere sideshow the actual issue before the jury, whether defendant Odeh had falsely answered the naturalization questions and whether she had acted knowingly. Such testimony almost certainly would confuse and mislead the jury, and also would consume a large amount of time. As a result, such testimony should be excluded under Rule 403. *See Langan,* 263 F.3d at 624 (if expert had been

51

permitted to testify, "it is likely that an uninformative battle of experts would have occurred if the government had offered its own expert testimony in order to refute Dr. Ross's opinion, and the jury could have been unduly misled and confused.").

    B.    The Court Has Already Articulated the Reasons to Exclude Dr. Fabri's Opinions Based on Rule 403

Admitting Dr. Fabri's opinion testimony would make for a radically different trial than what the Court permitted during the first trial, when it steadfastly refused to retry a 40-year old Israeli case. The Court repeatedly explained this: "Mr. Deutsch, let me just tell you this right now, and both sides, we're not going to retry her case that she had back 40 years ago . . .  We're not retrying that case. We're going to try this case. So a lot of the things that both sides are talking about, I'm not going to let in. Because we're not going to go through everything she went through 40 years ago."  (R. 178: Evidentiary Hearing Transcript, PgID 1828-1829). As the Court explained to the defendant on another occasion: "we can't retry that case. You don't get another shot at trying to win that case, and here I'm not going to allow you to testify about any of the details about it, because we, I mean, if I let you get into it, then the government's going to put in a whole lot of evidence about the case and it will be a totally one-sided situation, and, like I said, we're not here to retry your case and to talk about torture or rape,

or any of those things. And that's been my decision." (R. 182: Trial Transcript, PgID 2340-2341).

Thus, this Court has already ruled, for reasons contemplated by Fed. R. Evid. 403, that claims of torture and the substance of the underlying trial were not admissible, because the Court had to avoid "a totally one-sided situation" and that to "retry your case" from "40 years ago" would confuse the issues and mislead the jury. This is as true now as it was before the defendant's trial. Permitting Dr. Fabri to testify would create a trial over facts other than whether Defendant Odeh knowingly made false statements in her naturalization application, and would likely confuse the jury. For instance, if the jury were to conclude that Odeh was guilty of the charges in Israel, would it then conclude that it was required to find her guilty of the charge in this Court? Or if it found that her confession in Israel was coerced, would it then think itself required to find her not guilty here? The likelihood of such issues confusing the jury would mandate that the evidence of PTSD be deemed inadmissible under Fed. R. Evid. 403.

Simply put, if this Court were to allow Dr. Fabri to testify and to present Odeh's claims of torture to a jury, the resulting trial would be about nothing except what happened to Odeh in Israel in 1969-1970, contrary to this Court's prior rulings. Because such proceedings, implicitly or explicitly, would seek jury nullification of the charge here based on Odeh's alleged mistreatment in Israel, it

would be unfairly prejudicial within the meaning of Fed. R. Evid. 403. In addition, it would leave the jury hopelessly confused as to what verdict it should render based its determination of whether Odeh was or was not tortured. Such evidence should be barred under Fed. R. Evid. 403.

            C.    The Psychological Testimony Which Defendant Wishes to Introduce is Itself Unduly Confusing and Should be Barred Under Rule 403

Prior to trial in this matter, the Court considered Defendant Odeh's proffered evidence by Dr. Fabri, and ultimately held an evidentiary hearing at which Dr. Fabri testified. Prior to conducting such a hearing, the Court noted that expert testimony should be admitted where "'such evidence would negate intent rather than 'merely present a dangerously confusing theory of defense more akin to justification and excuse.'" (R. 98: Order Setting Evidentiary Hearing Regarding Defendant's Expert Evidence, PgID 987, citing *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003)). Here, however, Dr. Fabri's testimony presents such a dangerously confusing theory of defense, likely to support an argument for jury nullification, that it should be barred.

As discussed above, Dr. Fabri does not opine that it is likely that Defendant Odeh "filtered" her perception of the immigration questions such that she thought the questions asked only about her time in the United States. Rather, Fabri "did not know what went on in her mind," (R. 113: Evidentiary Hearing Transcript, PgID

54

1197), and, as Defendant Odeh's attorney told the Court, PTSD "*could* have affected her understanding the questions and giving the answers. She's [Fabri] not going to say she [Odeh] couldn't have known." (R. 179: Motion Hearing Transcript, PgID 1926) (emphasis added). Dr. Fabri further testified that interpreting the questions on the naturalization application to exclude events outside the United States "could be" consistent with PTSD. (R. 113: Evidentiary Hearing Transcript, PgID 1170).

Even if such proposed testimony met the *Daubert* standard, it is so inherently confusing as to run afoul of Fed. R. Evid. 403. The touchstone of *Daubert*, of course, is helpfulness to the trier of fact. But even if the evidence is deemed helpful in the sense that it could present a theory of possible utility to the jury, it is nonetheless subject to exclusion under Fed. R. Evid. 403 if that theory is so confusing, or so slippery, that a jury cannot in practice apply it. *See Daubert*, 509 U.S. at 595 (noting that Rule 403 analysis applies even if testimony found reliable and relevant). Such is the case here, where all that Dr. Fabri can say is that Odeh "could" have "filtered" her understanding of the questions, to answer falsely, even though it is conceded that she knew the truth that she had been convicted and imprisoned, and even though on other occasions, such as in *Women in Struggle*, she acknowledged the truth. Such a use of psychological evidence is, as the *Brown* court noted, a dangerously confusing theory which, in the present case, would merely present the jury with a basis on which to nullify the evidence based on a possible finding that Defendant Odeh had

been mistreated by Israeli authorities.   As such, the evidence should be found inadmissible under Rule 403.

## CONCLUSION

For the foregoing reasons, the Court should hold a *Daubert* hearing, find the testimony of Dr. Fabri inadmissible and reenter the defendant's judgment of conviction.

Respectfully submitted,

BARBARA L. MCQUADE
United States Attorney

s/Jonathan Tukel
JONATHAN TUKEL
Chief, National Security Unit
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

s/Cathleen M. Corken
CATHLEEN M. CORKEN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

s/Michael C. Martin
MICHAEL C. MARTIN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

Date: November 15, 2016

56

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2016, I electronically filed or caused

to be filed the foregoing with the Clerk of the Court using the ECF system, which

will send notification of such filing to all ECF filers.

<u>s/Michael C. Martin</u>
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100