**Dr. Lisa Hajjar**
Sociology Department
University of California-Santa Barbara
Santa Barbara, CA 93106
805-236-4144; lhajjar@soc.ucsb.edu

**RE: Statement about Israeli military courts in the occupied territories**

I am a full professor in the Sociology Department at UCSB. I have been asked to provide an expert statement about the Israeli military justice system in the occupied territories for a case involving Rasmea Odeh, who was arrested in 1969 and convicted in 1970. This statement is based on my extensive research on the Israeli military court system. My book, *Courting Conflict: The Israeli Military Court System in the West Bank and Gaza* (University of California Press, 2005), is the only book-length scholarly study on the subject.

Historical Background and Basics

The Israeli military court system in the West Bank and Gaza was established three days into the Six Day War in 1967. It is the criminal/legal component of the military administration that Israel has used to govern Palestinians in these regions occupied during the war with the surrounding Arab states. After the 1967 war, one-third of the population living under Israeli rule was Palestinians from the occupied territories.

For the first several years of the occupation, there was little resistance to the occupation among Palestinians. Nevertheless, as early as 1969, the Israeli military employed militarized violence and collective punishment across the territories (see http://unispal.un.org/UNISPAL.NSF/0/7813B07830BDC77705256560006A7CB0). In 1970 – 1971, the Israeli military undertook a "pacification" campaign. The imposed quiescence provided the authorities with the latitude to expand the use of the military court system.

Three bodies of legislation are enforced through the military courts: original Israeli military legislation, the British Defense (Emergency) Regulations of 1945 (promulgated during the British Mandate of Palestine), and local criminal laws (Jordanian in the West Bank and Egyptian in Gaza). Israeli military orders constitute the main body of law regulating the operation of the military courts. They also designate specific offenses. Between 1967 and the early 1990s, the Israeli military had legislated over 1,300 orders for the West Bank and over 1,000 for Gaza. The criminal provisions of the British Defense Regulations outlaw membership in an "illegal organization," which, in this context, has included all Palestinian nationalist organizations.

Military courts of the first instance are distinguished by the number of judges (one or three) and the maximum sentencing power. Three-judge courts are empowered to pass sentences up to the maximum of life in prison or the death penalty. There are also

military courts attached to prisons and detention centers to handle hearings for extension of detention and appeals against administrative detention. There was no military court of appeals until 1989; prior to that, convicted Palestinians' only recourse was to appeal to the military governor of the region (West Bank or Gaza). No decision of a military court has status as a legally binding precedent. Consequently, there is a great deal of disparity in the sentences issued for similar crimes.

In terms of its function as a *legal* system, the military courts have never met the baseline standards of due process, and certainly not during the first years of the occupation. Problems include the use of soldiers in a policing capacity, and the complexities, contradictions, and vagaries of the laws enforced through the courts. Moreover, there is no basis in law or practice for the presumption of innocence. Rather, the three-pronged practice of arrest, interrogation and prosecution is premised on a presumption of guilt. This is evident in the fact that any soldier can arrest any Palestinian for the slightest suspicion or cause without warrant, and once arrested, people can be held for prolonged periods incommunicado before being granted access to an attorney. There is no legal requirement that a Palestinian's arrest be preceded by a detention order, or that a person be informed of the reason for arrest at the time he or she is taken into custody.

The presumption of guilt is further confirmed by the pervasiveness of torture and abuse, as well as a general pattern of prolonged denials of lawyer-client meetings, judicial concession to prosecutors' requests for extension of detention, and refusal to release detainees on bail. While, technically, there is a provision for *habeas corpus* (challenging the lawfulness of an arrest and the necessity of detention), in practice this is treated by Israeli military authorities as a request for release on bail, and bail is almost never granted. In most cases, people are detained throughout the entire duration of proceedings until their case is concluded.

A Palestinian who is arrested can be held in custody for up to 18 days without charges before being brought before a judge. This breaks down as follows: 96 hours of detention on the order of any soldier, and two seven-day extensions of detention on the order of police officers, usually at the request of the GSS. Following the initial 18 days, detention can be extended by order of a judge. Extension-of-detention hearings usually take place at court facilities in prisons, although sometimes extension hearings take place in regular military courts. Typically, prosecutors request an extension of detention when the interrogation has not been completed (i.e., the person has not confessed), or when the authorities have not had time to act on the confession (e.g., arresting people implicated in the detainee's statement).

Although in principle, detained Palestinians have the right to meet with a lawyer, lawyer-client meetings tend to be prohibited as long as the person is undergoing interrogation. Provisions in military legislation can prohibit detainees from any access to lawyers for up to 90 days. Interrogators have the authority to prevent a lawyer-client meeting for up to 30 days (two 15-day periods, the second on the order of someone of higher rank than the person who ordered the first period). Following that, a military judge

can issue another 30-day order barring the meeting, and a third 30-day order can be issued by the president or acting president of a military court.

Since 1967, hundreds of thousands of Palestinians have been arrested by the Israeli military. Not all Palestinians who are arrested are prosecuted in the military court system; some are released following interrogation, others are administratively detained without trial. According to a widely acknowledged rule-of-thumb, approximately fifty percent of Palestinians who are arrested are released or administratively detained without charges, and the other fifty percent are charged with crimes and prosecuted. Of those who are charged, approximately 90-95 percent are convicted. Over 97 percent of all cases in which charges are brought are concluded through a plea bargain rather than a trial.

While plea bargaining is common in many criminal justice systems, in this system it must be understood in light of the interrogation process and the evidentiary weight of confessions. The primary or only evidence in the vast majority of military court convictions are confessions (first- and/or third-party) extracted during interrogation. The Israel Defense Forces and the police conduct some interrogations, but the main agency responsible for interrogation of Palestinians is the General Security Service (GSS, also known by its Hebrew acronyms Shin Bet or Shabak). Interrogations feed the legal process by procuring confessions that are then turned over to police and prosecutors.

Israeli torture and cruel treatment in the interrogation process

With the expansion of the military court system after the "pacification" campaign, demands for forms of evidence that would hold up in court increased. Consequently, interrogation was increasingly aimed at producing confessions. By 1970, the complete isolation—and thus effectiveness—of interrogation as a component of the legal process had been achieved.

Since 1968, Israeli and Palestinian defense lawyers working in the military court system reported claims by their clients of beatings, electric shock, death threats, position abuse, cold showers, sexual abuse, sleep deprivation, and denied access to toilets. In 1970, the Israeli publication *Zu Ha-Derech* reported a new policy to discourage military courts from investigating the conduct of interrogators: "Noting the importance and vitality of [the GSS's] security responsibilities in this area, it is the duty of the court to avoid disturbing them in their tasks" (quoted in Amad 1973: 19).

Reports about Israeli interrogation methods that claimed the routine use of torture and ill-treatment were condemned by officials as anti-Israel lies and smears, and refuted by arguing that such claims were based on pernicious fabrications by Palestinians and other "enemies of the state."

Although the number of Palestinian women and girls who have been arrested and interrogated is miniscule in comparison to the number of men and boys, it nevertheless numbers in the thousands (see Antonius 1980; Fahum 1984; Ghanem 1995). Palestinian females who are arrested are subjected to many of the same interrogation methods as

males. They also can be subjected to special methods that capitalize on their gender, such as sexual harassment and abuse, rape, and techniques that manipulate notions of "female honor" and women's feelings for their family members, especially their children (Thornhill 1992). From the beginning of the occupation, the threat of interrogation as a "dishonoring" experience was exploited by the Israeli military authorities to inhibit Palestinian women's participation in national politics. Many incidents have been reported of women and girls being detained and brought to interrogation centers where they are threatened or abused to pressure male family members to confess.

Women prisoners also have been used instrumentally in the interrogation of male prisoners. Torturing women in front of men is a means of pressuring men to confess to "save" women from further abuse. This dates back to the early resistance by *feday'in*. Fadl Yunis, in his prison memoir titled *Cell Number 7*, describes an experience of a Palestinian woman commando, stripped naked being interrogated in front of him. He writes, "Tears came to my eyes, but she said, addressing me in a collected voice: 'Don't worry brother. It doesn't matter that you see me naked. After all, you're my brother...and I'm your sister'" (quoted in Harlow 1992: 36).

Both the discourse and practices of interrogation underwent a qualitative change following the 1977 publication in *The Sunday Times* (London) of a detailed inquiry into "Arab allegations and official Israeli denials of the use of torture." The *Times* reported, "Torture of Arab prisoners is so widespread and systematic that it cannot be dismissed as 'rogue cops' exceeding orders. It appears to be sanctioned as deliberate policy." The Israeli government, through its embassy in London, ridiculed the findings and conclusions of the article as "fantastic horror stories" in a response on July 3, 1977. But Prime Minister Menachem Begin ordered a curtailment of violent interrogation tactics in Israeli prisons and detention centers. As a result, for the next several years, allegations of torture declined. To compensate, beginning around 1979 the GSS developed a new technique to gather information and extract confessions: the procurement and use of Palestinian collaborators (*'asafir*, literally "birds") in prisons.

In 1987, new and conclusive information about the history of Israeli interrogational torture came to light. It began in the aftermath of two scandals involving the GSS—the summary execution of captured Palestinians who had hijacked a bus, and a charge by a Circassian Israeli soldier that he had been tortured to elicit the confession that had been used to prosecute him (for treason). These events prompted the government to appoint an official commission of inquiry to investigate illegal activities by the GSS. The commission was headed by Moshe Landau, a retired justice of the High Court of Justice (HCJ). Among its findings, the Landau Commission report confirmed that GSS agents had used violent interrogation methods routinely on Palestinian detainees since at least 1971, and that they had routinely lied about such practices when confessions were challenged in court on the grounds that they had been coerced. The Landau Commission was harsh in its criticism of GSS perjury, but adopted the GSS's own position that coercive interrogation tactics are necessary in the struggle against "hostile terrorist activity." The Landau Commission accepted the broad definition of terrorism utilized by

the GSS, which encompasses not only acts or threats of violence, but virtually all activities related to Palestinian nationalism.

The Landau Commission argued that Israeli penal law could be interpreted to give interrogators license to continue the use of "moderate amounts of physical pressure" as well as various forms of psychological pressure as part of the fight against terrorism. The legality of such "pressure," the Commission reasoned, could be justified under the "necessity defense," which permits people to use violence in "self-defense," thereby mitigating criminal liability on the grounds that they are acting to prevent grievous harm. The specific interrogation methods that the Landau Commission recommended were contained in a classified appendix to the report.

In November 1987, the Israeli government adopted the Landau Commission's recommendation to authorize the use of "moderate physical pressure," making Israel the first state in the world to publicly sanction interrogation methods that constitute torture according to international law.

Following the publication of the Landau Commission report in 1987, lawyers mounted a protracted litigation campaign in the HCJ to challenge the legality of violent interrogation tactics used on Palestinians. In 1990, a group of Israeli lawyers and human rights activists formed the Public Committee against Torture in Israel (PCATI) to spearhead a campaign to end the use of torture. This litigation, along with the hundreds of petitions by lawyers representing Palestinian prisoners, forced the state to admit or acknowledge that permissible methods included the routine use of threats and insults, sleep deprivation, hooding and blindfolding, position abuse, physical violence (including "shaking" which produces a whiplash effect and leaves no physical marks), solitary confinement (including in refrigerated or overheated closet-like cells), and subjection to excessively filthy conditions. In 1993, in response to the litigation, the Israeli government reported that the GSS had modified its longstanding interrogation procedures, although these changes remained classified.

In January 1998, the HCJ combined a number of petitions pertaining to interrogation tactics, and convened a panel of nine justices to consider the matter. On September 6, 1999, the HCJ rendered a decision in *PCATI v. State of Israel* (HCJ 5100/94) prohibiting GSS agents from routinely using physical "pressure," although the decision neither called these tactics "torture," nor completely closed the window of opportunity for their continued use under exceptional circumstances. After the ruling, some methods all but disappeared (e.g., violent shaking, covering a detainee's head with a thick cloth sack, exposure to extremely loud and constant music, and tying to small tilted chairs). But other methods, including sleep deprivation, position abuse and painful shackling, exposure to extremes in temperature, and intense pressure applied to various body parts remain common practice.

Approximately 85 percent of arrestees are interrogated, and interrogation places Palestinians into conditions of discomfort, pain, humiliation and threats, from which there is no exit until the interrogation ends or the detainee provides information to the

interrogators' satisfaction. In 1993, the Gaza Community Mental Health Programme published findings of a survey study based on a sample of 477 ex-prisoners who had spent between six months and ten years in prison. Of this total, 91.7 percent had spent five years or less in prison, meaning that they were convicted of minor crimes. The findings revealed the incidence of specific interrogation methods on the following percentages of the sample: beatings (95.8); exposure to extreme cold (92.9); exposure to extreme heat (76.7); prolonged standing (91.6); applied pressure on the neck (68.1); food deprivation (77.4); solitary confinement (86); sleep deprivation (71.5); intense noise (81.6); verbal humiliation (94.8); threats against personal safety (90.6); forced witnessing of torture of other detainees (70.2); applied pressure on testicles (66); electric shock (5.9); tear gas (13.4); pushing instruments into the penis or rectum (11.1); witnessing torture of family members (28.1); threats of torture or rape of female family members (27.9). Other studies and investigations of interrogation tactics have generated similar findings.

Prosecution

Once the interrogation is finished, if there is a confession and/or other forms of evidence to charge the detainee, the prosecutor prepares the charge sheet and the legal process begins. If a confession is the main evidence, the prosecutor needs an additional scintilla (*dvar ma* in Hebrew). In this court system, the scintilla could be the protocol of the extension of detention hearing; if a detainee did not tell the presiding judge that s/he is "innocent," the prosecutor could use this as an admission of guilt. Given that detainees often are not represented by counsel at extension-of-detention hearings, many are unaware that declaring their innocence is an option. Corroborating evidence also can include the testimony of an arresting soldier, general information that a particular event for which the defendant is being charged actually occurred, or secret evidence.

Whereas in the domestic Israeli criminal justice system a confession must pass certain logical tests to ensure that it was not "invented" by the accused, such as a scintilla that the accused had the opportunity to commit the crime, or that the confession does not contradict other types of evidence, in the military court system the scintilla does not have to corroborate the confession or even to implicate the accused directly. All it has to show is a *possible* connection between the accused and the crime. Even if a defendant subsequently rescinds a confession on the grounds that it was coerced, or other exculpatory information becomes available, according to the rules of evidence that apply in this system, the court has the option to retain--and prefer--the confession over other evidence.

In principle, a defense lawyer can challenge a confession that a client claims was coerced by calling for a *zuta* (*voir dire*; often called a "mini-trial" or a "trial-within-a-trial"). This entails a hearing *in camera* in which a judge hears testimony from the defendant, the interrogators, and any others who might have relevant information (e.g., police, prison guards and doctors). But for such a challenge to succeed, the judge would have to consider the testimony of the defendant more credible than that of the interrogators. Since 1967, there are almost no instances in which a judge threw out a confession as a result of a *zuta*, and most defense lawyers are disinclined to utilize this

COMMONWEALTH OF PA
COUNTY OF DAUPHIN

procedure because the client can face greater punishment as reprisal for "wasting the court's time."

Secret evidence is always the basis for extra-judicial incarceration (i.e., administrative detention). Within the military court system, prosecutors can use secret evidence as a basis for charges. Much of the evidence classified as "secret" comes from Palestinian collaborators. The collaborator network forms an integral part of the state's resources to gather incriminating information that can be used to detain, charge and prosecute suspects. Secret evidence is unavailable to either the defense lawyer or the defendant, which means that the defense is afforded no opportunity to know the contents or contest the veracity of the evidence directly.

Overwhelmingly, the legal work that transpires in the military court system involves plea bargaining. Defense lawyers and prosecutors negotiate over the charges and the merits of evidence in a case in an effort to come to an arrangement on the sentence. For the defense, the incentive to plea bargain is a negative one: it assumes the likelihood of defeat at trial with the consequence of a higher sentence. For the prosecution, the incentive is a positive one: it provides an assured conviction of the accused, saving the time, effort and resources that a trial would entail. In many criminal court systems, plea bargaining is the routine and predominant way to resolve most cases. However, the prevalence of plea bargaining in this system must be understood to derive, in large part, from the myriad advantages that prosecutors enjoy. These advantages include administrative and legal provisions that permit the holding of detainees incommunicado for prolonged periods and impede lawyer-client meetings, the prevalent and routine use of coercive interrogation tactics to obtain confessions, the evidentiary weight of confessions and difficulties in challenging them in court, the use of "secret evidence" that is unavailable to defense lawyers or defendants, and a general tendency on the part of judges to accept prosecution evidence and prefer it to exculpatory evidence or contradictory testimony from defendants and defense witnesses.

In my expert opinion, during the period between 1967 and 1975, the Israeli military courts in the occupied territories did not operate in a manner consistent with basic due process or fundamental fairness.

Signed,
Lisa Hajjar

Date
7/22/14

Subscribed and sworn to before me
this 22nd day of July 20 14

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
TAMICA C. GOODSON, Notary Public
Susquehanna Twp., Dauphin County
My Commission Expires October 6, 2014

## Bibliography

Alternative Information Center. 1995. "What Happened to the Dream? A Roundtable Discussion with Longtime Ex-prisoners." *News from Within* 11: 3 – 13.

Amad, Adnan, ed. 1973. *Israeli League for Human and Civil Rights (The Shahak Papers)*. Beirut: Palestine Research Center.

Antonius, Soraya. 1980. "Prisoners for Palestine: A List of Women Political Prisoners." *Journal of Palestine Studies* 9: 29 – 80.

Cohen, Stanley and Daphna Golan. 1991. *The Interrogation of Palestinians during the Intifada: Ill-treatment, "Moderate Physical Pressure" or Torture?* Jerusalem: B'Tselem.

Fahum, Walid. 1984. *Birds of Neve Tirza* (in Arabic). Nazareth: Maktaba al-Fahum.

Ghanem, Hunaida. 1995. "Palestinian Women Political Prisoners." *Palestine-Israel Journal* 2: 32 – 36.

Ginbar, Yuval. 1996. "The Face and the Mirror: Israel's View of Its Interrogation Techniques Examined." LLM dissertation, University of Essex.

Hajjar, Lisa. 2005. *Courting Conflict: The Israeli Military Court System in the West Bank and Gaza*. Berkeley: University of California Press.

Harlow, Barbara. 1992. *Barred: Women, Writing, and Political Detention*. Hanover, NH: Wesleyan University Press.

Human Rights Watch. 1994. *Torture and Ill-treatment: Israel's Interrogation of Palestinians from the Occupied Territories*. New York: Human Rights Watch.

Landau, Moshe et al. 1987. *Commission of Inquiry into the Methods of Investigation of the General Security Services Regarding Hostile Terrorist Activity*. Jerusalem: Government Press Office.

Pacheco, Allegra. 1996. *Torture by the Israeli Security Services*. Jerusalem: Public Committee against Torture in Israel.

Public Committee against Torture in Israel. 1990. *Moderate Physical Pressure: Interrogation Methods in Israel*. Jerusalem: PCATI.

Sarraj, Eyad and Sohail Salmi. 1993. *Torture and Mental Health: The Experience of Palestinians in Israeli Prisons*. Gaza: Gaza Community Mental Health Programme.

Thornhill, Teresa. 1992. *Making Women Talk: The Interrogation of Palestinian Women Detainees*. London: Lawyers for Palestinian Human Rights.