UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,      CRIMINAL NO. 2:13-cr-20772

          Plaintiff,      HONORABLE GERSHWIN A. DRAIN

vs.

D-1 RASMIEH YOUSEF ODEH,

          Defendant.

_____/

<u>MOTION *IN LIMINE* OF UNITED STATES TO ADMIT EVIDENCE</u>

NOW COMES the United States, and for its Motion *In Limine* to Admit Evidence, states:

1.  During the defendant's first trial, the Court admitted into evidence various government exhibits, the admission of which were affirmed by the Sixth Circuit on appeal.

2.  The defendant has been charged in a first superseding indictment with Unlawful Procurement of Naturalization, in violation of 18 U.S.C. § 1425(a). The first superseding indictment alleges that the defendant obtained her citizenship contrary to law for all of the same reasons alleged in the original indictment. The government therefore moves to admit the same government exhibits that were introduced during the first trial on the original indictment.

3. The first superseding indictment also alleges that the defendant obtained her citizenship contrary to law because of additional false statements which she made, which relate to the defendant's membership or association with any organization, and the defendant's "direct or indirect" association "with a terrorist organization."

4. In addition, the first superseding indictment alleges that the defendant obtained her citizenship contrary to law because the defendant was ineligible for naturalization in the first instance, in that she had obtained her lawful permanent resident status illegally, an allegation which also was made in the original indictment. The first superseding indictment expressly states that Defendant's acquisition of lawful permanent resident was illegal because she had "engaged in a terrorist activity," and because she lacked "good moral character," as those terms are defined in the Immigration and Naturalization Act. Since the first trial, the Sixth Circuit has held that the question of whether a defendant lacked any of the prerequisites to naturalization is a question to be decided by the jury. *See* discussion *infra*.

4. Evidence related to the defendant's membership or association with a terrorist organization, the defendant's participation in terrorist activity, and the defendant's lack of good moral character, which are described in detail in the government's brief in support of this motion, are therefore relevant and

admissible.

5.  Pursuant to Local Rule 7.1(a)(2)(B), the undersigned sought concurrence of Michael Deutsch, counsel for the defendant, for the relief requested herein, which concurrence was denied, necessitating the filing of the instant motion and brief.

The government asks that the Court grant its motion, and admit the various items of evidence set forth.

Respectfully submitted,

BARBARA L. MCQUADE
United States Attorney

s/Jonathan Tukel
JONATHAN TUKEL (P41642)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9749
jonathan.tukel@usdoj.gov

s/Michael C. Martin
MICHAEL C. MARTIN
Assistant United States Attorney
211 W. Fort, Suite 2001
Detroit, MI 48226
(313) 226-9670
michael.c.martin@usdoj.gov

Dated: February 14, 2017

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                  CRIMINAL NO. 13-20772

       Plaintiff,                          HONORABLE GERSHWIN A. DRAIN

v.

RASMIEH YOUSEF ODEH,

       Defendant.
_____/

BRIEF OF UNITED STATES IN SUPPORT OF
MOTION *IN LIMINE* TO ADMIT EVIDENCE

The United States, submits this motion to admit certain evidence at trial.

Much of this evidence was admitted during the first trial, and therefore should be

admitted again. Other pieces of evidence have become relevant as a result of the

first superseding indictment and therefore should be admitted.  And finally, the

Sixth Circuit's decision in *United States v. Maslenjak*, 821 F.3d 675, 687 (6th Cir.

2016), *cert. granted on other grounds*, No. 16-309 (Jan. 13, 2017) makes clear that

evidence that defendant "engaged in a terrorist activity" is relevant and admissible

whether she is tried under the original or first superseding indictment.

BACKGROUND

In 1969, the defendant in concert with Aisha Odeh, Rasheda Obideh, and

others, caused a bomb to be placed at an Israeli Supersol supermarket, which killed

4

two Israeli civilians.  She also was involved in placing two bombs at the British

Consulate in Jerusalem, one of which was defused and the second of which, placed

four days later, detonated. The defendant was convicted and sentenced to life

imprisonment, but was released in 1979 in a prisoner exchange with a Palestinian

terrorist group, the Popular Front for the Liberation of Palestine ("PFLP"). The

defendant subsequently immigrated to the United States, and became a naturalized

United States citizen. On October 22, 2013, the defendant was indicted on one

count of naturalization fraud, in violation of 18 U.S.C. § 1425(a). (R. 3:

Indictment, PgID 18). During the trial, the Court admitted into evidence

government's exhibit 1A-1G, 2A-2B, 3, 4, 5, 6, 7, 8, 9A-9E, 10, 11, 12, 13, and 14.

Following the defendant's conviction, she appealed her conviction and

sentence on various grounds, including a claim that the district court improperly

admitted some of the exhibits identified above. The defendant's arguments

regarding those exhibits were rejected by Sixth Circuit and her conviction in that

respect was affirmed. The Sixth Circuit, however, remanded the case to the district

court for a determination of whether the defendant could offer the opinion

testimony of a psychologist, who admits that although "I don't know what went on

in her mind," claims that the defendant suffers from post-traumatic stress

syndrome, which, in turn, causes the defendant to have "filters" that "could

potentially" have prevented the defendant from answering immigration questions

truthfully.  (R. 113: Hearing Trans., PgID 1197). On December 6, 2016, this Court ruled that the psychologist's testimony was admissible. (R. 218: Opinion and Order Denying Government's Motion for Daubert Hearing, PgID 3040).

On December 13, 2016, a grand jury returned a first superseding indictment. As was the case in the original indictment, the first superseding indictment charged the defendant with one count of naturalization fraud, in violation of 18 U.S.C. § 1425(a), by providing false statements on her immigrant visa application, by providing false answers on her N-400 application for naturalization, and through her false statements to immigration officials. Those false statements pertained to: the places the defendant had lived in the past, the defendant's arrest in Israel, the fact that the defendant had been charged with a crime in Israel, the defendant's conviction in Israel, the defendant's imprisonment in Israel, and the defendant's prior false statements on her visa application.

The first superseding indictment added the allegation that the defendant obtained her naturalization contrary to law by making additional false statements on her immigrant visa application, by providing false answers on her N-400 application for naturalization, and through her false statements to immigration officials. Specifically, those false statements pertained to the defendant's membership or association with any organization, and the defendant's "direct or indirect" association with "a terrorist organization." In addition, both the original indictment

6

and the first superseding indictment alleged that the defendant obtained her naturalization contrary to law because she was not eligible to naturalize as a United States citizen in the first instance.  This is so, as alleged in both the original and the first superseding indictment, because Defendant lacked "good moral character," as that term is defined in the INA, which is a prerequisite to naturalization.  In addition, both indictments allege that defendant was ineligible to naturalize because she obtained her lawful permanent resident status illegally.  That is so because the Immigration and Nationality Act makes inadmissible to the United States any person who has "engaged in a terrorist activity," as that term is defined by the INA.  Since the first trial, the Sixth Circuit has made clear that § 1425's "contrary to law" language encompasses "all laws applicable to naturalization," not only those relating to false statements.  *See United States v. Maslenjak*, 821 F.3d 675, 687 (6th Cir. 2016), *cert. granted on other grounds*, No. 16-309 (Jan. 13, 2017).

Thus, for example, because the indictment in *Maslenjak* alleged that the defendant lacked good moral character, a requirement for eligibility to naturalize, the district court in that case properly instructed the jury to find directly whether or not the defendant had good moral character, with instructions on the definition of "good moral character" under the INA.  As in *Maslenjak*, the jury in this case will be called upon to determine whether Defendant Odeh satisfied "all laws applicable to naturalization," i.e., whether she had good moral character and whether she had

7

engaged in a terrorist activity, with instructions as to the definitions of those terms. (The government also will address the implications of *Maslenjak* in its response to Defendant's Motion to Dismiss the First Superseding Indictment, which is due later this month.)

The new landscape provided by the first superseding indictment and *Maslenjak* thus have two practical impacts. First, the testimony of the defendant's psychologist – which pertains exclusively to whether the defendant could knowingly lie – provides only a partial defense as it does not address whether the defendant did, in fact, engage in a terrorist activity or lack good moral character, either of which would render her ineligible to naturalize regardless of whether or not she knowingly lied.  Second, under *Maslenjak,* whether or not a defendant satisfied the requirements for naturalization is a decision to be made by the jury, under instructions as to the proper definitions of the various naturalization requirements.  Thus, because the jury will be called upon to determine directly whether defendant was associated directly or indirectly with a terrorist organization, whether she lacked good moral character, and whether she had engaged in a terrorist activity, evidence pertaining to these topics is now relevant to the charged offense and therefore should be admitted.

## ARGUMENT

The government moves to admit various items of evidence at the defendant's

8

retrial. This evidence includes exhibits which were admitted during the first trial, and new evidence that pertains to the first superseding indictment.

I.     The Court Should Admit Evidence Previously Admitted During the First Trial

During the first trial, the Court admitted into evidence government's exhibits 1A-1G, 2A-2B, 3, 4, 5, 6, 7, 8, 9A-9E, 10, 11, 12, 13, and 14. The defense did not appeal the admission of most of those exhibits.  The few that were challenged were found to be properly admitted by the Sixth Circuit. One court of appeals judge, Judge Moore, wrote a concurring opinion expressing her view that government exhibit 3 should have been redacted so that the names of the bombing victims, and a short prayer following their names, were not shown to the jury. The government will redact government exhibit 3 along the lines suggested by Judge Moore. Otherwise, the government moves to admit all of its exhibits which were previously admitted during the first trial.

II.    The Court Should Admit Additional Evidence that is Highly Probative of Allegations in the First Superseding Indictment

The Court should admit the following pieces of evidence, all of which are relevant to one or more of the following topics: the defendant's membership or association with any organization, the defendant's membership or association with a terrorist organization, the defendant's participation "in a terrorist activity," and the defendant's lack of "good moral character."

A. Transcripts from the Defendant's Trial in Israel, Including Her
   Various Written Confessions

Highly redacted portions of the trial transcripts were admitted in the prior

trial, which served to establish that Defendant Odeh had been arrested, charged,

convicted and imprisoned in Israel, which she had falsely denied on her

immigration application.  The government did not offer the confessions at the first

trial, not because they were inadmissible or irrelevant but simply to avoid the need

of litigating the issue of whether the confessions were voluntary.  *See, e.g.*, Page

ID 686.  The confessions, however, are relevant for a number of reasons.  Most

particularly, it is the defendant's contention, as the Court knows, that she was

tortured, falsely confessed, and as a result suffers from PTSD which somehow

prevented her from knowingly answering falsely that she had never been arrested,

charged, convicted or imprisoned.  Defendant has thus interjected into these

proceedings the circumstances of the bombings, and whether she truthfully

confessed to them.  Her written confessions, as well as significant corroboration

not involving the Israeli trial record are thus relevant to rebutting her claim of false

(and tortured) confession.  The confessions themselves were provided pursuant to

Mutual Legal Assistance Treaty, on which basis this Court admitted other items of

the Israeli trial record, and which rulings were affirmed on appeal.  Thus the

confessions are properly admissible.  The confessions also are relevant not only to

rebut Defendant Odeh's claim that she was tortured and involuntarily confessed,

but also because they serve to establish that she had "engaged in a terrorist activity," which rendered her ineligible to obtain an immigrant visa. As noted, *Maslenjak* held that the jury is to determine whether or not a defendant satisfied all criteria for naturalization.

> ### B.   Diplomatic Cable Regarding Interview of Defendant's Father

At the time of the defendant's arrest in Israel on February 28, 1969, for the Supersol bombing, the defendant's father also was detained.      Although the defendant was not then a United States citizen, her father was. As a result, on March 10, 1969 a United States consular official visited the defendant's father in jail. Later that same day, the consular official sent a cable to the Department of State recounting that meeting earlier in the day, as well as other information. According to the cable, the defendant's father "was present when police found explosives in his house but claims he not [sic] formerly aware their [sic] presence or how they could have gotten there." The defendant's father also complained of "uncomfortable, overcrowded jail conditions" but was "receiving no rpt [repeat] no worse than standard treatment afforded majority detainees at Jerusalem jail."

The cable therefore is affirmative evidence of the defendant's guilt of the current charge because it supports the conclusion that the defendant engaged in terrorist activity, namely the bombings. The cable also corroborates the testimony during the defendant's trial in Israel that Israeli officials found explosives at the

11

defendant's home (with which her father apparently had no connection). Lastly, the cable is relevant because it tends to defeat the defendant's defense, namely that she was tortured and therefore suffers from PTSD. The defendant has claimed that one of the ways Israeli officials tortured her was by bringing her father before her and beating him. This story, however, is contradicted by the observations and statement of the consular official.

In addition to being relevant, the cable is admissible under three hearsay exceptions. First, the cable is a record of a regularly conducted activity under Fed. R. of Evid. 803(6). *See Chavez v. Carranza*, 559 F.3d 486, 497 (6th Cir. 2009) (affirming admission of U.S. diplomatic cable under Rule 803(6)). Second, the cable is a public record under Fed. R. of Evid. 803(8). Third, the cable is admissible as a statement in an ancient document under Fed. R. of Evid. 803(16) because the cable "is at least 20 years old and whose authenticity is established." Fed. R. of Evid. 901(b)(8) provides that the authenticity of an ancient document is established if the document "is in a condition that creates no suspicion about its authenticity," the document "was in a place where, if authentic, it would likely be," and the document "is at least 20 years old when offered." These three requirements are met here. The cable appears authentic, as it is printed on United States Department of State letterhead, is marked "TELEGRAM," and contains header information denoting it as a diplomatic cable. In addition, the cable was located at

12

the United States National Archives. Lastly, the cable is well over 20 years old.

C.    An Article in the *Journal of Palestine Studies*

In the spring of 1980, an article entitled "Prisoners of Palestine: A List of Women Political Prisoners," was published by the University of California Press in the *Journal of Palestine Studies*. The article contained the written account of two Palestinian women who were prisoners in Israel, one of whom was the defendant. In the article, the defendant recounts how, as a young women living in Palestine, she had a strong desire to engage in "military work" against Israel. The defendant admitted to seeking out a certain individual who "was responsible for military affairs in the PFLP." The defendant also described her role in the bombing: "We had placed a bomb there [the British Consulate] to protest Britain's decision to furnish arms to Israel. Actually we placed two bombs, the first was found before it went off so we placed another." The defendant also described in great detail her arrest, alleged torture, imprisonment and release from prison – apparently suffering from none of the memory deficits that she now claims afflicted her when she applied for citizenship. In short, the article is relevant because it establishes her association with an organization, the PFLP, and her role in terrorist activity. In addition, the article is an example of how the defendant can recall her past when she chooses to, thereby serving to rebut her claim that she could not remember her past when she applied for naturalization.

The article is admissible.  There are two potential hearsay issues, the statement of defendant in the article, and the author's recitation of defendant's statement.  Defendant's statement itself is admissible because it is an admission by a party opponent.  See Fed. R. Evid. 802(d)(2)(A) ("A statement that meets the following conditions is not hearsay: The statement is offered against an opposing party and was made by the party in an individual capacity[.]")  Defendant's statement is then incorporated into the author's article, which is a written assertion by the author, and thus a statement as well.  Fed. R. Evid. 801(a).  However, provided that there is a hearsay exception for the author's statement in the article the entire writing is admissible because "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.

The author's statement in the article is a statement in an ancient document, and thus is admissible, because the authenticity of the Journal of Palestinian studies can be established and it is more than 20 years old.  Fed. R. Evid. 803(16).  In addition, the article can be read into evidence because it is a learned treatise or periodical, pursuant to Fed. R. Evid. 803(18).  Statements in learned treatises or periodicals can be read to the jury if relied on by an expert and "the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice." Fed. R. Evid. 803(18)(B). The

14

Federal Rules of Evidence consider learned treatises or periodicals to have a "high standard of accuracy" because they are "written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake." Fed. R. Evid. 803(18), Advisory Committee Notes (1972). During the retrial of this case, the government intends to call an expert witness who relies on the article in part to form his opinions. The expert will also establish that the *Journal of Palestine Studies* is a well-regarded academic journal that is a reliable authority. The article is therefore admissible.

### D.   The Video *Women in Struggle*

In 2004, a video was produced in which the defendant and her accomplice in the bombings, Aisha Odeh, who was tried jointly with her in Israel, appear. In the beginning of the video, Aisha Odeh describes her history of having been involved with the PFLP, and her involvement in the bombings of the supermarket and British Consulate. Aisha Odeh then travels to a residence where she meets with the defendant and the two are interviewed while sitting together.  During the interview, Aisha Odeh states to the defendant: "You dragged me towards political work." In response, the defendant smiles and laughs and sarcastically says: "Who me! That is an accusation." Aisha Odeh then states: "You dragged me into military work . . . ." The defendant says that "military work was in you" because of Aisha Odeh's brother, brother-in-law, and other young men.

15

These statements are relevant for a number of reasons. They again serve to disprove the defendant's narrative of false confession leading to PTSD, as they serve to demonstrate that her confessions to involvement in the bombings were true. They also serve to show that she answered falsely when she denied direct or indirect association with a terrorist organization.

### 1.    The Defendant's Own Statements

Obviously, any statements made by the defendant in the video are admissible as a statement of an opposing party under Federal Rule of Evidence 801(d)(2)(A), and are therefore not hearsay. Indeed, a portion of *Women in Struggle* in which the defendant talks about her imprisonment was admitted as an exhibit during the defendant's first trial to prove the falsity of her answer on the immigration form to the question of whether she ever had been imprisoned. Defendant did not challenge the admission of that evidence on appeal.

### 2.    The Defendant's Adoptive Admissions

Aisha Odeh's statements about the defendant having dragged her into political and military work are adoptive admissions under Federal Rule of Evidence 801(d)(2)(B), and are therefore not hearsay. Rule 801(d)(2)(B) provides that "a statement is not hearsay" if the "statement is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true." A party's adoption of a statement "can be manifested by any appropriate means, such as

16

language, conduct, or silence." *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996). In this instance, the defendant manifested her adoption of the statement that she brought Aisha Odeh into political and military work by her conduct (laughing), and her language (sarcastically saying ""Who me! That is an accusation."). In addition, "[w]hen a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood and acquiesced in the statement." *Id.* Here, there is no question that the defendant heard Aisha Odeh's statements and understood them, given that the defendant verbally responded to those statements. Nor is there any doubt that the statements were the type that an innocent person would respond to. After all, the statements at issue implicated the defendant in bombings that killed two people. Moreover, these statements were made in 2004 – the same year that the defendant applied for naturalization. If the statements were not true, the defendant would have had a strong incentive to deny them at that time. The fact that she did not deny them, but instead manifested her adoption of those statements by her behavior and words, means that those statements are treated as her own under the law and are therefore admissible.

E.    The 1972 Munich "Kommunique"

In 1972, PFLP terrorists kidnapped Israeli athletes at the Munich Olympic Games.  The PFLP issued a "communique" which sets forth the hijackers' demands including the release of hundreds of prisoners in Israel in exchange for the athletes. Included was a demand to release the defendant and Aisha Odeh. The communique is relevant because it establishes the defendant's association with the PFLP, but is not hearsay because it only is offered to prove that the demand was made, not for the truth of the matter asserted, which is directly relevant to the charges in the first superseding indictment.

F.    Videos of Aisha Odeh and Rasheda Obeiduh, Which Are Admissible Under Fed. R. Evid. 804(b)(3)

In three videos, *Tell Your Tale Little Bird*, *Women in Struggle*, and an interview of Aisha Odeh on Palestinian television on August 27, 2013, Aisha Odeh and Rasheda Obeiduh, who were involved in the bombings with defendant, provide details of those events.  Portions of the videos where the other two women speak are admissible under Fed. R. Evid. 804(b)(3).

Rule 804(b)(3) provides that the statement of an unavailable witness is not hearsay if "a reasonable person in the declarant's position would have made" the statement "only if the person believed it to be true because, when made, it . . . had so great a tendency to  . . . expose the declarant to civil or criminal liability, " and "is supported by corroborating circumstances that clearly indicate its

18

trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Admissibility under Rule 804(b)(3) turns on "whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" *Williamson v. United States*, 512 U.S. 594, 603–04 (1994). "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Id*. at 599. Each portion of a statement must be viewed in context to determine whether it is sufficiently inculpatory to satisfy the rule's requirements. *Id.* at 604.

The major issue under Rule 804(b)(3) is whether self-incriminatory statements made to law enforcement officers by a declarant "unfairly shift blame" onto the defendant or seek to curry favor with the authorities. *See generally Williamson*, 512 U.S. at 603. None of those concerns are present with the items of evidence offered here. The videos at issue were voluntarily made by individuals, apparently for commercial purpose as they are marketed, without any involvement of any foreign or American law enforcement agency. Rather than being made to authorities or seeking to shift blame, the videos were statements by individuals expressing pride in their past activities, which involved bombings of the Supersol and the British Consulate. Statements are considered self-incriminatory under

19

Rule 804(b)(3) where they describe criminal acts which the defendant and the declarant committed jointly. *See United States v. Saget,* 377 F.3d 223, 231 (2d Cir.2004).

As to the first part, unavailability, both Aisha Odeh and Rasheda Obeiduh are foreign nationals outside of the United States and thus not subject to process. They are thus unavailable. *See* Fed. R. Evid. 803(b)(5). The government is seeking their depositions through the Department of Justice Office of International Affairs, but they appear to reside in the West bank and thus are not subject to any Mutual Legal Assistance Treaty. Therefore, if the government is unable to obtain the two womens' depositions, even if the Court grants a motion for taking the depositions, the government will have exercised "reasonable means" to have obtained their testimony within the meaning of Fed. R. Evid. 804(a)(5)(B).

There also is no Confrontation Clause issue with regard to the videos. The Confrontation Clause applies only to "'witnesses' against the accused—in other words, those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Although *Crawford* declined to provide a comprehensive definition of testimony, it seems to apply only to testimony given for purposes of a legal proceeding. *See id.* at 68 (noting that "testimonial" means at minimum "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." However, "where nontestimonial hearsay is at issue, it is

20

wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* None of the video statements was testimonial, because none of them was given for the purpose of bearing witness against an accused. Rather, they are in the nature of a memoir by the participants.

### 1. Statement by Aisha Odeh in *Women in Sturggle*

The government seeks to admit the portion of *Women in Struggle* in which Aisha Odeh states forthrightly that she placed the bomb at the Supersol and was involved in the preparation of explosives, but that the defendant and Rashideh Obeiduh scouted the location in advance and chose the location. Aisha Odeh also states that "Rasmieh Odeh was more involved that I (Aisha Odeh) was and Rasheeda Obeiduh had gone and studied the location and had come and done a report back. I (Aisha Odeh) only got involved during the preparation of explosives." This statement relates to joint activity and thus is admissible as a joint inculpatory statement. Moreover, there are corroborating circumstances that clearly indicate the trustworthiness of that statement, as required by the rule.

Defendant Odeh herself made three statements to Israeli authorities, on March 1, 1969, and twice more on March 3, 1969. She provided more detail in each, and the details match very closely the details provided by Aisha Odeh and Rashideh Obeiduh in the videos they made many years later, thus providing the necessary corroboration. For example, in one of her statements on March 3, 1969,

the defendant stated that she met with Rashida and another individual, "to prepare explosives in my house." (Discovery Page 206.) The defendant stated further that on Thursday, the day before the supermarket explosion, the bomb-maker "prepared the three boxes with explosives. Two for the supermarket and the third one for [the] place I intended to go myself. . . The two female friends, Ayisha and Rashida spent the night in my place." (*Id*.) This statement corroborates the video statement of Aisha Odeh and Rasheeda Obeideuh that the three of them planned and carried out the bombings at the supermarket and the British Consulate. Aisha Odeh's video statement on *Women In Struggle* also is corroborated by the defendant's statement to Israeli authorities that "Ayisha and Rashida, each one of them left around 8, while carrying a box." (*Id*.)

Aisha Odeh's statements in *Women in Struggle* about the Defendant and Rasheda Obeiduh scouting the location of the Supersol is further corroborated by the defendant's second statement on March 3, 1969. In that statement, Defendant Rasmieh Odeh stated "About ten days prior to explosion I went to the Supermarket with a girl from Jerusalem named Rashida. We've canvassed the location and found a place we'd leave the explosives and we bought many grocery items there and among those a can of preserves that we purchased in the afternoon as we've came to this place twice: first time we came at noon and the second time in the afternoon." (Discovery page 209.) And the video statement also is corroborated

by the diplomatic cable, which establishes that explosive devices were present in Defendant Odeh's house. Thus, that statement meets the requirements of Rule 804(b)(3) and should be admitted.

### 2. Statement by Aisha Odeh on Palestinian Television, August 27, 2013

Aisha Odeh gave an interview to Palestinian television in her home on August 27, 2013. Again, this interview was not a part of any law enforcement effort, and thus does not implicate any of the blame-shifting concerns of Rule 804(b)(3). In response to a question asking how she was arrested, her answer was "Of course Israel arrests many people in such situations. They gathered information and found evidence that led to the people who carried out the operation. A year later I was tried, I and the members of the cell, Rasmieh Odeh and Yacub Odeh."

In addition to being notably silent about claims of torture, Aisha Odeh's statement is strongly corroborated by other evidence. In her statement of March 1, 1969, to Israeli authorities, Defendant Rasmieh Odeh stated "After the suffering that was caused to us, the family, I was thinking of revenge to those in charge, who were the cause of it, like back in 1948[.]" So she asked another individual, Hannie, to assist her. "He agreed, and we set up time for Thursday 26.2.69 (February 26, 1969) a day that nobody will be at home, not my parents, and everyone will be in the town of Jericho, in order not to find out anything I'd do nor find anything in

23

my possession." (Discovery page 212.) As recorded in the diplomatic cable, Defendant Rasmieh Odeh's father stated on March 10, 1969, that he did not have "any knowledge of sabotage. Stated he had been staying Jericho and only returned to Bireh day before arrest, but his two daughters had been living in Bireh. [Yusef] Odeh [Defendant Rasmieh Odeh's father] cannot believe they guilty but says cannot be certain. [Yusef] Odeh was present when police found explosives in his house but claims he not formerly aware their presence or how they could have gotten there." Thus, the video statement regarding the cell members who carried out the operation is strongly "supported by corroborating circumstances that clearly indicate its trustworthiness" namely the absence of Defendant Rasmieh Odeh's parents due to their being in Jericho at the time. Fed. R. Evid. 804(b)(3)(B).

### 3. Statement by Rasheda Obeiduh in *Tell Your Tale Little Bird*

The government seeks to offer the statement of Rasheda Obeiduh in *Tell Your Tale Little Bird* that she and her friends "Aisha and Rasmieh" carried out the Supersol bombing, and how she fled from authorities and destroyed evidence related to the bombings. In addition, after each person who appears in the video, including Defendant Odeh, is introduced, she tells something about herself. At the end of each person's first appearance, subtitles appear stating that person's name and reason for being in the video. For Defendant Odeh, the subtitles state

24

"Rasmieh Aoudeh, Born in Lefta, Participated in the blowing up of supersol, West Jerusalem."

Rasheda Obeiduh's statement is corroborated by Defendant Odeh's statement to Israeli authorities on March 3, 1969, that she and Rasheda went to the Supersol and conducted reconnaissance, and by her statement that Aisha and Rasheda stayed at her house the night before the bombing. The statement also is corroborated by Aisha Odeh's statements in *Women in Struggle* about the involvement of Defendant Rasmieh Odeh and Rasheda Obeiduh, and their roles.

### G. Video of Leila Khaled Regarding "Task Force Rasmieh Odeh" on *Tell Your Tale Little Bird*

In the video *Tell Your Tale Little Bird*, Leila Khaled, who attempted to hijack two aircraft in 1969 and 1970 watches a video with her young son, which shows a hijacked aircraft on the ground at Dawson's Field, Jordan, in September 1970. The government seeks to offer that portion of the video, in which one of the hijackers can clearly be heard stating "The Popular Front for the Liberation of Palestine informs you that its [unintelligible] Commando Unit is now in complete control of the DC-8 plane fl--, flying for Swiss Air, Flight number 100, on its way from Zurich to New York. Task Force Rasmieh Odeh who has taken over command of this plane and . . ."

The statement is not hearsay. The announcement by the hijacker that "Task Force Rasmieh Odeh" is in control of the aircraft is not offered to prove the truth

of the matter asserted.  The government is not trying to prove who was in control of the aircraft, but rather that a group of hijackers was named after Defendant Odeh, which has independent evidentiary significance, in that it serves to prove her association with the PFLP and her previous involvement in terrorist activity.

### H. Video of Defendant Odeh and Others at Conclusion of *Tell Your Tale Little Bird*.

In the final scene of *Tell Your Tale Little Bird*, Defendant Odeh, Leila Khaled, Rasheda Obeiduh, Aisha Odeh and others sit together drinking tea or coffee, with the sound of music playing but without any words.  The government seeks to admit that portion of the video, which serves to show Defendant Odeh's association with admitted terrorists, and thus helps establish that she had an association with a terrorist organization, and that she had engaged in terrorist activity.  There is no hearsay issue as there is no statement on that portion of the video as no words are spoken.  Fed. R. Evid. 801(a).

<u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion should be denied.

Respectfully submitted,

BARBARA L. MCQUADE
United States Attorney

<u>s/Jonathan Tukel</u>                              <u>s/Michael C. Martin</u>
JONATHAN TUKEL (P41642)              MICHAEL C. MARTIN
Assistant United States Attorney          Assistant United States Attorney
211 West Fort Street, Suite 2001         211 W. Fort, Suite 2001
Detroit, MI 48226                               Detroit, MI 48226
(313) 226-9749                                  (313) 226-9670
jonathan.tukel@usdoj.gov                   michael.c.martin@usdoj.gov


Dated: February 14, 2017

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 14, 2017, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system which will

send notification of such filing to the attorney(s) of record.

<u>s/Jonathan Tukel</u>
JONATHAN TUKEL (P41642)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9749
jonathan.tukel@usdoj.gov

28