UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

                                   Case No.  13-20772
                                   Hon. Gershwin Drain

RASMIEH YUSEF ODEH,

      Defendant.

## RASMEA ODEH'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE SEIZED

      NOW COMES Rasmea Odeh, through her undersigned counsel, and

pursuant to her rights under the Fourth, Fifth and Sixth Amendments to the United

States Constitution, and International Human Rights Law, including the

*Convention against Torture and Other Cruel, Inhuman or Degrading Treatment

or Punishment*, and the *International Covenant on Civil and Political* Rights,

Customary International Law *(jus cogens*)**,** and Rule 12 of Fed. R. Crim. Pro., and

moves to suppress all statements or writings, written  or oral, she is alleged to have

made to agents of the Israeli government, including the Israeli police, interrogators

of the General Security Service (GSS), and others working with the GSS,

subsequent to her unlawful arrest by authorities of the government of the State of

1

Israel in February and March of 1969 and the fruits of her illegal arrest and interrogation, which the prosecution seeks to put in evidence at the trial of this cause. Ms. Odeh also moves to suppress any and all evidence which Israeli authorities claim was seized from her home.

This motion is made in the event that this Court upholds the legality of the Superseding Indictment creating the potential prospect that the government will seek to put in evidence statements Ms. Odeh is alleged to have made to the Israeli authorities, or evidence the Israeli authorities claim to have seized.

In support of this motion, Ms. Odeh states the following:

1.  Ms Odeh was arrested in her home in January of 1969, without a warrant or legal justification, as part of a round-up of Palestinians living under Occupation.  She was immediately brought to an Israeli jail where she was beaten by soldiers with wooden sticks and metal bars, as a result of which her body was bruised and swollen. She was then moved to the Israeli "Moscobiya" Interrogation Center in Jerusalem and further subjected to a continuous regime of harsh interrogation constituting torture over a period of 25 days.

2.  As set out fully in paragraphs 13-47 in the Affidavit of Dr. Mary Fabri, dated July 18, 2014, (Attachment #A, Doc#45 Pg. ID 321-326), which is

hereby adopted and incorporated in this Motion, Ms. Odeh was subjected to intensive physical and sexual threats, numerous vicious beatings, and electric shock, and was forced to witness the torture of others, including her father.

3.   Ms. Odeh was subjected to a highly sophisticated and terrifying regime of physical and psychological coercion, carried out by a group of interrogators and their agents who were acting pursuant to written interrogation policies of the Israeli General Security Service (GSS) allowing for physical and psychological coercion.

4.   The statements alleged to have been given by Rasmea Odeh were not voluntary and were not the product of her free will, but rather, were the result of torture, cruel, inhuman and degrading treatment, and extreme physical and psychological coercion, all in violation of the Fifth Amendment to the U.S. Constitution and international law that is binding on U.S. courts.  Consequently, all   the defendant's alleged statements were involuntary and must be suppressed for all purposes.   Additionally, the fruits of any and all such statements must be suppressed.

5.   Furthermore, Mr. Odeh was denied access to a lawyer during the entire period of her interrogation, and only was given counsel immediately before

3

her trial in a military tribunal, in violation of her Sixth Amendment rights, and the fruits of this violation must also be suppressed.

6    Likewise, the statements, evidence seized at the home of Ms. Odeh, and other fruits of Ms Odeh's arrest were the product of a violation of her Fourth Amendment rights and must be suppressed.

WHEREFORE, the defendant, Rasmea Odeh, after production by the government of all relevant documents, including the procedures and protocols of the Israeli interrogators, and all relevant written reports of the Israeli police and interrogators, respectfully requests that the Court hold a pre-trial evidentiary hearing with the testimony of all witnesses who were present during the arrest and interrogation or have knowledge of the arrest and interrogation of Rasmea Odeh, and at the conclusion of such hearing, that it order the suppression of all statements and evidence and the fruits such statements and evidence which the prosecution may seek to put in evidence for any purpose at any stage of the trial of the above-entitled case.

Dated 3/15/17                          Respectfully submitted,

                                       "/s/"  Michael E. Deutsch

                                       MICHAEL E. DEUTSCH
                                       People's Law Office

1180 N. Milwaukee Avenue
3rd Floor
Chicago, Illinois 60622
(773)235-0070

**HEARTLAND ALLIANCE**
MARJORIE KOVLER CENTER

Marjorie Kovler Center
1331 West Albion Avenue
Chicago, IL 60626

P 773.381.4070
F 773.381.4073
kovlercenter.org

July 18, 2014

## Affidavit of Mary Fabri, PsyD

I, Mary Fabri, PsyD, having been duly sworn, do hereby state as follows:

**Qualifications:**

1. My name is Mary Fabri. I am a licensed clinical psychologist in good standing in the state of Illinois. I am currently self-employed as an international consultant and trainer on mental health. I have current contracts as a co-investigator on a National Institute of Child Health and Human Development grant on Improving Adherence Among HIV+ Rwandan Youth and as a consultant with the National Center on Domestic Violence, Trauma, and Mental Health for a Promising Practices and Model Programs project. I am also a member of the Leadership Council and a pro bono consultant for Heartland Alliance Marjorie Kovler Center (Kovler Center).

2. I was employed as the Senior Director of Torture Treatment Services and International Training for Kovler Center in Chicago from July of 2005 until August of 2012. I was the Director of the Kovler Center from October of 2000 until July of 2005 when I was promoted to Senior Director. From December of 1987 until I was hired as Director, I was a pro bono psychologist and member of the founding clinical committee for the Kovler Center. Responsibilities included the assessment of torture survivors and providing expert witness testimony in asylum hearings.

3. I have served as a member of the Board of Directors for Torture Abolition and Survivor Support Coalition, a Washington DC based organization advocating for survivors of torture since 2005 and served as the President from June 2012 until June 2014.

4. I was a member of the Executive Committee for the National Consortium of Torture Treatment Programs from October 2001 until March of 2009 and served as President for five years, June 2004 through March 2009.

5. I was employed as Director of Refugee Mental Health Training from September of 1997 through September of 2000 and as the Clinical Administrator of the Bosnian Mental Health Program from February of 1995 until July of 1997. Both programs were under the auspices of Heartland Alliance for Human Needs and Human Rights in Chicago, IL.

6. I was employed by Cook County Hospital, Department of Psychiatry, as a Clinical Psychologist in September of 1987 until I left at the end of January of 1995 to work at Heartland Alliance.

7. I completed my education in clinical psychology at the Illinois School of Professional Psychology in June of 1986 and was awarded the degree of

1

Doctor of Psychology (PsyD). I completed my one-year post-doctoral training at Cook County Hospital in July of 1987.

**Background Information:**

8.  Mr. Jim Fennerty referred Ms. Odeh to the Kovler Center for an evaluation of her mental health functioning and for psychological support on March 5, 2014. Mr. Fennerty also posed the question, if it is found that Ms. Odeh has a psychological disorder, could it affect her interpretation of questions about being arrested, convicted, or in prison on an application for naturalization.

9.  Ms. Marianne Joyce, the Social Service Manager at Kovler Center referred Ms. Odeh to me. I was asked to conduct the intake and complete the evaluation for Ms. Odeh. I met with Ms. Odeh six times, April 18, May 16, July 11, 12, 13, and 15, 2014 for approximately three hours each session or a total of 18 hours. An Arabic interpreter was present for all appointments with the exception of May 16.

10. During our first meeting, Ms. Odeh described multiple traumatic experiences that she stated began shortly after she was born in 1948. When just months old, her family was forcibly removed from a village in Jerusalem to Ramallah. In 1951, her father left the family to go to the United States to work and to support the family by sending money home. Ms. Odeh reported growing up with no "Baba," the Arabic term she used for father, and described this as traumatic. She stated that as a child, she missed having a father and did not understand why her father could not come home.

11. Ms. Odeh attended elementary school and high school in Ramallah. In 1964, her father returned to live with the family. With the collaboration of a brother, they were able to build a home that housed extended family in separate apartments. In 1967, the home sustained damage during the Six Day War. Ms. Odeh stated she and her family were exposed to the destruction of bombed buildings and dead bodies.

12. Ms. Odeh attended one year of university in Beirut in 1968, but in 1969, she was not allowed to return due to an Israeli travel policy implemented in the West Bank.

13. In 1969, Ms. Odeh was living with her family of origin. She stated it was the time of Eid, a holy time for Muslims. She was at home with her father and two sisters. They would be traveling the next day to Jericho to join her mother and other family members who were already there. That night after midnight, Israeli soldiers made a forced entry into their home and started yelling and knocking things over. She remembered they spilled all the kitchen containers that held oil, rice, flour, and other cooking ingredients onto the floor. She stated the soldiers were scaring them all. She described herself in her pajamas being forcibly removed from the house. She was taken away separately from her father and sisters.

2

14. Ms. Odeh described being forced into a vehicle by Israeli soldiers who beat her, called her names, and threatened her. She was taken to a jail and interrogated. She reported that the beatings continued during the questioning, that wooden sticks and metal bars were used to hit her, as well as open hands and fists. Soldiers wearing boots also kicked her. She stated she was called "bad names" and insulted and threatened with sexual violence throughout the interrogation. She described her body as bruised and swollen and that she felt like there was a "fire in my head, like high electricity voltage, like my head was going to explode."

15. Ms. Odeh reported she was moved to Moscovia in Jerusalem from the initial jail site where the interrogations and torture continued.

16. Ms. Odeh stated at some point the interrogators put her in a room with her father. The soldiers told her father that they were going to rape her and also named men who they told her father had sex with his daughter. Ms. Odeh stated this was a "big shame" for both of them to be spoken about in this way.

17. At different times during the interrogations, Ms. Odeh described being in adjoining rooms to her father or her sisters. She could hear them being beaten and their screams. She said they could hear how in the next room, the soldiers pretended to be nice to her, so that her father and sisters could hear and think they were the only ones being tortured.

18. During this time, Ms. Odeh stated she was menstruating and she was denied any sanitary products and she was not allowed access to a bathroom or any other way to clean herself. She described that the soldiers would pour water on her, beat her, and insult her for being dirty and smelly.

19. Ms. Odeh reported that the torture during the first seven to ten days was continuous, and that she was not allowed to sleep. She also stated she was tortured for a total of 25 days and detained at Moscovia for 45 days. She was not allowed to sleep in any regular pattern, denied access to medical attention, and was not told why she was being detained nor provided with any access to legal resources. She described continual beatings, questioning, threats, humiliation, and deprivation.

20. In Moscovia, Ms. Odeh described three different types of interrogators: 1. The interrogators that pretended to be protective toward her, talked to her nicely and shared personal information. They would say they understood the Arab culture and the importance of protecting her and encouraged her to cooperate; 2. The interrogators who played "good cop" to another interrogators "bad cop" and pretended to be interested in her welfare; and 3. The interrogator who physically and psychologically tortured. She described in detail examples of the strategies they used. She remembered one who said he was named "Marqus" as the first type. He told her he was from Egypt, that he liked the Arab world, and that he wanted to go back home. He would tell her that he would help her to escape and that she could get her life back by telling the others what they want. He also told her that she did not have to talk about herself or her family, but to provide

3

information about others. She also described an interrogator who said his name was "Ezra Kaloge" who told her he was an Arab Jew from Iraq. He would often come in first and tell her that he wanted to help, that he believed her, that he did not want all the bad things to continue, and she must provide information, but then the torturer would come in, he was called "Abuhani." Ms. Odeh described "Abuhani" as a tall, blonde man, a huge man that hit her with fists and open hands. When he punched her, Ms. Odeh declared, "I felt like I was going to die." At some point, Ms. Odeh stated she had a temporary loss of hearing after "Abuhani" repeatedly struck hard blows to her ears with "his big hands." She received no medical attention after this event and reported having hearing difficulties for almost two years.

21. Miss Odeh described at times she felt like throwing herself out of a window, that she had no information to share. She stated she was beaten all over her body with hands, fists, wooden batons, and metal rods, and kicked with boots. She stated her body was covered with dark bruising and her face was swollen and bruised as well. At times she could not stand without help. She said she often fainted, or lost consciousness. She described feeling "broken, tired, and unable to move, like a dead body." She also said she was left naked most of the time and tortured in front of detained men and that this was "a big shame for everyone."

22. Ms. Odeh recalled one experience where she was taken to a room and was naked, the soldiers used chains to restrain her arms and also to chain her legs spread wide. They brought detained men into the room and told her that the men were going to have sex with her. She recognized one of the men as her fiancé. She stated that she does not know what happened because "I fainted."

23. Another incident Ms. Odeh described was being made to watch the electrical torture of a man named Qassem Abu Ackar. She was made to watch as they tortured him and used electric charges to his genitals. He called out to her asking Ms. Odeh to tell his pregnant wife to take care of their baby. Mr. Ackar died during his torture and Ms. Odeh was made to watch.

24. During one of the interrogations, she was in a room naked and being beaten in front of other male detainees. At some point she was taken into another room and electric wires were attached all over her body. Ms. Odeh pointed to her chest, her abdomen, her genitals, her legs and arms. She described that there was a device that looked like a thick pen that would be placed near an electric wire connection and when it touched her skin, she would feel a strong electric shock. She reported that the interrogator told her they would kill her with electricity if she did not tell them everything.

25. Ms. Odeh reported that other prisoners could see and hear her being tortured with electricity and she heard them being told that if they did not provide information, the same thing would happened to them. Ms. Odeh remembered that she was told the same thing as she witnessed the death of Qassem Abu Ackar from electrical torture.

4

26. Another time, Ms. Odeh stated she was placed in a room with another man who she saw had an open, infected head wound. His body and face was severely bruised and swollen. Ms. Odeh said her body was naked, bruised, and swollen as well. When he looked at her and smiled, she recognized him as her fiancé. She realized they were being watched, that everyone could see this meeting.

27. Another incident that Ms. Odeh recalled involved her being tortured in front of a young woman. Ms. Odeh was being severely beaten and her body was already severely bruised and swollen. She heard the soldiers tell the young woman that she could stop the torture if she confessed to whatever they asked. Ms. Odeh stated, "I felt like I was dead and in hell."

28. Ms. Odeh described another event when a woman dressed in a short black dress (above the knees) wearing black spike heels came into the room where Ms. Odeh was on the floor naked and began walking on her. Ms. Odeh said the woman pressed the spike heels into her body and ground them into her. She stepped all over her body and was also pinching her all over the body, including her breasts. The woman told her that she was being prepared to have sex with a man.

29. Ms. Odeh described another event where she was again naked on a floor and semi-conscious. She became aware of someone being brought into the room by many soldiers. It was her father and the soldiers ordered him to have sex with his daughter. She heard her father scream, cry, and protest as they ordered him to strip off his clothes. They were beating him. He fainted. Ms. Odeh stated she tried to move, but the soldiers began kicking her repeatedly and she passed out. When she regained consciousness, she was in another room covered with a soiled blanket.

30. Ms. Odeh reported that during the event described in #25, "I felt I would sign anything they wanted to protect him [father]." She stated that the accumulation of all the acts of torture had resulted in her being willing to confess to anything.

31. After the incident with her father (#25), the interrogator who identified as Iraqi, "Ezra Kaloge", told Ms. Odeh that she better provide the information they wanted or else they would bring her father back and force him to have sex with her. He also said that other prisoners who have not been with a woman for a long time would have her as well. He encouraged her to "save your father." He told her that she should tell them what she knows. Ms. Odeh said she strongly wanted to save her father and other family members from any more suffering and torture.

32. As she heard screams of people being tortured, Ms. Odeh stated, "I know how I was tortured, others are being tortured in the same way." She reported she began to believe that she had to tell them whatever they wanted. She described feeling pressure build up inside of her that she had to tell them whatever they wanted.

33. Ms. Odeh stated it was at this point in time of her detention that she signed a confession. She asked them to tell her what they wanted her to confess. She said she did what they asked, it did not matter to her at the time what

5

she was signing, she would sign anything to avoid them from continuing to torture her father.

34. After she signed the confession, she was in a room with other soldiers and interrogators. The primary torturer identified by Ms. Odeh as "Abuhani" entered the room and took her into another room that had a table and chairs. She described that he sat on the table and put one leg up on a chair. He told her to come to him and when she stayed back, he pulled her by her hair and held her between his legs. Ms. Odeh stated she spit on him and swore. He told her that he was not going to have sex with a dirty girl and that he did not want to have sex with her. He unzipped his pants and pulled out his penis which was enlarged and told her she could see he needed sex, but not with her as she was dirty and smelly. Ms. Odeh said she turned her back to him, but then reached behind her and pulled his penis. "Abuhani" screamed and began beating her.

35. Ms. Odeh reported she was then taken to another empty room. The woman in the spike heels returned and began stepping all over her body and pinching her. Ms. Odeh described that the woman pushed the heels hard into her body, pinched her all over, and again told her, she was being prepared to have sex.

36. Ms. Odeh then stated that "Abuhani" came into the room and told her that she did not deserve to have a man take her virginity. He showed her a rough, thick wooden stick. Soldiers held her down and spread her legs open and "Abuhani" repeatedly shoved the stick into her vagina. She was aware of others being in the room and later learned that her father had witnessed her sexual assault. Ms. Odeh stated she lost consciousness during the assault.

37. When she regained consciousness, Ms. Odeh stated she was lying in a room in a different part of the building. She reported an older woman, likely a cleaning woman, saw her and spoke kindly to her.

38. After the sexual violence, Ms. Odeh said that she "broke down." She reported that she felt like she was dying. Her sister was allowed to visit. She reported that her sister asked if she had been raped. Ms. Odeh said her sister looked so distress and sexual assault of any kind is such a big shame in her culture, so she said, "I told her no." She explained, "I needed to protect her."

39. Ms. Odeh described that from that experience of sexual assault, "I told myself that this is just a body, it is not who I am." She also stated, "Sexual torture changed me. It affected me. I never married after that."

40. Ms. Odeh stated she remained in Moscovia for a total of 45 days. Interrogation and torture continued even after her confession. She reported that interrogators continued to ask her questions about people and if she responded, "I don't know," she was told that she was not telling them everything. They continued to threaten her with sexual assault.

41. Ms. Odeh stated she remembers thinking that, "They cannot reach my soul. This is just a body. Even if my body dies, my soul will live." She stated she realized that she is not able to stop them from torturing her or anyone else.

42. During the time of imprisonment in Ramlah, Ms. Odeh reported being in cells with Israeli criminals. She described that prison guards incited acts of violence by the Israeli cellmates toward the Palestinians by calling them names and insulting them. She stated they were physically attacked, garbage was thrown on the beds, and once a fire was started.

43. Ms. Odeh stated during the imprisonment, Arab officials visited and also representatives of Red Cross. She reported after the visits that she and others were punished for disclosing maltreatment and poor conditions.

44. Over time, Ms. Odeh stated that they organized themselves and began to protest the prison conditions in an organized way, several times holding hunger strikes.

45. In late 1977 or early 1978, Ms. Odeh recalled a Muslim religious day when families were not allowed to visit the prisoners. The cell windows were also covered with metal sheets. Prisoners protested by yelling and making noise, demanding that their families to be allowed to visit and to uncover the windows. Prisoners threatened a hunger strike. Ms. Odeh reported soldiers and police entered the prison and sprayed gas. Ms. Odeh stated she was standing by her cell door where there was a small opening and was directly sprayed with gas. She lost her sight. First day, no one believed her when she reported it. Next day, a lawyer (Felicia Langer) came to visit and requested that she be taken to a hospital, but she was not. Then her family was allowed to visit and she fell down a set of stairs when she was not guided to the door where visiting would take place. She was taken to hospital and she reported being seen by a psychologist and a medical doctor. The vision problems lasted approximately one month.

46. In March of 1979, Ms. Odeh was released along with others as part of a prisoner exchange. In April of 1979, she traveled to Geneva, Switzerland where she gave testimony regarding the torture she suffered while detained by Israeli soldiers.

47. At the end of the narrative of her torture and imprisonment, Ms. Odeh stated, "It may have been ten years, but it felt like 100 years."


### Psychological Assessment

48. This evaluator completed the intake and evaluation with Ms. Odeh in six sessions, each approximately three hours long, or a total of eighteen hours. The process included: a diagnostic interview, Kovler intake forms, and the Clinician Administered Post Traumatic Stress Disorder (PTSD) Scale for DSM 5 (CAPS 5) which is a 30 question standardized interview that is considered a gold standard in PTSD diagnosis including the Life Event Checklist (LEC-5) and the PTSD Checklist (PCL-5). The Hopkins Symptom Checklist-25 (HSCL-25) measuring anxiety and depression was also administered.

**Behavioral Observations:**

49. Ms. Odeh is a well-nourished 64 year-old woman of Arab descent. She dressed modestly and neatly in dark slacks and long sleeved tops. She made good eye contact in our meetings and her speech was fluent and logical. Ms. Odeh was friendly and cooperative with the evaluation process and was able to converse in English. She especially relied on the Arabic interpreter during the narrative of her detention and torture experiences.

50. Ms. Odeh's affect was appropriately matched to the content of each session. For example, Ms. Odeh spoke in Arabic when recounting the distressing events of her torture experiences. At these times, she became visibly upset. Her breathing became rapid and she would gasp for breath. Ms. Odeh would cover her face with her hands and cry. Most of the time Ms. Odeh composed herself with short breaks. There was one exception to this when recalled the details of the sexual assault and she asked not to continue. At other times, Ms. Odeh would smile and be able to engage in small talk, especially at the beginning of sessions. She also would become animated and express pleasure when describing her work with the Arab American Action Network. She described with pride how one Arab Muslim woman came to a support group and shared how she had told her husband that she wanted their daughters to be educated and to attend college if that was their wish. She stated she likes to work with women because "they are the foundation of the family and they should be confident and speak their opinions." Her range of emotions was appropriate to the content. There was no evidence of thought disorder.

51. This evaluator found Ms. Odeh's reports both verbally and on paper assessments to be consistent. Ms. Odeh's answers to questions were consistent with her report on diagnostic measures. Ms. Odeh did not appear to over-endorse symptoms, but accurately described symptoms in her own words that are consistent with PTSD. This writer observed no evidence of feigning or malingering. Lastly, Ms. Odeh provided high levels of detail when describing traumatic experiences that remained consistent over time.

**Diagnosis:**

52. Thorough diagnostic interviewing and standardized psychological assessment revealed that Ms. Odeh has experienced symptoms over the past month (the typical time period to assess for the current presence of psychological symptoms) consistent with a diagnosis PTSD.

53. To develop PTSD (Criterion A of PTSD in DSM 5 is the accepted clinical definition of a trauma), one must be exposed to one of the following: "death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence." This exposure can occur directly, by witnessing in person, or by learning a close friend or relative was exposed to trauma. Ms. Odeh reported the following events described in the

8

background section that, in this evaluator's professional opinion, meet criterion A for PTSD:

   a. Exposure to conditions of war that included forced displacement, family separation, bombing, destruction of buildings, and dead bodies;

   b. Being taken from her home in the middle of the night and detained without official charges for 45 days;

   c. While detained, being interrogated with the use of physical assault that included being hit, slapped, kicked, and beaten;

   d. While detained, being repeatedly sexually humiliated, threatened with rape, and sexually assaulted with a wooden baton

   e. Witnessing the torture and abuse of other detained prisoners including her father and two sisters;

   f. Being detained in prison for approximately 10 years following a forced confession solicited with torture;

   g. While in prison, being sprayed with a toxic substance that resulted in temporary blindness.

54. Ms. Odeh reported experiencing the following symptoms within the past month related to the Criterion A events, and also attributed reactivation of symptoms as a result of being required to tell professionals in detail about the torture experiences for the legal case, and additionally the current Israeli-Palestinian conflict which presents reminders of her past pain and suffering. This is consistent with other survivors of war trauma and torture whose symptoms are reactivated when they provide testimony about their experiences and/or when media presents auditory and visual information that reminds them of their past experiences. Her self-reported symptoms are organized below to illustrate how her symptoms appear to be consistent with PTSD. All symptoms included below meet the criteria for their respective PTSD symptoms and were reported as experienced within the past month.

55. Intrusion or Re-experiencing Symptoms (Criteria B of PTSD in DSM 5; one required for diagnosis of this symptom cluster):

     1. *Endorsed* Recurrent, involuntary, and intrusive memories: Ms. Odeh reported experiencing intrusive memories of the torture experiences on a daily basis over the past month. The content of her memories are of events that occurred during the 45 days of detention and interrogation. One example she provided was regarding the electrical shock torture. She described the recent occurrence in the following way, "Last night I could not sleep, it was like a movie and I could see all that happened to me. I saw it in my mind; the electricity is running in my head and my whole body."

     2. *Endorsed* Dissociative reactions (flashbacks): Ms. Odeh reported that she sometimes has flashbacks. She stated it happens more often when she is alone and that being

9

with others helps her. Although she stated it has also happened at work where she will be trying to work, but intrusive thoughts about her torture enter her mind and then "I lose where I am, I am back being tortured. Then I awake and I see where I am. I feel powerless afterwards. My body feels dead. I try to get up and walk around." This is consistent with the experience of a PTSD flashback. She stated the flashbacks are typically triggered by intrusive memories and reports that intrusive memories occur more often than flashbacks. The lower frequency compared to intrusive memories and tendency for flashbacks to be triggered is consistent with my clinical experience and understanding of the scientific literature on PTSD.

3. *Endorsed* Traumatic nightmares: Ms. Odeh reported an increase in nightmares, which she stated occur two to three times per week, and is related to the torture during the 45 day detention at Moskovia. She cited a recent example of dreaming of the night she was taken from her home and the interrogation and torture that took place. She stated she woke up screaming, crying, and feeling like she could not catch her breath. Consistent with traumatic nightmares, Ms. Odeh reported that when she wakes up from the dream, she is initially confused about where she is, but is able to orient herself. She stated that when she has nightmares, she is unable to sleep again and remains awake for the remainder of the night.

4. *Endorsed* Marked physiological reactivity after exposure to the trauma-related stimuli: Ms. Odeh described that certain thoughts and feelings (e.g. recalling a torture event), as well as situations (e.g. seeing images of war or torture on TV) trigger headaches, difficulty breathing, increased heart rate, pain in her stomach, and nausea. This reportedly has increased in occurrence with her legal case and the current conflict between Israelis and Palestinians.

5. *Endorsed* Intense prolonged or psychological distress after exposure to traumatic reminders: Ms. Odeh described feeling nervous, angry and upset when recalling the 45 days of interrogation and torture. She reported, however, "It is part of the whole torture, it continues, you cannot escape." She remarked again that having to talk with this evaluator and her lawyers, and then the news makes her remember. She stated, "I try to escape, but it all reminds me."

10

56. Avoidance (Criterion C of PTSD in DSM 5; one required for diagnosis of this symptom cluster):

1. *Endorsed* Trauma-related thoughts or feelings: Ms. Odeh reported, "In general, I do not like to speak about my feelings about the torture with others, but I cannot avoid." She stated she tries to avoid by distracting herself, by being with others, and by doing things.

2. *Endorsed* Trauma-related external reminders: Ms. Odeh again stated, 'I cannot avoid, my case, my lawyer, the documents, and the media -- everything makes me remember." She went on to say, "I try, but I am not successful."

57. Negative alterations in cognitions and mood (Criterion D of PTSD in DSM 5; two required for the diagnosis of this symptom cluster):

1. Inability to remember an important aspect of the traumatic events: Miss Odeh did <u>not</u> endorse this symptom, she stated, " I thought I had succeeded in forgetting, but now I know I remember everything. Maybe the time or sequence is not always correct, but I remember every detail."

2. Persistent, distorted cognitions about the cause of the trauma that leads to blaming self or others for what happened: Miss Odeh did <u>not</u> endorse this symptom, she stated, "I do not blame myself, I am a victim."

3. *Endorsed* Persistent (and often distorted) negative beliefs about oneself, others, or the world: Ms. Odeh stated that she grew up in fear as a child, that her family life was disrupted by war, and then she was tortured. She declared, "I don't trust others, I fear harm from others." She also said, "Authorities cannot be trusted, they say one thing and do another." She also shared, "I am suspicious of men. I don't know if it is true, but it is my feeling."

4. *Endorsed* Persistent negative trauma-related emotions: Ms. Odeh reported, "I feel like something is following me. I feel fear and then anger." She stated she tries to control her emotions but sometimes it comes out and she recognizes that she is not managing them well.

5. *Endorsed* Experiencing a loss of interest in significant activities, feeling significantly alienated from others, or difficulty experience positive emotions: Ms. Odeh reported that with her current legal case she has changed. She described, "I use to spend much time in the community for my work; now I just want to get done." She also reported that she loves to read and write and

11

now she does not. These symptoms of altered interests and activities are common in individuals with PTSD.

6. *Endorsed* Persistent inability to experience positive emotions: Ms. Odeh commented, "In general, I am a positive lady. I liked to laugh, to have fun." She then stated, "During this period, I am changed." She described, "I feel like I built a house in the air and now everything has come down again. Everything is destroyed again."

7. *Endorsed* Feelings of detachment from others: Ms. Odeh described feeling as if, "I cannot give my normal self right now." She went on to say, "I do not want to talk to friends. I do not want to affect them." She remarked that she is "struggling with this all the time."

58. Alterations in arousal and reactivity (Criterion E of PTSD in DSM 5; two required for the diagnosis of this symptom cluster):

1. *Endorsed* Irritable behavior and angry outbursts towards others: Ms. Odeh described feeling angry much of the time. She stated, "It comes out. It shows in my face, my voice is sharper. My face has changed, it is just rough and angry now." She denied any physical aggression, but stated, "It is my words." ·

2. *Endorsed* Hypervigilance: Ms. Odeh reported an increase in watchful behavior. She described, "If I see someone sitting in a parked car, I fear they are watching me." She also remarked that she use to feel safe when she saw the police, but now she fears that they will arrest her.

3. *Endorsed* Exaggerated startle response: Ms. Odeh provided multiple examples of strong startle reactions, stating that fireworks remind her of bombings and that thunder causes her to feel fearful and to jump. She said when people ask her what is wrong, "I tell them nothing, but I am having bad memories."

4. *Endorsed* Problems in concentration: Ms. Odeh stated that she has significant concentration difficulties. She describes how at work, she will start an email, but she finds that she has stopped and not finished it. She is just sitting at the computer. She also shared that her boss has commented to her about a reduction in her productivity. She also said when she reads, "It is too difficult; I read the same paragraph 3 or 4 times." She reported that she has the same difficulties with writing.

5. *Endorsed* Sleep disturbance: Ms. Odeh stated that she has problems falling asleep nightly and that she goes to bed but doesn't sleep until "around 4 or 5 am, and I get up at 7 am." She also reported, "last night I did not sleep at all because of the bad memories." Ms. Odeh stated she

12

would like to sleep 6 to 8 hours a night, but that in recent months she never sleeps more than 2 or 3 hours. She described, "All the bad thoughts come to my mind when I go to bed."

6. Reckless or self-destructive behavior: Ms. Odeh did not endorse this symptom and denied any difficulties with aggressive behavior or reckless behavior that are also symptoms of this cluster.

59. Consistent with a diagnosis of PTSD, Ms. Odeh described first having these symptoms during her time in prison following the 45-day period of interrogation and torture. She reported that after some time, maybe two or three years, the symptoms lessened. Upon her release in 1979, she stated, "I was embraced by the community and they supported me." She admitted to periodic reactivation of symptoms especially when exposed to visuals of torture in movies, TV programs, and news reports. She explained, "During movies where there is torture and war, I feel it is my life. I cry and cry. I cannot breathe. It becomes my life." This describes a trigger and flashback experience. Also consistent with diagnostic criteria, Ms. Odeh stated that the current reoccurrence of symptoms are highly distressing and impairing in her life, she commented, "I work to avoid the anger and bad feelings, but they just come; I cannot help it." She also described feeling as if she was two persons, saying, "the inside person is the result of the torture and is fearful, insecure, unsafe, and threatened." She also said, "the person others see is the person I want to be, a strong woman, confident, organized, educated, striving to be the best, a good person." In my clinical experience, torture survivors often present as capable and competent persons, but psychologically, the torture has damaged their sense of self and feelings of insecurity and low self-esteem are common.

**Testing data:**

60. Clinician Administered Post Traumatic Stress Disorder (PTSD) Scale for DSM 5 (CAPS 5) Ms. Odeh met the criteria of the 30 question gold standard measure for PTSD, describing events that met Criterion A of exposure to actual or threatened death, serious injury, or sexual violence and endorsing more than the required one intrusion symptoms (Criterion B) and avoidance symptoms (Criterion C) and describing the more than required two cognition and mood symptoms (Criterion D), arousal and reactivity symptoms (Criterion E). Ms. Odeh has chronic PTSD with reactivation of symptoms when exposed to reminders of the traumatic experiences.

61. PTSD Checklist (PCL-5)

    i. The PCL-5 is a 20-item self-report measure that assesses the 20 DSM-5 symptoms of PTSD.

13

    ii.  Verbal confirmation of understanding of each question was ensured. Clarification was provided when needed with the assistance of the Arabic interpreter.

    iii.  A range of responses were endorsed on this measure, the responses were consistent with self-report and no indication of lack of effort was observed.

    iv.  Ms. Odeh scored a 62 out of a possible 80 on the PCL-5 and the current recommended cut off is 38 indicating the need for further assessment and a score of 49 to 52 is recommended as a more stringent cut off.

    v.  Ms. Odeh also endorsed items based on the DSM-5 diagnostic rule which requires at least: 1 B item (questions 1-5), 1 C item (questions 6-7), 2 D items (questions 8-14), 2 E items (questions 15-20) that suggest PTSD.

    vi.  This measure alone would not be used to diagnose PTSD, but is a gold standard screening tool.

62. Hopkins Symptom Checklist 25 (HSCL-25)

    i.  The HSCL-25 has been used to assess anxiety and depression in Palestinians (Thabet, Dajani & Vostanis, 2012 and Afana, Dalgard, et al, 2002).

    ii.  This measure is a screening tool and would not be used to diagnose an Anxiety Disorder or Depression.

    iii.  Anxiety Subscale

        1.  This tool measures self-reported symptoms of general anxiety.

        2.  Verbal confirmation of understanding of each question was ensured. Clarification was provided when needed with the assistance of the Arabic interpreter.

        3.  A range of responses were endorsed on this measure, the responses were consistent with self-report and no indication of lack of effort was observed.

        4.  Ms. Odeh scored a 2.7 on the anxiety subscale. A score of 1.75 or greater is considered a scientifically validated cut-off for problematic symptoms of anxiety.

        5.  Symptom responses on this subscale were consistent with self-report during diagnostic interviewing.

    iv.  Depression Subscale

        1.  This tool measures self-reported symptoms of depression.

        2.  Verbal confirmation of understanding of each question was ensured. Clarification was provided when needed with the assistance of the Arabic interpreter.

        3.  A range of responses were endorsed on this measure, the responses were consistent with self-report and no indication of lack of effort was observed.

4. Ms. Odeh scored a 2.13 on the depression subscale. A score of 1.75 or greater is considered a scientifically validated cut-off for problematic symptoms of depression.

5. Symptom responses on this subscale were consistent with self-report during diagnostic interviewing.

**Summary:**

63. This evaluator found a high degree of convergence between self-report during diagnostic interviewing, behavioral observations, and testing data; all of which suggest that Ms. Odeh is experiencing symptoms of PTSD and meets diagnostic criteria for PTSD.

64. Symptoms of depression and anxiety are present but are more likely accounted for by PTSD symptoms.

65. These symptoms are highly consistent with Ms. Odeh's self-report of traumatic events (arrest, interrogation, torture, and imprisonment in 1969):

   a. These symptoms were reported as first beginning after the 45 days of torture and during the imprisonment in Ramlah Prison.

   b. These symptoms improved over a time estimated to be approximately two to three years.

   c. These symptoms reoccur when exposed to reminders of the traumatic events, such as the current need to describe in detail the torture experience for legal reasons and the media coverage of the recent conflict between Israelis and Palestinians.

   d. These traumatic events are sufficient (based on DSM 5 criteria) to produce PTSD.

   e. The described symptoms are typical of what someone with PTSD would experience.

   f. The content of these symptoms is highly specific to the traumatic events that occurred (e.g. flashbacks of being tortured when watching a movie depicting torture; intrusive memories about the torture that disrupts sleep; nightmares about being abducted and tortured; fear of police officers in uniform).

   g. Ms. Odeh did not exhibit any behaviors that may suggest feigning (such as over-reporting, reporting of bizarre symptoms) about these symptoms.

66. **DSM 5 Diagnosis: 309.81 Posttraumatic Stress Disorder**

**Referral question and response:**

1. Could PTSD affect Ms. Odeh's interpretation of questions about being arrested, convicted, or in prison on an application for naturalization.

2. Ms. Odeh's report of multiple traumas across her lifespan and in particular the experiences of 25 days of torture, the current reported symptomology, and this evaluator's diagnostic findings are consistent with a diagnosis of Posttraumatic Stress Disorder (PTSD). Ms. Odeh reported a remission of the first episode of PTSD symptoms while in Ramlah prison after approximately two to three years post-torture. The remission of symptoms is disrupted with reoccurrences of symptoms when triggered by reminders. Currently, the reminders are the legal case requiring her to disclose the details of her torture experience and the current Israeli-Palestinian violence resulting in a strong reoccurrence of symptoms. This is consistent with the findings of longitudinal studies in the regarding trajectories of PTSD and reactivation of symptoms over the lifetime. (Mollica, Caridad & Massagli, 2007; Solomon & Mikulincer, 2006; Marshall, Schell, et al, 2005; Eisenman, Gelberg, et al, 2003; Silove, Steel, et al, 2002)

3. Ms. Odeh described, "To speak about the torture is to be tortured again." She stated that she feels "nervous, gets a bad headache, and I feel like I want to throw up" when she talks about "all the bad things." She said to me during one of our sessions, "I do not like to speak about this (torture experiences), but I am obliged to tell you everything."

4. As reported in the symptom section, Ms. Odeh described feeling "fearful, insecure, unsafe, and threatened" on the inside, but wants others to see her as a strong woman who is confident and striving to be her best.

5. The psychological wounds of trauma, such as torture, are complex and enduring. Trauma survivors employ different strategies to help them manage the symptoms. Avoidance (and sometimes even denial) of thoughts, feelings, and activities associated with the trauma is a symptom and is also an attempt to cope with the overwhelming memories of the trauma. It is the intention of the survivor to keep reminders at a distance.

6. Ms. Odeh endorsed all five of the re-experiencing symptoms in Criteria B and both of the avoidance symptoms in Criteria C, although she readily admitted that currently she is not succeeding in avoiding talking about or thinking about the torture due to her legal case and the current violence in Gaza.

7. It is this evaluator's professional opinion based on more than 25 years of working with survivors of torture that the current reactivation of symptoms is proof of Ms. Odeh's vulnerability for reoccurrence of PTSD.

8. It is this evaluator's opinion, to a reasonable psychological certainty, that someone with PTSD would cognitively process questions about the past to avoid recalling traumatic experiences, such as torture, that are at the root of one's disorder.

16

**Treatment Recommendations:**

1. Supportive services be made available by Kovler Center which may include cognitive behavioral therapy to improve and support coping strategies,
2. Psychiatric medication to aid with sleep,
3. Community activities to promote social interaction.

Respectfully submitted by:

_Mary Fabri, PsyD_
Mary Fabri, PsyD
IL License #071-003776

"OFFICIAL SEAL"
F. Sahatqija
Notary Public, State of Illinois
My Commission Expires 10/12/14

F. Sahatqija
July 18, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

                                              Case No.  13-20772
                                              Hon. Gershwin Drain

RASMIEH YUSEF ODEH,

        Defendant.

BRIEF IN SUPPORT OF SUPRESSION MOTION

I.      The "shocking to the judicial conscience" standard must be
        interpreted to create a presumption of non-voluntariness for 5th
        Amendment purposes in facially coercive foreign custodial
        interrogation

      Involuntary confessions, obtained under conditions of duress or coercion, are

inadmissible under the 5th Amendment protection against self-incrimination.

*Hogan*, 378 U.S. 1, 7 (1964); *Bram v. United States*, 168 U.S. 532, 542-

543 (1897); *Missouri v. Seibert*, 542 U.S. 600, 652-653 (2003); *Miranda v.*

*Arizona*, 384 U.S. 436 (1966). As the "privilege against self-incrimination

guaranteed by the Fifth Amendment is a fundamental trial right of criminal

defendants," violations can only occur at the introduction of coerced testimony at

trial. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990). Therefore the

1

territory in which the defendant was coerced into giving involuntary statements, or national-affiliation of the agent who extracted the statement is immaterial to the 5th Amendment inquiry.

A confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will." *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).]

A coerced confession is offensive to basic standards of justice, not because the victim has a legal grievance against the police, but because declarations procured by torture are not premises from which a civilized forum will infer guilt." *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944).

In *United States v. Mandujano*, 425 U.S. 564, 587-89 (1976) the Supreme Court stated that: "This Court has consistently emphasized and, more importantly, has stood fast to ensure the essential premise underlying our entire system of criminal justice, that 'ours is an accusatorial and not an inquisitorial system' --- a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth."

2

Countless opinions express the Court's determination to enforce the guarantee of an adversary system embodied in our Bill of Rights in the face of attempts, in the name of expediency and in ignorance of the lessons of history, to utilize inquisitional procedures. And the successful maintenance of the adversary system when threatened by these sometimes blatant but often more subtle assaults has had as a core underpinning the vigilance of this Court in jealously guarding the right of every person not to be compelled to be a witness against himself. of our liberty - 'one of the great landmarks in man's struggle to make himself civilized.'"

*Ullman vs United States*, 350 U.S. 422, 427 (1956)

## II.   Coerced confessions also violate International Law Binding on the U.S. Courts

The treatment and methods used against Ms. Odeh to obtain her alleged confession violated international law covenants against Cruel, Inhuman or Degrading Treatment or Punishment which are binding on U.S. courts.

Under Article 6 clause 2 of the United States Constitution, commonly referred to the Supremacy Clause," a ratified treaty is part of the supreme law of the land and binding on federal and state courts." (??)   Similarly, customary international law – *jus cogens* – is also part of U.S. law, equally binding on state and federal courts. See *Paquette Habana*, 175 U.S. 677. 700 (1900)

3

The United States Court of Appeals for the Second Circuit in *Filartega v. Pena-Irala*, 630 F.2d 876 (2d Cir 1980), held that the prohibitions against torture were so universally accepted that they have become part of customary international law binding on the United States. "We conclude that official torture is now prohibited by the law of nations. The prohibition is clear and unambiguous, and admits of no distinction between treatment of aliens and citizens." Id. at 885

The United States Senate has ratified the "Convention against Torture (CAT). The convention, a treaty also binding on the U.S., makes clear that there are "no exceptional circumstance s whatsoever, " including a state of war or any other public emergency, which can justify torture . These long-standing principles and rules are completely clear and unambiguous, and require that this honorable Court order suppression of any and all statements said to have been made by the defendant while in Israeli custody, along with all other evidence allegedly recovered as 'fruit of the poisonous tree' of her illegal arrest and interrogation in Jerusalem in 1969.

**III.    Ms Odeh is Entitled to Discovery to Establish her Suppression Claim**

Pursuant to Federal Rule of Criminal procedure 16 (a) (1)(E), Ms. Odeh is entitled to discovery to sustain her burden to show that her statements made to the Israeli authorities were not made of her own free will and the methods used

against were shocking to the conscious. See *United States v. Soto-Zuniga,* 837 F.2d 992, 1000 (9th Cir. 2016).

Clearly, Ms. Odeh is entitled to know the identity of her interrogators, and have them produced in court for a suppression hearing. Further, the defense is entitled to know the written protocols and methods that these interrogators were authorized to employ, and any and all writings which document these procedures and Ms. Odeh's interrogation.

Dated 3/15/17                                        Respectfully submitted,

                                                             "/s/"  Michael E. Deutsch

                                                             MICHAEL E. DEUTSCH
                                                             People's Law Office
                                                             1180 N. Milwaukee Avenue
                                                             3rd Floor
                                                             Chicago, Illinois 60622
                                                             (773)235-0070

5

## CERTIFICATE OF SERVICE

I herby certify that on March 15, 2017, I electronically filed or caused to be filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF filers.

/s/ Michael E. Deutsch
People's Law Office
1180 N. Milwaukee Ave.
Chicago, Il 60642
773-235-0070

Dated: March 15, 2017